# 21-2883

## IN THE
## United States Court of Appeals
### FOR THE SECOND CIRCUIT

United States of America,

*Appellee*,

v.

Wallace Best, AKA Coop, Jeffrey Thomas, AKA Zig, Oscar Zavala, AKA Manuel Garcia Martinez, AKA Oscar Rangel Zavala, AKA Oscar Zavala Rangel, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, AKA JB, AKA Cash, Tomasz Turowski, Jason Cox, Oscar Garcia-Hernandez, AKA Psych, Lamont D. Jefferies,

*Defendants*,

Constantino Acosta-Banda,

*Defendant - Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

### APPENDIX

---

Robin Christine Smith, Esq.
Leean Othman, Esq.
Law Office of Robin C. Smith, Esq., P.C.
802 B Street
San Rafael, California 94901
(415) 726-8000
rcs@robinsmithesq.com

*Counsel for Defendant-Appellant*

**LANTAGNE LEGAL PRINTING**
**801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**

## **TABLE OF CONTENTS**

**Page**

Docket Entries ............................................................................1

Plea Agreement (Dkt. 358), filed 3/4/21............................................. 21

Transcript of Plea Proceedings on 3/4/21 .......................................... 30

Second Superseding Indictment (Dkt. 372), filed 3/15/21 ............................ 82

Sentencing Memorandum of Defendant (Dkt. 645), filed 10/19/21................. 92

Sentencing Memorandum of United States (Dkt. 647), filed 10/26/21 ........ 111

Judgment (Dkt. 659), filed 11/16/21 ............................................... 122

Notice of Appeal (Dkt. 662), filed 11/17/21 .................................... 128

Transcript of Sentencing Hearing on 11/22/21 ............................................ 131

CT CMECF NextGen                                    https://ecf.ctd.uscourts.gov/cgi-bin/DktRpt.pl?339247476381751-L_1_0-1

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,EFILE,INTERP,MOTREF,SALM,WIG

# U.S. District Court
## District of Connecticut (New Haven)
## CRIMINAL DOCKET FOR CASE #: 3:20-cr-00028-VAB-6

Case title: USA v. Best et al                      Date Filed: 02/19/2020

                                                   Date Terminated: 11/16/2021

Assigned to: Judge Victor A. Bolden
Referred to: Judge Sarah A. L. Merriam
USMJ

### Defendant (6)

**Constantino Acosta-Banda**          represented by   **John D. Maxwell**
*TERMINATED: 11/16/2021*                              Brown, Paindiris & Scott
                                                      2252 Main St.
                                                      Glastonbury, CT 06033
                                                      860-659-0700
                                                      Fax: 860-652-4382
                                                      Email: jmaxwell@bpslawyers.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      Designation: CJA Appointment

### Pending Counts                                    ### Disposition

CONSPIRACY TO DISTRIBUTE
CONTROLLED SUBSTANCE
(Conspiracy to Distribute, and to Possess             Dismissed by government's oral motion
with Intent to Distribute, Heroin and
Fentanyl)
(1)

CONSPIRACY TO DISTRIBUTE                               Defendant is hereby committed to the
CONTROLLED SUBSTANCE;                                 custody of the Federal Bureau of Prisons to
Conspiracy to Distribute and to Possess               be imprisoned for a total of 70 months;
With Intent to Distribute Heroin and                  supervised release for a total term of 3
Fentanyl                                              years; special assessment of $100 shall be
(1s)                                                  paid immediately.

### Highest Offense Level (Opening)

Felony

**1**

**Terminated Counts**                                          **Disposition**

None


**Highest Offense Level (Terminated)**

None


**Complaints**                                                **Disposition**

21:846=CP.F (Conspiracy to Possess with
Intent to Distribute Heroin)

---

**Plaintiff**

**USA**                               represented by   **Karen L. Peck**
                                                      DOJ-USAO
                                                      1000 Lafayette Boulevard
                                                      Ste 10th Floor
                                                      Bridgeport, CT 06640
                                                      203-668-3905
                                                      Email: karen.peck@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Retained*

                                                      **Katherine Elizabeth Boyles**
                                                      DOJ-USAO
                                                      157 Church St.
                                                      25th Floor
                                                      New Haven, CT 06510
                                                      203-931-5088
                                                      Email: katherine.boyles@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Lauren C Clark**
                                                      DOJ-USAO
                                                      1000 Lafayette Boulevard
                                                      Ste 10th Floor
                                                      Bridgeport, CT 06604
                                                      203-696-3019
                                                      Email: lauren.clark@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Retained*

                                                      **Leonard C. Boyle**
                                                      U.S. Attorney's Office-NH
                                                      157 Church St., 25th Floor

New Haven, CT 06510
203-821-3700
Email: leonard.boyle@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2020 | | Arrest of Constantino Acosta-Banda in Southern District of California (San Diego). (Fazekas, J.) (Entered: 03/11/2020) |
| 02/12/2020 | 1 | SEALED COMPLAINT as to Constantino Acosta-Banda (1). (Attachments: # 1 Affidavit) (Torres, K.) [3:20-mj-00130-WIG *SEALED*] (Entered: 02/12/2020) |
| 02/12/2020 | 3 | SEALED MOTION to Seal - by USA as to Constantino Acosta-Banda. (Torres, K.) [3:20-mj-00130-WIG *SEALED*] (Entered: 02/12/2020) |
| 02/12/2020 | 4 | ORDER granting 3 Sealed Motion as to Constantino Acosta-Banda (1). Signed by Judge William I. Garfinkel on 2/11/2020. (Torres, K.) [3:20-mj-00130-WIG *SEALED*] (Entered: 02/12/2020) |
| 02/19/2020 | 13 | SEALED INDICTMENT returned before Judge Sarah A. L. Merriam with the signature of the foreperson redacted. Grand jury number N-19-1 as to Wallace Best (1) count(s) 1, Jeffrey Thomas (2) count(s) 1, Jason Cox (3) count(s) 1, Warrant to issue as to Oscar Garcia-Hernandez (4) count(s) 1, Oscar Zavala (5) count(s) 1, Constantino Acosta-Banda (6) count(s) 1, Gustavo Gonzalez-Yanez (7) count(s) 1, Jesus Mendez (8) count(s) 1, David Azarias Morales-Verdugo (9) count(s) 1. (Caffrey, A.) (Entered: 02/19/2020) |
| 02/19/2020 | 14 | Unredacted document with FOREPERSON'S SIGNATURE as to defendant(s)Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo. Access to the pdf document is restricted pursuant to Federal Rule of Criminal Procedure 49.1(e). (Caffrey, A.) (Entered: 02/19/2020) |
| 02/19/2020 | 21 | REDACTED INDICTMENT returned before Judge Sarah A. L. Merriam with the signature of the foreperson redacted. Grand jury number N-19-1 as to Wallace Best (1) count(s) 1, Jeffrey Thomas (2) count(s) 1, Jason Cox (3) count(s) 1, Oscar Zavala (5) count(s) 1, Constantino Acosta-Banda (6) count(s) 1, Gustavo Gonzalez-Yanez (7) count(s) 1, Jesus Mendez (8) count(s) 1, David Azarias Morales-Verdugo (9) count(s) 1. (Perez, J.) (Entered: 03/04/2020) |
| 02/27/2020 | 27 | Rule 5 Documents Received as to Constantino Acosta-Banda. (Fazekas, J.) (Entered: 03/11/2020) |
| 03/03/2020 | 18 | SEALED MOTION - Governments Sealed Motion to Unseal by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo. (Attachments: # 1 Attachment, # 2 Proposed Order)(Fazekas, J.) (Entered: 03/03/2020) |
| 03/04/2020 | 20 | ORDER granting 18 Sealed Motion as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9). Signed by Judge Victor A. |

| | | |
|---|---|---|
| | | Bolden on 3/4/2020. (Perez, J.) (Entered: 03/04/2020) |
| 03/04/2020 | 22 | CASE UNSEALED as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo.(Perez, J.) Modified on 3/4/2020 (Perez, J.). (Entered: 03/04/2020) |
| 03/04/2020 | 23 | ELECTRONIC FILING ORDER FOR COUNSEL as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER Signed by Judge Victor A. Bolden on 3/4/2020. (Perez, J.) (Entered: 03/04/2020) |
| 03/27/2020 | | Attorney update in case as to Constantino Acosta-Banda. Attorney John D. Maxwell for Constantino Acosta-Banda added. (Imbriani, Susan) (Entered: 03/27/2020) |
| 03/31/2020 | 50 | ATTORNEY APPEARANCE: John D. Maxwell appearing for Constantino Acosta-Banda (Maxwell, John) (Entered: 03/31/2020) |
| 04/06/2020 | 59 | First MOTION to Seal Motion for Protective Order by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo. (Peck, Karen) (Entered: 04/06/2020) |
| 04/06/2020 | 60 | First SEALED MOTION In Re: Motion for Protective Order - by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo. (Attachments: # 1 Text of Proposed Order)(Peck, Karen) (Entered: 04/06/2020) |
| 04/07/2020 | 66 | ORDER granting 59 Motion to Seal as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9). The Court finds that good cause exists to seal these documents and that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons. See D. Conn. L. Crim. R. 57(b)(1)(A). Signed by Judge Victor A. Bolden on 4/7/2020. (Perez, J.) (Entered: 04/07/2020) |
| 04/07/2020 | 67 | PROTECTIVE ORDER granting 60 Sealed Motion as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9). Signed by Judge Victor A. Bolden on 4/7/2020. (Perez, J.) Modified on 4/7/2020 to include Jason Cox (3) (Perez, J.). (Entered: 04/07/2020) |
| 04/30/2020 | 78 | MOTION for Speedy Trial finding re: Exigent Circumstances by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo. (Clark, Lauren) (Entered: 04/30/2020) |
| 05/04/2020 | 81 | ORDER granting 78 Motion Specific Findings on Exigent Circumstances as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), and David Azarias Morales-Verdugo (9). The Court concludes that the ends of justice will be served by granting the requested speedy trial waiver, outweighing the best interest of the public and the Defendants in a speedy trial. The District of Connecticut has issued several General Orders related to changes and restrictions due to the coronavirus ("COVID-19"), including suspending jury selections and jury trials, limiting specific |

| | | |
|---|---|---|
| | | categories of people from entering federal courthouses, and continuing all in-court (in-person) civil and criminal proceedings. Most recently, the limitations, suspensions, and continuations have been extended through June 15, 2020. As COVID-19 continues to affect the ability to conduct in-court proceedings and the normal functioning of the court, the Court orders the period between March 24, 2020 and June 15, 2020 should be excluded from the Speedy Trial Act clock under 18 U.S.C. § 3161(h)(7)(A). Signed by Judge Victor A. Bolden on 5/4/2020. (Garcia, A.) (Entered: 05/04/2020) |
| 06/17/2020 | | NOTICE regarding hearing via Zoom as to Wallace Best, Jeffrey Thomas, Constantino Acosta-Banda, Jesus Mendez: The Arraignment scheduled for 6/18/2020 at 2:00 will be conducted via Zoom.Hearings will proceed as follows:<br><br>2:00 p.m. Mendez<br>2:15 p.m. Thomas<br>3:00 p.m. Acosta - Banda<br>3:15 p.m. Best<br><br>The video link is https://www.zoomgov.com /j/1607149115?pwd=OHJldk1WOTRHNWNiWDVWczJqZXdvUT09 and call in number is 1 646 828 7666.<br><br>Meeting ID: 160 714 9115<br><br>Meeting Password: 20cr28<br><br>Please note: Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, screenshots, streaming, and rebroadcasting in any form, of court proceedings. The Judicial Conference of the United States, which governs the practices of the federal courts, has prohibited it. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Torres, K.) (Entered: 06/17/2020) |
| 06/18/2020 | 100 | **Entered in Error** NOTICE OF E-FILED CALENDAR as to Wallace Best, Jeffrey Thomas, Constantino Acosta-Banda, Jesus Mendez: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. ( Arraignment set for 6/18/2020 02:00 PM before Judge William I. Garfinkel) (Torres, K.) Modified on 6/18/2020 (Torres, K.). (Entered: 06/18/2020) |
| 06/18/2020 | 101 | NOTICE OF E-FILED CALENDAR as to Wallace Best, Jeffrey Thomas, Constantino Acosta-Banda, Jesus Mendez: Arraignment set for 6/18/2020 02:00 PM before Judge William I. Garfinkel (Torres, K.) (Entered: 06/18/2020) |
| 06/18/2020 | 104 | Minute Entry for proceedings held before Judge William I. Garfinkel:Initial Appearance and Arraignment as to Constantino Acosta-Banda (6) Count 1 held on 6/18/2020, Not guilty Plea entered on Count 1. (Defendant motions due 7/9/2020; Government responses due 7/23/2020. Jury Selection set for 8/3/2020 09:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden) Defendant detained. 17 minutes(Court Reporter S. Montini.)(Torres, K.) (Entered: 06/22/2020) |

| 06/18/2020 | 105 | ORDER OF DETENTION as to Constantino Acosta-Banda. Signed by Judge William I. Garfinkel on 6/18/2020. (Torres, K.) (Entered: 06/22/2020) |
|---|---|---|
| 07/09/2020 | 124 | Consent MOTION for Speedy Trial *Findings re: COVID-19*, Consent MOTION for Order Re: Trial Schedule by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo. (Clark, Lauren) (Entered: 07/09/2020) |
| 07/13/2020 | 125 | ORDER granting 124 Motion for Speedy Trial as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9).

The Court concludes that the ends of justice will be served by granting the requested speedy trial waiver, outweighing the best interest of the public and the Defendants in a speedy trial. The District of Connecticut has issued several General Orders related to changes and restrictions due to the coronavirus ("COVID-19"), including suspending jury selections and jury trials, limiting specific categories of people from entering federal courthouses, and continuing all in-court (in-person) civil and criminal proceedings. Most recently, the limitations, suspensions, and continuations have been extended through September 1, 2020. COVID-19 continues to affect the ability to conduct in-court proceedings and the normal functioning of the court, including the ability of counsel to review discovery and meet with Defendants. Trial preparation demands close contact with witness and close collaboration with parties. Furthermore, counsel have began negotiations to potentially resolve the Defendants' cases without trial. Accordingly, the Court orders the period between June 15, 2020 and February 1, 2021 should be excluded from the Speedy Trial Act clock under 18 U.S.C. § 3161(h)(7)(A).

The Court adopts the following pre-trial schedule:
- Substantive motions are due December 1, 2020.
- Responses to substantive motions are due December 8, 2020.
- Joint trial memorandum, including proposed jury instructions, voir dire, and motions in limine, is due January 11, 2021.
- Responses to motions in limine are due January 18, 2021.
- Jencks production is due January 20, 2021.
- Exhibits production is due January 22, 2021.
- The pretrial conference will be scheduled for the week of January 25, 2021.
- Jury selection scheduled for February 1, 2021.

Signed by Judge Victor A. Bolden on 7/13/2020. (Garcia, A.) (Entered: 07/13/2020) |
| 07/13/2020 | 126 | NOTICE OF E-FILED CALENDAR as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Pretrial Conference set for 1/27/2021 12:00 PM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. Jury Selection set for 2/1/2021 09:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. (Garcia, A.) (Entered: 07/13/2020) |

| 07/17/2020 | 127 | NOTICE OF E-FILED CALENDAR as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Pretrial Conference set for 1/27/2021 12:00 PM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. Jury Selection set for 2/1/2021 09:00 PM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. (Perez, J.) (Entered: 07/17/2020) |
| --- | --- | --- |
| 09/22/2020 | 164 | MOTION for Bond *Motion for Pretrial Release* by Constantino Acosta-Banda. (Maxwell, John) (Entered: 09/22/2020) |
| 09/23/2020 | 165 | ORDER REFERRING CASE to Magistrate Judge William I Garfinkel as to Constantino Acosta-Banda 164 MOTION for Bond *Motion for Pretrial Release* filed by Constantino Acosta-Banda. Signed by Judge Victor A. Bolden on 9/23/2020. Motions referred to William I Garfinkel(Perez, J.) (Entered: 09/23/2020) |
| 10/02/2020 | 168 | Memorandum in Opposition by USA as to Constantino Acosta-Banda re 164 MOTION for Bond *Motion for Pretrial Release* (Clark, Lauren) (Entered: 10/02/2020) |
| 10/05/2020 | 169 | SEALED SUPERSEDING INDICTMENT returned before Judge Sarah A. L. Merriam with the signature of the foreperson redacted. Grand jury number N-19-1 as to Wallace Best (1) count(s) 1s, 2s, Jeffrey Thomas (2) count(s) 1s, 2s, Jason Cox (3) count(s) 1s, Oscar Garcia-Hernandez (4) count(s) 1s, Oscar Zavala (5) count(s) 1s, Constantino Acosta-Banda (6) count(s) 1s, Gustavo Gonzalez-Yanez (7) count(s) 1s, Jesus Mendez (8) count(s) 1s, David Azarias Morales-Verdugo (9) count(s) 1s, Frank Jamont Best (10) count(s) 2, 3-7, Tomasz Turowski (11) count(s) 2, 8. Warrant issued as to Turowski, Summons issued for Frank Best, Thomas (Pesta, J.) Modified text on 10/6/2020 (Pesta, J.). (Entered: 10/06/2020) |
| 10/05/2020 | 170 | Unredacted document of 169 with FOREPERSON'S SIGNATURE as to defendant(s)Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski. Access to the pdf document is restricted pursuant to Federal Rule of Criminal Procedure 49.1(e). (Pesta, J.) (Entered: 10/06/2020) |
| 10/05/2020 | 198 | REDACTED SUPERSEDING INDICTMENT returned before Judge Sarah A. L. Merriam with the signature of the foreperson redacted. Grand jury number N-19-1 as to Wallace Best (1) count(s) 1s, 2s, Jeffrey Thomas (2) count(s) 1s, 2s, Jason Cox (3) count(s) 1s, Oscar Zavala (5) count(s) 1s, Constantino Acosta-Banda (6) count(s) 1s, Gustavo Gonzalez-Yanez (7) count(s) 1s, Jesus Mendez (8) count(s) 1s, David Azarias Morales-Verdugo (9) count(s) 1s, Frank Jamont Best (10) count(s) 2, 3-7, Tomasz Turowski (11) count(s) 2, 8. Warrant issued as to Turowski, Summons issued for Frank Best, Thomas(Perez, J.) (Entered: 10/30/2020) |
| 10/06/2020 | 174 | SEALED MOTION - by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski. (Attachments: # 1 Proposed Order)(Caffrey, A.) (Entered: 10/06/2020) |

| | | |
|---|---|---|
| 10/06/2020 | 175 | ORDER granting 174 Sealed Motion as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Garcia-Hernandez (4), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9), Frank Jamont Best (10), Tomasz Turowski (11). Signed by Judge Sarah A. L. Merriam on 10/6/2020. (Caffrey, A.) (Entered: 10/06/2020) |
| 10/16/2020 | 181 | MOTION to Withdraw 164 MOTION for Pretrial Release by Constantino Acosta-Banda. (Fanelle, N.) (Entered: 10/16/2020) |
| 10/22/2020 | 194 | SEALED MOTION- Government's EX PARTE SEALED Motion to Unseal - by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski. (Attachments: # 1 Attachment, # 2 Proposed Order)(Perez, J.) (Entered: 10/30/2020) |
| 10/27/2020 | 193 | ORDER REFERRING CASE to Magistrate Judge William I Garfinkel as to Constantino Acosta-Banda 181 MOTION to Withdraw Document 164 MOTION for Bond *Motion for Pretrial Release* filed by Constantino Acosta-Banda. Signed by Judge Victor A. Bolden on 10/27/2020. Motions referred to William I Garfinkel(Perez, J.) (Entered: 10/27/2020) |
| 10/30/2020 | 195 | ORDER granting 194 Sealed Motion as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9), Frank Jamont Best (10), Tomasz Turowski (11). Signed by Judge Victor A. Bolden on 10/30/2020. (Perez, J.) (Entered: 10/30/2020) |
| 10/30/2020 | 196 | CASE and INDICTMENT UNSEALED as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski. (Perez, J.) (Entered: 10/30/2020) |
| 10/30/2020 | 197 | ELECTRONIC FILING ORDER FOR COUNSEL as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. Signed by Judge Victor A. Bolden on 10/30/2020. (Perez, J.) (Entered: 10/30/2020) |
| 11/19/2020 | 249 | NOTICE OF E-FILED CALENDAR as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephonic Scheduling Conference set for 11/30/2020 03:00 PM before Judge Victor A. Bolden. Dial In: (888) 808-6929; Participant Code: 9284309.(Perez, J.) (Entered: 11/19/2020) |
| 11/30/2020 | 257 | ORDER as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski. Following the parties' November 30, 2020 telephonic scheduling conference, the Court orders the parties, by **December 11, 2020**, to jointly file a proposed schedule. Accordingly, any deadlines between now and |

| | | |
|---|---|---|
| | | December 11, 2020 with respect to motions are extended until December 11th and are subject to further extension based on the December 11th filings.<br>Signed by Judge Victor A. Bolden on 11/30/2020. (Millat, C.) (Entered: 11/30/2020) |
| 11/30/2020 | 270 | Minute Entry for proceedings held before Judge Victor A. Bolden:Telephonic Scheduling Conference as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski held on 11/30/2020. Total time: 27 minutes(Court Reporter S. Montini.)(Perez, J.) (Entered: 12/02/2020) |
| 12/01/2020 | 275 | ORDER granting 181 Motion to Withdraw Document as to Constantino Acosta-Banda (6); withdrawing 164 Motion for Bond as to Constantino Acosta-Banda (6). Signed by Magistrate Judge William I Garfinkel on 12/1/2020. (Torres, K.) (Entered: 12/03/2020) |
| 12/11/2020 | 302 | Second MOTION to Continue *Jury Selection and for Scheduling Order and Exclusion of Speedy Trial Time* by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski. (Peck, Karen) (Entered: 12/11/2020) |
| 12/15/2020 | 311 | ORDER granting 302 Motion to Continue as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9), Frank Jamont Best (10), Tomasz Turowski (11). Based on the parties' 302 joint motion, the Court adopts the following schedule:<br><br>-Substantive motions are due **June 14, 2021**.<br>-Responses to substantive motions are due **July 12, 2021**.<br>-Joint trial memorandum, including proposed jury instructions, voir dire, and motions in limine, are due **August 9, 2021**.<br>-Responses to motions in limine are due **August 16, 2021**.<br>-Production of Jencks material and exhibits due **August 23, 2021**.<br>-Pretrial conference scheduled for **September 2, 2021, at 10:00 a.m.** in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden.<br>-Jury selection scheduled for **September 6, 2021**, with trial to begin immediately thereafter.<br><br>The Court concludes that under 18 U.S.C. § 3161(h)(7)(A), the ends of justice will be served by continuing the date for jury selection, outweighing the best interests of the public and the Defendants in a speedy trial. *See United States v. Lynch*, 726 F.3d 346, 355 (2d Cir. 2013) ("Because the district court had articulated its findings supporting its determination that the ends of justice would be served before granting the continuance, and those findings fulfilled the criteria set out in § 3161(h)(7)(B), the district court complied with *Zedner*.") (citing *Zedner v. United States*, 547 U.S. 489, 491 (2006) (express Speedy Trial Act findings must be put on the record)). As the parties have explained, "the delays in the case caused by the COVID-19 pandemic (including but not limited to periods of quarantine by Government counsel, agents, officers, and staff, as well as certain defendants)," "the safety concerns presented by holding a multi-defendant trial with the ongoing threat of the virus," "the need for counsel to review voluminous discovery that is still being produced and discuss it with their clients," "the fact that the case involves witnesses from areas outside Connecticut... and travel is difficult and restricted during the pandemic," the numerous pending motions, and "the fact that many of the defendants are still discussing |

| | | |
|---|---|---|
| | | potential resolutions of the case against them without a trial," *see* ECF No. 302 at 4, all weigh in favor of continuing the date for jury selection. Therefore, under 18 U.S.C. § 3161(h)(7)(B), given these concerns articulated by the parties, as well as the ongoing nature of the COVID-19 pandemic, the Court finds it appropriate to continue jury selection and trial.<br><br>Accordingly, jury selection is continued until **September 6, 2021**. The Court orders that the time period from February 1, 2021 through September 6, 2021 be excluded from Speedy Trial Act calculations.<br><br>While one of the defendants, Mr. Cox, may not be in full accord with this delay, the ends of justice still will be served by this Order, particularly in light of the numerous pretrial motions filed by Mr. Cox, which still must be resolved, and which Mr. Cox appears to continue filing.<br><br>Signed by Judge Victor A. Bolden on 12/15/2020. (Millat, C.) (Entered: 12/15/2020) |
| 12/15/2020 | 312 | NOTICE OF E-FILED CALENDAR as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 1/27/2021 12:00 P.M.* Pretrial Conference set for 9/2/2021 10:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. *RESET FROM 2/1/2021 8:30 AM* Jury Selection set for 9/6/2021 08:30 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. (Millat, C.) (Entered: 12/15/2020) |
| 02/19/2021 | 340 | NOTICE OF HEARING as to Constantino Acosta-Banda ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION.<br><br>Change of Plea Hearing set for 3/4/2021 10:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden (Clark, Lauren) (Entered: 02/19/2021) |
| 03/03/2021 | 355 | NOTICE OF E-FILED CALENDAR as to Constantino Acosta-Banda: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Change of Plea Hearing set for 3/4/2021 10:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. (Perez, J.) (Entered: 03/03/2021) |
| 03/03/2021 | | NOTICE regarding hearing via Zoom as to Constantino Acosta-Banda: The Change of Plea Hybrid Hearing scheduled for 3/4/2021 10:00 AM will be conducted via Zoom. The public may join by video conference through the Zoom application at https://www.zoomgov.com /j/1603302027?pwd=YVE5S0dlOC9ZNTR5L3FWbTN2TlFSQT09. The public may also access the proceedings by telephone at 1-646-828-7666.<br><br>Meeting ID: 160 330 2027<br><br>Meeting Password: 866861<br><br>Please note: Persons granted remote access to proceedings are reminded of the general |

| | | prohibition against photographing, recording, screenshots, streaming, and rebroadcasting in any form, of court proceedings. The Judicial Conference of the United States, which governs the practices of the federal courts, has prohibited it. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Perez, J.) (Entered: 03/03/2021) |
|---|---|---|
| 03/04/2021 | 357 | Minute Entry for proceedings held before Judge Victor A. Bolden: Change of Plea Hearing as to Constantino Acosta-Banda held on 3/4/2021, Plea entered by Constantino Acosta-Banda (6) Guilty Count 1s. Defendant detained. Proposed sentencing schedule due to Clerk by 3/19/2021. Total Time: 1 hour and 03 minutes(Court Reporter S. Montini.)(Perez, J.) (Entered: 03/05/2021) |
| 03/04/2021 | 358 | PLEA AGREEMENT as to Constantino Acosta-Banda (Perez, J.) (Entered: 03/05/2021) |
| 03/15/2021 | 372 | SEALED SECOND SUPERSEDING INDICTMENT returned before Judge Robert M. Spector with the signature of the foreperson redacted. Grand jury number N-19-1. Wallace Best (1) count(s) 1ss, 2ss, Jeffrey Thomas (2) count(s) 1ss, 2ss, Jason Cox (3) count(s) 1ss, Oscar Garcia-Hernandez (4) count(s) 1ss, Gustavo Gonzalez-Yanez (7) count(s) 1ss, Jesus Mendez (8) count(s) 1ss, David Azarias Morales-Verdugo (9) count(s) 1ss, Frank Jamont Best (10) count(s) 2s, 3s, 4s, 5s-6s, 7s, Tomasz Turowski (11) count(s) 2s, 8s, warrant to issue as to Lamont D. Jefferies (12) count(s) 2. (Murphy, Tatihana) Modified Doc title on 3/17/2021 (Murphy, Tatihana). (Entered: 03/17/2021) |
| 03/15/2021 | 374 | Unredacted document with FOREPERSON'S SIGNATURE regarding Indictment (Sealed),, 372 as to defendant(s)Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies. Access to the pdf document is restricted pursuant to Federal Rule of Criminal Procedure 49.1(e). (Murphy, Tatihana) (Entered: 03/17/2021) |
| 03/25/2021 | 377 | ORDER OF REFERRAL TO PROBATION FOR PRESENTENCE INVESTIGATION AND REPORT as to Constantino Acosta-Banda. First Disclosure-PSI due 5/17/2021; Objections Due 5/31/2021; 2nd-Disclosure PSI due 6/10/2021; Sentencing Memorandum due 6/14/2021; Response due 6/21/2021. Sentencing set for 6/28/2021 10:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. Signed by Judge Victor A. Bolden on 3/25/2021. (Perez, J.) (Entered: 03/25/2021) |
| 03/25/2021 | 378 | NOTICE OF E-FILED CALENDAR as to Constantino Acosta-Banda: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Sentencing set for 6/28/2021 10:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. (Perez, J.) (Entered: 03/25/2021) |
| 03/31/2021 | 383 | MOTION to Unseal Case by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies. (Attachments: # 1 Proposed Order, # 2 Exhibit)(Torres, K.) (Entered: 04/02/2021) |

CT CMECF NextGen                                    https://ecf.ctd.uscourts.gov/cgi-bin/DktRpt.pl?339247476381751-L_1_0-1

| | | |
|---|---|---|
| 03/31/2021 | 403 | ORDER denying 383 Motion to Unseal Case as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9), Frank Jamont Best (10), Tomasz Turowski (11). See doc 390 . Signed by Judge S. Dave Vatti on 3/31/2021. (Torres, K.) (Entered: 04/07/2021) |
| 04/14/2021 | 415 | MOTION to Unseal Second Superseding Indictment and Third Superseding Indictment by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies. (Imbriani, Susan) (Entered: 04/15/2021) |
| 04/22/2021 | 417 | ORDER REFERRING CASE to Judge Sarah A. L. Merriam as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies 415 MOTION to Unseal Document filed by USA.<br>Signed by Judge Victor A. Bolden on 4/22/2021. Motions referred to Judge Sarah A. L. Merriam.(Perez, J.) (Entered: 04/22/2021) |
| 04/22/2021 | 418 | ORDER as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies.<br>The government has filed a motion to unseal the Second Superseding Indictment (Doc. # 372 ) and the Third Superseding Indictment (Doc. # 387 ). See Doc. # 415 . The Court currently intends to grant the motion, and to unseal the docket in this matter. If any party objects to this planned unsealing, counsel may file an objection on the docket no later than **April 26, 2021.**<br>It is so ordered.<br>Signed by Judge Sarah A. L. Merriam on 4/22/2021. (Merriam, Sarah) (Entered: 04/22/2021) |
| 05/10/2021 | 439 | MOTION to Enlarge Sentencing Deadlines by Constantino Acosta-Banda. (Perez, J.) (Entered: 05/10/2021) |
| 05/10/2021 | 440 | ORDER: The government has filed a motion seeking to maintain all references to Defendant #4 in this matter under seal. See Doc. #383. The Court inquired of counsel for the government today regarding the need for continued sealing. It appears likely that Defendant #4 is aware of the charges filed. Further, counsel for the co-defendants, and the co-defendants themselves, are apparently aware of the identity of Defendant #4.<br>Local Rule 57(b)(2) provides that an indictment and accompanying arrest warrant "may be filed under seal if the court finds that sealing is necessary for the safety of any person or for any compelling law enforcement reason." D. Conn. L. Crim. R. 57(b)(2). However, absent particularized findings regarding sealing, "upon the initial appearance of the first defendant arrested in the case, the entire case must be unsealed and the full caption must be entered on the docket sheet." Id. The original indictment and first superseding indictment were redacted at the request of the government, in effect sealing the matter as to Defendant #4 only. See Doc. #20, Doc. #195.<br>On March 15, 2021, a Second Superseding Indictment was returned and accepted as to certain defendants. See Doc. #372, Doc. #373. A Third Superseding Indictment was returned and accepted as to all defendants on March 29, 2021. See Doc. #387. Both of |

| | | |
|---|---|---|
| | | those indictments were sealed completely, thereby placing the entire matter under seal. The Court finds that while there were adequate reasons to maintain sealing of this matter as to Defendant #4 at the times of the prior sealing orders issued on March 4, 2020, (Doc. #20) and on October 30, 2020, (Doc. #195) the government has not articulated a sufficient basis to maintain sealing as to Defendant #4 under the current circumstances. Specifically, it appears that the information sought to be kept under seal is already widely known, and "the proverbial bell cannot be un-rung once information has already been publicly disclosed." Vineyard Vines, LLC v. MacBeth Collection, L.L.C., No. 3:14CV01096(SALM), 2019 WL 12024583, at *4 (D. Conn. Apr. 1, 2019). The Court therefore intends to unseal the docket in this matter. If the government wishes to file a supplemental motion for continued sealing, setting forth a basis for particularized findings demonstrating that sealing is warranted under the Local Rules and precedent, it may file such a motion on the docket no later than **May 13, 2021**. If no such motion is filed, this matter will be unsealed on May 14, 2021, without redactions to the Second and Third Superseding Indictments. It is so ordered. Signed by Judge Sarah A. L. Merriam on 5/10/2021. (Caffrey, A.) (Entered: 05/10/2021) |
| 05/11/2021 | 448 | ORDER granting 439 Motion for Extension of Time as to Constantino Acosta-Banda (6). New date to follow. Signed by Judge Victor A. Bolden on 05/11/2021. (Millat, C.) (Entered: 05/11/2021) |
| 05/14/2021 | 457 | AMENDED ORDER OF REFERRAL TO PROBATION FOR PRESENTENCE INVESTIGATION AND REPORT as to Constantino Acosta-Banda. First Disclosure-PSI due 7/1/2021; Objections Due 7/15/2021; 2nd-Disclosure PSI due 7/25/2021; Sentencing Memorandum due 7/29/2021; Response due 8/5/2021. Sentencing set for 8/12/2021 10:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. Signed by Judge Victor A. Bolden on 5/14/2021. (Perez, J.) (Entered: 05/14/2021) |
| 05/14/2021 | 458 | NOTICE OF E-FILED CALENDAR as to Constantino Acosta-Banda: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 6/28/2021* Sentencing set for 8/12/2021 10:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. (Perez, J.) (Entered: 05/14/2021) |
| 05/14/2021 | 460 | ORDER granting 415 Motion to Unseal Document as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Garcia-Hernandez (4), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9), Frank Jamont Best (10), Tomasz Turowski (11), Lamont D. Jefferies (12). On May 10, 2021, the Court issued an Order indicating its intent to unseal the docket in this matter, making no redactions to the Second and Third Superseding Indictments, on May 14, 2021. See Doc. #440. The government was afforded an opportunity to file a supplemental memorandum in support of sealing, but elected not to do so. As previously noted, the Court finds that "the government has not articulated a sufficient basis to maintain sealing as to Defendant #4 under the current circumstances." Doc. #440. Accordingly, the docket in this matter will be unsealed, including information regarding Defendant #4. It is so ordered. Signed by Judge Sarah A. L. Merriam on 5/14/2021. (Caffrey, A.) (Entered: 05/14/2021) |

| 05/14/2021 | | CASE UNSEALED as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies, INDICTMENT UNSEALED as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies (Caffrey, A.) (Entered: 05/14/2021) |
| --- | --- | --- |
| 06/16/2021 | 521 | Second MOTION for Extension of Time to Enlarge Sentencing Deadlines until 30 Days by Constantino Acosta-Banda. (Maxwell, John) (Entered: 06/16/2021) |
| 06/17/2021 | 522 | ORDER granting 521 Motion for Extension of Time as to Constantino Acosta-Banda (6). Scheduling order to follow. Signed by Judge Victor A. Bolden on 06/17/2021. (Millat, C.) (Entered: 06/17/2021) |
| 06/21/2021 | 524 | AMENDED ORDER OF REFERRAL TO PROBATION FOR PRESENTENCE INVESTIGATION AND REPORT as to Constantino Acosta-Banda. First Disclosure-PSI due 8/4/2021; Objections Due 8/18/2021; 2nd-Disclosure PSI due 8/28/2021; Sentencing Memorandum due 9/1/2021; Response due 9/8/2021. Sentencing set for 9/15/2021 12:00 PM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. Signed by Judge Victor A. Bolden on 6/21/2021. (Perez, J.) (Entered: 06/21/2021) |
| 06/21/2021 | 525 | NOTICE OF E-FILED CALENDAR as to Constantino Acosta-Banda: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 8/12/2021* Sentencing set for 9/15/2021 12:00 PM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. (Perez, J.) (Entered: 06/21/2021) |
| 07/02/2021 | 548 | MOTION for Order Re: Protective Order *re: Disclosures* by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies. (Attachments: # 1 Text of Proposed Order)(Peck, Karen) (Entered: 07/02/2021) |
| 07/06/2021 | 551 | Set/Reset Deadlines re Motion or Report and Recommendation in case as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies as to 548 MOTION for Protective Order re: Disclosures. Any responses to the 548 motion for a protective order shall be due by **July 16, 2021.** (Millat, C.) (Entered: 07/06/2021) |
| 07/13/2021 | 556 | Consent MOTION to Continue *Government's Response to Substantive Motions* by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies. (Clark, Lauren) (Entered: 07/13/2021) |
| 07/14/2021 | 557 | ORDER granting 556 Motion to Continue the Government's deadline to respond to substantive pretrial motions until August 3, 2021 as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Garcia-Hernandez (4), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David |

|            |     |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| ---------- | --- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|            |     | Azarias Morales-Verdugo (9), Frank Jamont Best (10), Tomasz Turowski (11), Lamont D. Jefferies. Signed by Judge Victor A. Bolden on 7/14/2021. (Millat, C.) (Entered: 07/14/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| 07/21/2021 | 566 | REPLY TO RESPONSE to Motion by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies re 548 MOTION for Order Re: Protective Order *re: Disclosures* (Peck, Karen) (Entered: 07/21/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                         |
| 08/03/2021 | 572 | Memorandum in Opposition by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies re 281 MOTION to Suppress , 510 MOTION for Disclosure *of background evidence*, 307 MOTION to Inspect *Grand Jury Selection Records*, 134 MOTION For a Franks hearing , 159 MOTION for Disclosure , 226 MOTION for Disclosure , 569 MOTION for Bill of Particulars , 476 MOTION FOR PRESERVATION OF NOTES , 513 MOTION in Limine *re: prior conviction*, 565 MOTION to Produce *Recordings, Transcripts, and Other Records*, 112 First MOTION *for Notice of Intention to Use Evidence*, 473 MOTION for Bill of Particulars , 268 MOTION to Sever Count 1 of the Superseding Indictment , 113 First MOTION in Limine *Re: Prior Misconduct*, 412 SEALED MOTION Supplemental Motion for Transfer of Venue -, 267 MOTION to Sever Defendant , 501 First MOTION for Order Re: Disclosure and Access to the Confidential Informant , 515 MOTION Prompt disclosure of Jencks and other information re 311 Order on Motion to Continue,,,,,,,,,,,, , 514 MOTION to Strike *Section 851 Information from the Third Superseding Indictment*, 149 MOTION Supplemental Motion For a Franks Hearing re 134 MOTION For a Franks hearing , 512 MOTION in Limine *re: prior incarceration*, 474 MOTION to Sever Defendant , 558 MOTION for Bill of Particulars , 564 MOTION to Sever Count One of the Third Superseding Indictment (Peck, Karen) (Entered: 08/03/2021) |
| 08/04/2021 | 575 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED - government and defense counsel)* as to Constantino Acosta-Banda. Objections to PSI due 8/18/2021. (available to USA, Constantino Acosta-Banda) (Attachments: # 1 Financial Statement)(Sitek, J.) (Entered: 08/04/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
| 08/10/2021 | 584 | MOTION for Extension of Time File Sentencing Memorandum *Motion for Enlargement of Time* until 10/15/21 by Constantino Acosta-Banda. (Maxwell, John) (Entered: 08/10/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
| 08/11/2021 | 589 | ORDER granting 584 Motion for Extension of Time as to Constantino Acosta-Banda (6). New sentencing date and related filing deadlines to follow. Signed by Judge Victor A. Bolden on 08/11/2021. (Dalton, A.) (Entered: 08/11/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     |
| 08/12/2021 | 591 | AMENDED ORDER OF REFERRAL TO PROBATION FOR PRESENTENCE INVESTIGATION AND REPORT as to Constantino Acosta-Banda. Objections Due 10/5/2021; 2nd-Disclosure PSI due 10/15/2021; Sentencing Memorandum due 10/19/2021; Response due 10/26/2021. Sentencing set for 11/2/2021 12:00 PM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. Signed by Judge Victor A. Bolden on 8/12/2021. (Perez, J.) (Entered: 08/12/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                   |

| | | |
|---|---|---|
| 08/12/2021 | 592 | NOTICE OF E-FILED CALENDAR as to Constantino Acosta-Banda: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 9/15/2021* Sentencing set for 11/2/2021 12:00 PM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. (Perez, J.) (Entered: 08/12/2021) |
| 08/13/2021 | 595 | MOTION for Order Re: Pretrial Schedule *(Proposed)* by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies. (Clark, Lauren) Modified on 10/28/2021 to terminate motion, see 597 (Perez, J.). (Entered: 08/13/2021) |
| 08/13/2021 | 596 | Amended MOTION for Order Re: Pretrial Schedule *(Proposed)* by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies. (Clark, Lauren) (Entered: 08/13/2021) |
| 08/16/2021 | 597 | ORDER. Based on and following consideration of the parties' 596 joint motion, the Court **GRANTS** the motion, and adopts the following pretrial schedule as to Wallace Best (1), Jeffrey Thomas (2), Jason Cox (3), Oscar Garcia-Hernandez (4), Oscar Zavala (5), Constantino Acosta-Banda (6), Gustavo Gonzalez-Yanez (7), Jesus Mendez (8), David Azarias Morales-Verdugo (9), Frank Jamont Best (10), Tomasz Turowski (11), Lamont D. Jefferies (12): <br><br> -Substantive motions are due **September 17, 2021**. <br> -Responses to substantive motions are due **October 8, 2021**. <br> -Joint trial memorandum, including proposed jury instructions, voir dire, and motions in limine, are due **January 7, 2022**. <br> -Responses to motions in limine are due **January 14, 2022**. <br> -Production of Jencks material and exhibits due **January 21, 2022**. <br> -Pretrial conference scheduled for **January 25, 2022 at 9:30 a.m.** in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden. <br> -Jury selection scheduled for **January 31, 2022**, with trial to begin immediately thereafter. <br><br> Hearings on any substantive motions will be held based on the Court's availability in early November 2021. Hearing date and related information to follow. <br><br> The Court concludes that, under 18 U.S.C. § 3161(h)(7)(A), the ends of justice will be served by continuing the date for jury selection, outweighing the best interests of the public and the Defendants in a speedy trial. *See United States v. Lynch, 726 F.3d 346*, 355 (2d Cir. 2013) ("Because the district court had articulated its findings supporting its determination that the ends of justice would be served before granting the continuance, and those findings fulfilled the criteria set out in § 3161(h)(7)(B), the district court complied with Zedner.") (citing *Zedner v. United States*, 547 U.S. 489, 491 (2006) (express Speedy Trial Act findings must be put on the record)). As the parties have explained, "the delays in the case caused by the COVID-19 pandemic", "the safety concerns presented by holding a multi-defendant trial of significant length with the ongoing threat of the virus and variants of the virus", "the need for witnesses |

|  |  |  |
|---|---|---|
|  |  | to travel from outside Connecticut for trial in the wake of the pandemic", "the need for counsel to review discovery and discuss it with their clients, including those clients who are newly-added to the case", "the fact that there are pending motions regarding evidence, joinder and severance of counts", and "that many of the defendants are still discussing potential resolution of the case against them without a trial", *see* ECF No. 596 at 3, all weigh in favor of continuing the date for jury selection. Therefore, under 18 U.S.C. § 3161(h)(7)(B), given the concerns articulated by the parties, as well as the ongoing nature of the COVID-19 pandemic, the Court finds it appropriate to continue jury selection and trial.<br><br>Accordingly, jury selection is continued until **January 31, 2022**, and the time period from September 6, 2021 through February 22, 2022 shall be excluded from Speedy Trial Act calculations.<br><br>While one of the defendants, Mr. Cox, objects to this delay, the ends of justice still nevertheless will be served by this Order, particularly in light of the numerous pretrial motions filed by Mr. Cox, which still must be resolved, and which Mr. Cox appears to continue filing.<br><br>In light of this scheduling order, the motion for a pretrial scheduling order, ECF No. 595 , is **DENIED as moot**.<br><br>Signed by Judge Victor A. Bolden on 08/16/2021. (Dalton, A.) (Entered: 08/16/2021) |
| 10/14/2021 | 643 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED - government and defense counsel)* as to Constantino Acosta-Banda. (available to USA, Constantino Acosta-Banda) (Attachments: # 1 Addendum, # 2 Financial Statement)(Sitek, J.) (Entered: 10/14/2021) |
| 10/14/2021 | 644 | Sealed Sentencing Recommendation: as to Constantino Acosta-Banda (Sitek, J.) (Entered: 10/14/2021) |
| 10/19/2021 | 645 | SENTENCING MEMORANDUM by Constantino Acosta-Banda (Maxwell, John) (Entered: 10/19/2021) |
| 10/20/2021 | 646 | NOTICE OF E-FILED CALENDAR as to Constantino Acosta-Banda: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 11/2/2021 12:00 PM TIME CHANGE.* Sentencing set for 11/2/2021 10:00 AM in Courtroom Two, 915 Lafayette Blvd., Bridgeport, CT before Judge Victor A. Bolden.(Perez, J.) (Entered: 10/20/2021) |
| 10/26/2021 | 647 | RESPONSE/REPLY by USA as to Constantino Acosta-Banda re 645 Sentencing Memorandum (Clark, Lauren) (Entered: 10/26/2021) |
| 10/26/2021 | 648 | MOTION for Acceptance of Responsibility by USA as to Constantino Acosta-Banda. (Clark, Lauren) (Entered: 10/26/2021) |
| 11/02/2021 | 651 | ORAL MOTION to Dismiss Original Indictment by USA as to Constantino Acosta-Banda. (Perez, J.) (Entered: 11/03/2021) |
| 11/02/2021 | 652 | Minute Entry for proceedings held before Judge Victor A. Bolden: Sentencing as to Constantino Acosta-Banda held on 11/2/2021; Motion Hearing as to Constantino Acosta-Banda held on 11/2/2021; granting 648 Motion for Acceptance of Responsibility as to Constantino Acosta-Banda (6) filed by USA; granting 651 ORAL |

CT CMECF NextGen                                    https://ecf.ctd.uscourts.gov/cgi-bin/DktRpt.pl?339247476381751-L_1_0-1

| | | |
|---|---|---|
| | | Motion to Dismiss Original Indictment as to Constantino Acosta-Banda (6) filed by USA. Total Time: 1 hour (Court Reporter S. Montini.) Spanish Interpreter: Carlos Camacho (Perez, J.) (Entered: 11/03/2021) |
| 11/05/2021 | 655 | Statement of Reasons *(SEALED - government and defense counsel)* as to Constantino Acosta-Banda. (available to USA, Constantino Acosta-Banda) (Sitek, J.) (Entered: 11/05/2021) |
| 11/16/2021 | 659 | JUDGMENT as to Constantino Acosta-Banda (6), Count 1, Dismissed by government's oral motion; Count 1s, Defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total of 70 months; supervised release for a total term of 3 years; special assessment of $100 shall be paid immediately.<br>Signed by Judge Victor A. Bolden on 11/16/2021. (Perez, J.) (Entered: 11/17/2021) |
| 11/16/2021 | 660 | DISMISSAL OF COUNTS as to Constantino Acosta-Banda. (Perez, J.) (Entered: 11/17/2021) |
| 11/17/2021 | 662 | NOTICE OF APPEAL by Constantino Acosta-Banda re 659 Judgment, (Attachments: # 1 envelope)(Imbriani, Susan) (Entered: 11/19/2021) |
| 11/18/2021 | 661 | SEALED CJA 23 Financial Affidavit by Constantino Acosta-Banda *dated 11/18/2021* (Maxwell, John) (Entered: 11/18/2021) |
| 11/19/2021 | 663 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 662 Notice of Appeal - Final Judgment. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Robin D. Tabora, Clerk. Documents manually filed not included in this transmission: None (Imbriani, Susan) (Entered: 11/19/2021) |
| 01/11/2022 | 694 | ATTORNEY APPEARANCE Katherine Elizabeth Boyles appearing for USA (Boyles, Katherine) (Entered: 01/11/2022) |
| 01/13/2022 | 696 | ORDER granting 548 Motion for Protective Order. Following review of the parties' submissions, the Court finds that the proposed Protective Order is supported by good cause and clear and compelling reasons, and the protection of these filings is narrowly tailored to serve those reasons. Accordingly, the Court enters the protective order proposed by the Government. Signed by Judge Victor A. Bolden on 1/13/2022. (Dalton, A.) (Entered: 01/13/2022) |

CT CMECF NextGen                                    https://ecf.ctd.uscourts.gov/cgi-bin/DktRpt.pl?339247476381751-L_1_0-1

| 02/07/2022 | 720 | TRANSCRIPT of Proceedings: as to Constantino Acosta-Banda Type of Hearing: Plea Hearing. Held on 3/4/21 before Judge Victor Bolden. Court Reporter: Sharon Montini. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 2/28/2022. Redacted Transcript Deadline set for 3/10/2022. Release of Transcript Restriction set for 5/8/2022. (Montini, S.) (Entered: 02/07/2022) |
| --- | --- | --- |
| 02/07/2022 | 721 | TRANSCRIPT of Proceedings: as to Constantino Acosta-Banda Type of Hearing: Sentencing Hearing. Held on 11/2/21 before Judge Victor Bolden. Court Reporter: Sharon Montini. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 2/28/2022. Redacted Transcript Deadline set for 3/10/2022. Release of Transcript Restriction set for 5/8/2022. (Montini, S.) (Entered: 02/07/2022) |
| 02/13/2022 | 733 | Motion for Conference and Memorandum in Opposition by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, Jesus Mendez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies re 268 MOTION to Sever Count 1 of the Superseding Indictment , 267 MOTION to Sever Defendant , 474 MOTION to Sever Defendant , 564 MOTION to Sever Count One of the Third Superseding Indictment *and Request for Status Conference* (Peck, Karen) Modified on 2/16/2022 to add motion relief (Perez, J.). (Entered: 02/13/2022) |
| 03/10/2022 | 753 | MOTION For Proposed Scheduling Order by USA as to Wallace Best, Jeffrey Thomas, Jason Cox, Oscar Garcia-Hernandez, Oscar Zavala, Constantino Acosta-Banda, Gustavo Gonzalez-Yanez, David Azarias Morales-Verdugo, Frank Jamont Best, Tomasz Turowski, Lamont D. Jefferies. (Peck, Karen) Modified on 4/28/2022 to remove improperly selected defendant-Mendez (Murphy, Tatihana). (Entered: 03/10/2022) |

| **PACER Service Center** |
| --- |
| **Transaction Receipt** |
| 05/13/2022 14:01:59 |

| PACER Login: | lantagne92 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 3:20-cr-00028-VAB |
| Billable Pages: | 16 | Cost: | 1.60 |



**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

---

*Connecticut Financial Center*          *(203)821-3700*
*157 Church Street, 25th Floor*          *Fax (203) 773-5376*
*New Haven, Connecticut 06510*          *www.justice.gov/usao/ct*

March 4, 2021

John D. Maxwell, Esq.
Brown Paindiris & Scott, LLP
2252 Main Street
Glastonbury, CT 06033

　　　　Re:　*United States v. Constantino Acosta-Banda*
　　　　　　Case No. 3:20-cr-28 (VAB)

United States District Court
District of Connecticut
FILED AT    BRIDGEPORT
March 4           20 21
Robin D. Tabora, Clerk
By
Deputy Clerk

Dear Attorney Maxwell:

　　　　This letter confirms the plea agreement between your client, Constantino Acosta-Banda
(the "defendant"), and the United States Attorney's Office for the District of Connecticut (the
"Government") in this criminal matter.

**THE PLEA AND OFFENSE**

　　　　In consideration for the benefits offered under this agreement, the defendant agrees to
plead guilty to Count One of the Superseding Indictment charging him with conspiracy to
distribute and to possess with intent to distribute, heroin and fentanyl in violation of 21 U.S.C.
§§ 841(a)(1), 841(b)(1)(C) and 846.

　　　　The defendant understands that, to be guilty of this offense, the following essential
elements must be satisfied: *[handwritten: C.A.C. February]*

1.　From approximately ~~August~~ 2019 through February 10, 2020, there was an
agreement between two or more persons to possess with the intent to distribute and
to distribute heroin and fentanyl; and

2.　During the existence of the conspiracy, the defendant knowingly, willfully, and
voluntarily became a participant in, or a member of, the agreement, and did so with
the intention of furthering an objective of the conspiracy.

*John D. Maxwell*, *Esq.*
*Page 2*

## THE PENALTIES

### Imprisonment

This offense carries a maximum penalty of 20 years of imprisonment.

### Supervised Release

In addition, the Court must impose a term of supervised release of at least 3 years and may impose a term of supervised release up to a lifetime. 18 U.S.C. § 3583, 21 U.S.C. § 841(b)(l)(C). The defendant understands that, should he violate any condition of supervised release, he may be required to serve a further term of imprisonment of up to 2 years per violation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

### Fine

This offense carries a maximum fine of $1,000,000. The defendant is also subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000; or (4) the amount specified in the section defining the offense which is $1,000,000.

### Special Assessment

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction. The defendant agrees to pay the special assessment on or before the date of sentencing unless he establishes an inability to pay on or before the date of sentencing through the financial disclosure to the U.S. Probation Office as part of the presentence investigation and report, in which case the defendant agrees to pay it as soon as practicable.

### Interest, penalties and fines

Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572(h), (*i*) and § 3612(g).

### Forfeiture

The defendant agrees to hold the United States, its agents and employees harmless from any claims whatsoever in connection with the seizure or forfeiture of any assets covered by this agreement. The defendant further agrees to waive all constitutional and statutory challenges in any manner to any forfeiture carried out in accordance with this plea agreement on any grounds. The defendant also understands and agrees that by virtue of his plea of guilty he waives any

*John D. Maxwell, Esq.*
*Page 3*

rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

## THE SENTENCING GUIDELINES

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

### Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) disclosing to the United States Attorney's Office and the United States Probation Office a complete and truthful financial statement detailing the defendant's financial condition. The defendant expressly authorizes the United States Attorney's Office to obtain a credit report concerning the defendant.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or

*John D. Maxwell, Esq.*
*Page 4*

takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

Determination of Quantity

The parties agree and acknowledge that the determination of the quantity of heroin and fentanyl, which was part of the defendant's relevant and readily foreseeable conduct as a result of his role in the conspiracy, will be determined by the Court at sentencing by a preponderance of the evidence standard. However, the defendant expressly agrees and stipulates that the quantity of heroin and fentanyl that was reasonably foreseeable to him as a result of his role in the charged conspiracy was at least 3 kilograms but less than 10 kilograms of heroin and he waives any right to a jury trial or a sentencing hearing on the issue of the quantity of controlled substances involved in the offense.

Guideline Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The defendant's base offense level under U.S.S.G. § 2D1.1(c)(3) is 32. Two levels are subtracted under U.S.S.G. § 3B1.2 based on the defendant being a minor participant in the offense conduct, and three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 27.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category III. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.

A total offense level 27, assuming a Criminal History Category III, would result in a range of 87 to 108 months of imprisonment (sentencing table) and a fine range of $25,000 to $250,000, U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of two years to five years. U.S.S.G. § 5D1.2.

The Government and the defendant reserve their rights to seek a departure or a non-Guidelines sentence, and both sides reserve their right to object to a departure or a non-Guidelines sentence.

The defendant understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw the guilty plea if the Court imposes a sentence outside any of the ranges set forth in this agreement.

*John D. Maxwell*, *Esq.*
*Page 5*

In the event the United States Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the parties reserve the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

<u>Information to the Court</u>

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

**WAIVER OF RIGHTS**

The defendant acknowledges and agrees that he is knowingly, intelligently, and voluntarily waiving the following rights:

<u>Waiver of Right to Proceed In Person Due to COVID-19 Public Health Emergency</u>

The defendant understands that he has a right to be physically present in a public courtroom for a guilty plea hearing. In light of the ongoing COVID-19 health emergency, however, the defendant knowingly and voluntarily waives his right to be physically present in the courtroom for the purpose of entering a plea and consents to proceed by video teleconference (or by means of audio teleconferencing if video teleconferencing is not reasonably available). The defendant further expressly stipulates that he has consulted with his counsel regarding the above waiver and consent and wishes to proceed by means of video teleconferencing (or by means of audio teleconferencing if video conferencing is not reasonably available). The parties agree that in light of the nature of this prosecution and the interests of the defendant and the public, this proceeding cannot be further delayed without serious harm to the interests of justice.

<u>Waiver of Trial Rights and Consequences of Guilty Plea</u>

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

*John D. Maxwell*, *Esq.*
*Page 6*

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's guilty plea be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

Waiver of Right to Challenge Conviction

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction. By pleading guilty, the defendant waives his right to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. In addition to any other claims he might raise, the defendant waives his right to challenge his conviction based on (1) any non-jurisdictional defects in the proceedings before entry of this plea, (2) a claim that the statute(s) to which the defendant is pleading guilty is unconstitutional, and (3) a claim that the admitted conduct does not fall within the scope of the statute. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

Waiver of Right to Appeal or Collaterally Attack Sentence

The defendant acknowledges that under certain circumstances, he is entitled to challenge his sentence. In consideration for the benefits offered under this agreement, the defendant agrees not to appeal or collaterally attack the sentence in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241 if that sentence does not exceed 108 months of imprisonment, a five-year term of supervised release, a $100 special assessment, and $250,000 fine, even if the Court imposes such a sentence based on an analysis different from that specified above. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

*John D. Maxwell*, Esq.
*Page 7*

<u>Waiver of Challenge to Plea Based on Immigration Consequences</u>

The defendant understands that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, non-citizens are subject to removal for a broad range of crimes, including the offense(s) to which the defendant is pleading guilty. Indeed, because the defendant is pleading guilty to conspiracy to possess with the intent to distribute and to distribute narcotics, removal is presumptively mandatory. Likewise, if the defendant is a naturalized citizen of the United States, pleading guilty may result in denaturalization and removal. Removal, denaturalization, and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is automatic removal from the United States.

The defendant understands that he is bound by his guilty plea regardless of the immigration consequences of the plea. Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on those consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction or sentence, based on the immigration consequences of his guilty plea, conviction or sentence. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in the appropriate forum.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

**27**

*John D. Maxwell*, *Esq.*
*Page 8*

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in the offense conduct, which forms the basis of the Superseding Indictment in this case.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, the defendant will not be permitted to withdraw his guilty plea.

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

LAUREN C. CLARK
ASSISTANT UNITED STATES ATTORNEY

*John D. Maxwell, Esq.*
*Page 9*

     The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

_____        3/4/21
CONSTANTINO ACOSTA-BANDA       Date
The Defendant

     I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

_____        3/4/21
JOHN D. MAXWELL, ESQ.       Date
Attorney for the Defendant

```
1              UNITED STATE DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3    - - - - - - - - - - - -  -  x
                                : Case No.
4    UNITED STATES OF AMERICA,   : 20CR28(VAB)
                                :
5                  Government,   :
           vs.                  :
6                                : 915 Lafayette Blvd
     CONSTANTINO ACOSTA-BANDA,   : Bridgeport, CT
7                                : March 4, 2021
                   Defendant.    :
8    - - - - - - - - - - - -  -  X

9
                 TRANSCRIPT OF PLEA HEARING
10
     BEFORE:  THE HONORABLE VICTOR A. BOLDEN, U.S.D.J.
11

12   APPEARANCES:
     FOR THE GOVERNMENT:      LAUREN C CLARK, ESQ.
13                            KAREN PECK, ESQ.
                              DOJ-USAO
14                            1000 Lafayette Boulevard
                              Ste 10th Floor
15                            Bridgeport, CT 06604

16
     FOR THE DEFENDANT:
17                            JOHN D. MAXWELL, ESQ.
                              Brown, Paindiris & Scott
18                            2252 Main St.
                              Glastonbury, CT 06033
19

20

21

22              Sharon Montini, RMR, FCRR
                     915 Lafayette Blvd
23                Bridgeport, CT 06604
                  Official Court Reporter
24

25
```

1                    (Proceeding commenced 10:15 a.m.)

2                    THE COURT:  Good morning.  Please be

3     seated.  We're here in the United States v

4     Constantino Acosta-Banda.  Will counsel please state

5     their appearances for the record.

6                    MS. CLARK:  Good morning, Your Honor.

7     Lauren Clark on behalf of the United States, and

8     with me is AUSA Karen Peck.

9                    THE COURT:  Good morning, Ms. Peck and

10    Ms. Clark.

11                   MR. MAXWELL:  Good morning, Your Honor.

12    John Maxwell for Mr. Acosta-Banda, who is sitting to

13    my left.

14                   THE COURT:  All right.  Good morning,

15    Mr. Maxwell.  Good morning, Mr. Acosta-Banda.

16                   The record should also reflect we have

17    an interpreter present for Mr. Acosta-Banda.

18                   Would you please state your name,

19    address, and qualifications for the record.

20                   THE INTERPRETER:  Good morning, Your

21    Honor.  Barbara Considine, Florence, Massachusetts.

22                   THE COURT:  All right.  And you are

23    certified in Mr. Acosta-Banda's native language?

24                   THE INTERPRETER:  Yes, in Spanish, Your

25    Honor.

```
1                    THE COURT:  Thank you very much.  And
2    have you had an opportunity to speak with him?
3                    THE INTERPRETER:  Yes, Your Honor.
4                    THE COURT:  And have you had any
5    difficulty communicating with him?
6                    THE INTERPRETER:  Other than the
7    technology, no, Your Honor.
8                    THE COURT:  Okay.  And I think we've
9    gotten the technology fixed.
10                   THE INTERPRETER:  Yes.
11                   THE COURT:  Obviously if there is some
12   issue, please let us know and we'll get it fixed.
13                   THE INTERPRETER:  Will do.
14                   THE COURT:  Is there any reason why you
15   would not be able to justly, truly, fairly, and
16   impartially act as an interpreter in this case?
17                   THE INTERPRETER:  No, Your Honor.
18                   THE COURT:  Thank you very much.
19                   Ms. Perez, would you please swear in the
20   interpreter.
21                   (Oath administered)
22                   THE COURT:  Assistant U.S. Attorney
23   Clark, are there any issues with the government's
24   obligations under the Crime Victims' Rights Act?
25                   MS. CLARK:  No, Your Honor.
```

1          THE COURT:  All right.  And my

2    understanding is the purpose of today's proceeding

3    is to accept a guilty plea.  Is that your

4    understanding?

5          MS. CLARK:  That is my understanding,

6    Your Honor.

7          THE COURT:  Thank you very much.

8          Mr. Acosta-Banda, I want to begin by

9    telling you to take your time during this

10   proceeding.  I'm in no hurry and I want to make sure

11   you completely understand what you are doing today.

12   If at any time during this proceeding you have any

13   questions or problems, or you need more time to

14   speak to your lawyer, Mr. Maxwell, please just let

15   me know and I will give you all of the time that you

16   need.  Do you understand, sir?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And, sir, before accepting

19   your plea, there are a number of questions I must

20   ask you while you are under oath to assure myself

21   that it is a valid plea.  Do you understand?

22          THE DEFENDANT:  Yes.

23          THE COURT:  All right.  Ms. Perez, would

24   you please swear in Mr. Acosta-Banda.

25          (Oath administered)

```
1                    THE COURT:  All right.  Please be
2       seated.  You can be seated again, sir.
3                    For the record, I'm going to advise you
4       of your rights.  You have the right to remain
5       silent.  You have the right not to continue with a
6       statement.  Your statements can be used against you.
7       You have the right to have counsel at every stage of
8       these proceedings.  You have the right to have
9       counsel appointed if you cannot afford counsel.  And
10      there is an attorney-client privilege which allows
11      you to speak confidentially with your lawyer.  Do
12      you understand all of these rights, sir?
13                   THE DEFENDANT:  Yes.
14                   THE COURT:  All right.  And do you
15      understand that having been sworn you will be
16      subject to the penalties for perjury or for making a
17      false statement if you do not answer truthfully here
18      today?
19                   THE DEFENDANT:  Yes.
20                   THE COURT:  And do you understand that
21      if the government chooses to prosecute you for
22      perjury or for making a false statement it can use
23      any statement you give here today under oath against
24      you?
25                   THE DEFENDANT:  Yes.
```

```
 1                THE COURT:  All right.  Sir, would you
 2      please state your full name for the record.
 3                THE DEFENDANT:  Acosta-Banda,
 4      Constantino.
 5                THE COURT:  All right.  Have you ever
 6      used any other names?
 7                THE DEFENDANT:  No.
 8                THE COURT:  Okay.  And in what year were
 9      you born, sir?
10                THE DEFENDANT:  1978.
11                THE COURT:  And where you were born,
12      sir?
13                THE DEFENDANT:  In Chihuahua, Mexico.
14                THE COURT:  And are you a United States
15      citizen?
16                THE DEFENDANT:  No.
17                THE COURT:  Other than Mexico, have you
18      ever lived outside of the United States?
19                THE DEFENDANT:  Yes.
20                THE COURT:  Where else?
21                THE DEFENDANT:  I have lived in Tijuana.
22                THE COURT:  But that's Mexico.
23                THE DEFENDANT:  Yes.
24                THE COURT:  Okay.  Just Mexico and the
25      United States?
```

1          THE DEFENDANT:  And California.

2          THE COURT:  Okay.  Thank you very much.

3   All right.  And how far did you go in school, sir?

4          THE DEFENDANT:  Just second.

5          THE COURT:  Second grade or high school?

6          THE DEFENDANT:  Second grade in

7   elementary school.

8          THE COURT:  Thank you, sir.  Are you now

9   or have you recently been under the care of a

10  physician, psychiatrist, social worker, or

11  counselor?

12         THE DEFENDANT:  No.

13         THE COURT:  In the past 48 hours, have

14  you taken any narcotic drugs, medicine, or pills?

15         THE DEFENDANT:  No.

16         THE COURT:  Have you consumed any

17  alcoholic beverages in the last 48 hours?

18         THE DEFENDANT:  No.

19         THE COURT:  Have you ever been

20  hospitalized or treated for alcoholism or narcotics

21  addiction?

22         THE DEFENDANT:  No.

23         THE COURT:  And today, as you are here

24  before this Court, is your mind clear here?

25         THE DEFENDANT:  Yes.

```
 1                    THE COURT:  And you do have the capacity
 2      to understand what is going on here today?
 3                    THE DEFENDANT:  Yes.
 4                    THE COURT:  All right.  Mr. Maxwell --
 5                    MR. MAXWELL:  Yes, Your Honor.
 6                    THE COURT:  -- are you sure that your
 7      client understands the nature of these proceedings?
 8                    MR. MAXWELL:  Yes, Your Honor.  Just for
 9      the record, I have had the good fortune of having a
10      paralegal, Spanish speaking paralegal in our office,
11      Sandra Torres.  So we've had several phone calls,
12      and the Zoom system that Wyatt has set up.  And,
13      actually, I have seen him at the facility at Wyatt a
14      few times.  They have a pretty decent Plexiglass
15      room.  So we've had numerous opportunities to
16      discuss the charges and his plea proceeding with
17      him.
18                    THE COURT:  And as you have already
19      suggested, you have had no difficulty communicating
20      with him?
21                    MR. MAXWELL:  None.
22                    THE COURT:  And you believe he
23      understands the rights he will be waiving by
24      pleading guilty today?
25                    MR. MAXWELL:  Yes, I do, Your Honor.
```

```
1              THE COURT:  And do you have any doubt as
2    to his competence to plead guilty at this time?
3              MR. MAXWELL:  None, Your Honor.
4              THE COURT:  Thank you, sir.
5              MR. MAXWELL:  And also, for the record,
6    he does understand English to a large degree.  I
7    just don't think it's enough, for the record, to do
8    a change of plea proceeding.
9              THE COURT:  That's fine.  We certainly
10   agree given the significance of this legal
11   proceeding.
12             And, Mr. Acosta-Banda, have you had an
13   opportunity to discuss your case with Mr. Maxwell?
14             THE DEFENDANT:  Yes.
15             THE COURT:  And are you satisfied with
16   the representation that you have been provided, sir?
17             THE DEFENDANT:  Yes.
18             THE COURT:  Thank you.
19             Assistant U.S. Attorney Clark, what's
20   the nature of the charges against the defendant here
21   and the maximum sentence to which he could be
22   exposed and any mandatory minimum sentence that may
23   apply?
24             THE DEFENDANT:  Your Honor, the
25   defendant is charged in Count One of the superseding
```

```
1   indictment with conspiracy to distribute and to

2   possess with intent to distribute heroin and

3   fentanyl, and that is in violation of 21, United

4   States Code, Sections 841(a)(1), 841(b)(1)(C), and

5   846.  It carries a maximum penalty of up to 20 years

6   of imprisonment -- there is no mandatory minimum on

7   this count -- a term of supervised release of at

8   least three years and up to life, a maximum fine of

9   $1 million, and special assessment of $100 for the

10  count of conviction.

11              THE COURT:  All right.  Is the

12  alternative fine provision applicable here?

13              MS. CLARK:  Yes, Your Honor, it is.

14              THE COURT:  All right.  Thank you very

15  much.

16              Mr. Acosta-Banda, do you understand the

17  charges against you, sir?

18              THE DEFENDANT:  Yes.

19              THE COURT:  Do you understand the

20  penalties that are associated with that charge?

21              THE DEFENDANT:  Yes.

22              THE COURT:  All right.  And, sir, have

23  you had enough opportunity and information to

24  discuss your case with Mr. Maxwell?

25              THE DEFENDANT:  Yes.
```

```
 1              THE COURT:  And do you believe Mr.
 2   Maxwell has answered your questions well enough and
 3   given you enough advice and guidance for you to make
 4   a decision about pleading guilty today?
 5              THE DEFENDANT:  Yes.
 6              THE COURT:  And do you have any concerns
 7   about whether Mr. Maxwell has done a good job for
 8   you?
 9              THE DEFENDANT:  No.
10              THE COURT:  No concerns.  All right.
11   Thank you, sir.
12              What I'm going to do now is I'm going to
13   review with you the various rights that you'd be
14   giving up if you decide to plead guilty today.  I'm
15   going to go through each of them to make sure you
16   are aware of them before you enter your plea of
17   guilty.  Please listen carefully because at the end
18   of this review I'm going to ask you if you
19   understand them and that you know you are waiving
20   every one of these rights by entering a plea -- I'm
21   sorry, there is a problem?
22              THE INTERPRETER:  Your Honor, I can see
23   him struggling.
24              THE COURT:  Yep.  Okay.  All right.  So
25   please listen carefully because at the end of this
```

**40**

1  review I'm going to ask if you understand them and

2  you know that you are waiving every one of these

3  rights by entering a plea of guilty.

4          The first and most important thing you

5  must understand is that you do not have to plead

6  guilty even if you think you are guilty.  Instead,

7  you can require the government to prove its case at

8  trial.  Under our system of law the prosecutor has

9  the burden of proving the guilt of a defendant

10  beyond a reasonable doubt, and if the prosecutor is

11  unable to meet that burden, the jury has the duty to

12  find the defendant not guilty.  It sometimes

13  happens --

14          THE INTERPRETER:  I'm sorry.  I'm going

15  to move this.

16          THE COURT:  Sure.  That's fine.  That's

17  fine.  The critical thing is just to make sure that

18  you are heard -- Jazmin -- Ms. Perez, would you set

19  a microphone near her.

20          Because once you interpret to English

21  from his Spanish, I need to make sure that it's

22  recorded by the court reporter.

23          THE INTERPRETER:  Understood, Your

24  Honor.

25          THE COURT:  Why don't we do this.  Let's

**41**

1  do a sound check just to make sure.  So why don't

2  you go ahead and speak and I can make sure the court

3  reporter can hear you.

4            THE INTERPRETER:  All right.  We're

5  going to proceed without using the equipment.

6            THE COURT:  Ms. Montini, is there any

7  issue?

8            THE COURT REPORTER:  No, that's perfect.

9  Thank you.

10           THE COURT:  Great.  Okay.

11           All right.  Let me -- I will start this

12 last part again.  The first and most important thing

13 you must understand is you do not have to plead

14 guilty even if you think you are guilty.  Instead,

15 you can require -- I'm sorry?

16           THE INTERPRETER:  No.

17           THE COURT:  Oh, okay.

18           Instead, you can require the government

19 to prove its case at trial.  Under our system of

20 law, the prosecutor has the burden of proving the

21 guilt of a defendant beyond a reasonable doubt, and

22 if the prosecutor is unable to meet that burden, the

23 jury has the duty to find the defendant not guilty.

24           It sometimes happens in American

25 courtrooms that a jury returns a verdict of not

**42**

1  guilty, and what the jury was saying in those cases

2  is not that it found the defendant to be innocent,

3  but rather that the government had failed to meet

4  its burden of proving beyond a reasonable doubt that

5  the defendant was guilty.  Do you understand?

6            THE DEFENDANT:  Yes.

7            THE COURT:  So even if you believe you

8  are guilty, you do have a choice.  You may plead

9  guilty, as you apparently now wish to do, or you can

10 change your mind and say to the government "meet

11 your burden of proving my guilt beyond a reasonable

12 doubt."  And the way you exercise that option is by

13 saying "not guilty" when I ask you how you wish to

14 plead.

15            You have a right to plead not guilty,

16 and once you plead not guilty, or if you have

17 already pled not guilty, you have a right to persist

18 in that plea.  Do you understand that?

19            THE DEFENDANT:  Yes.

20            THE COURT:  If you plead not guilty, the

21 Constitution and federal laws entitle you to a

22 speedy, public trial by jury with the assistance of

23 a lawyer at every stage of the proceedings in the

24 charges in the superseding indictment.  If you could

25 not afford counsel, you would have the right to have

**43**

1    counsel appointed to represent you.

2              At any trial you would be presumed

3    innocent and the government would have to overcome

4    that presumption by proving you guilty of each and

5    every element of the crimes charged by competent

6    evidence and beyond a reasonable doubt.  You would

7    not have to prove that you were innocent.  If the

8    government were to fail to prove each and every

9    element, the jury would have the duty to find you

10   not guilty.  Do you understand that?

11              THE DEFENDANT:  Yes.

12              THE COURT:  In the course of a trial,

13   the witnesses for the government would have to come

14   to court and testify in your presence and your

15   counsel would have the right to cross-examine the

16   witnesses for the government, to object to evidence

17   offered by the government and to offer evidence on

18   your behalf, as well as to use a subpoena to obtain

19   the attendance of witnesses to testify at trial on

20   your behalf.

21              At a trial, while you would have the

22   right to testify if you chose to do so, you also

23   could not be required to testify.  You have a

24   constitutional right not to be compelled to take the

25   stand at a criminal trial against yourself.  If you

1  decide not to testify, the Court would instruct the

2  jury that you were exercising your right and that it

3  could not hold that against you.

4           If you decide to plead guilty, however,

5  I will have to ask you questions about what you did

6  in order to satisfy myself that you are, in fact,

7  guilty, and you will have to answer my questions and

8  admit your guilt.

9           If you plead guilty and I accept your

10  plea as valid, you will be giving up your

11  constitutional right to a trial and the other rights

12  I have just discussed.  There will be no trial of

13  any kind and no right to appeal the conviction,

14  although under some circumstances you or the

15  government may have the right to appeal any sentence

16  that I would impose.  So I would simply enter a

17  finding of guilty on the basis of your guilty plea.

18  Do you understand?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Do you understand all of the

21  rights I have just reviewed with you?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Do you have any questions

24  about anything that I have said so far?

25           THE DEFENDANT:  No.

```
1                THE COURT:  And, sir, are you willing to
2    give up your right to a trial?
3                THE DEFENDANT:  Yes.
4                THE COURT:  Are you willing to give up
5    the other rights I have just discussed?
6                THE DEFENDANT:  Yes.
7                THE COURT:  The offense to which you
8    intend to plead guilty, sir, is a felony offense.
9    If your plea is accepted you will be found guilty of
10   this offense.  You will be subject to sentencing as
11   I will describe in greater detail in a few minutes,
12   but you also will be subject to other collateral
13   consequences and demands.  You will be deprived of
14   valuable civil rights, such as the right to vote,
15   the right to hold public office, the right to serve
16   on a jury, and the right to possess any kind of
17   firearm.
18                A DNA sample will be collected you from
19   to be used by the Bureau of Prisons or the probation
20   office for analysis and indexing and inclusion in a
21   federal database.
22                I understand you are not a United States
23   citizen, so you could be deported or removed from
24   the United States, denied citizenship, and denied
25   admission to the United States in the future.
```

```
1              Finally, your guilty plea today may work
2   to your disadvantage if in the future you are found
3   guilty of another crime because there is a
4   possibility you could receive a more severe penalty
5   at that time as a result of this guilty plea and
6   conviction.  Do you understand these additional
7   consequences of pleading guilty?
8              THE DEFENDANT:  Yes.
9              THE COURT:  And are you willing to
10  accept all of those consequences and still willing
11  to give up your right to a trial and the other
12  rights I have just discussed?
13             THE INTERPRETER:  I'm sorry, I didn't
14  hear the last piece, Your Honor.
15             THE COURT:  And the other rights I have
16  just discussed.
17             THE DEFENDANT:  Yes.
18             THE COURT:  Is anyone threatening you or
19  forcing you enter a plea of guilty today?
20             THE DEFENDANT:  No.
21             THE COURT:  Do you want more time to
22  talk to Mr. Maxwell about giving up your right to a
23  trial and pleading guilty?
24             THE DEFENDANT:  No.
25             THE COURT:  Mr. Maxwell?
```

```
1                    MR. MAXWELL:  Yes, Your Honor.

2                    THE COURT:  Are you sure that Mr.

3    Acosta-Banda has had enough time and received enough

4    information and guidance from you about the strength

5    of the government's case and the strength of any

6    defense case such that he's able to make a knowing,

7    intelligent, and voluntary choice to plead guilty

8    here today?

9                    MR. MAXWELL:  Yes, I am, Your Honor.

10                   THE COURT:  Are you convinced that he

11   understands the rights he will be waiving by

12   pleading guilty?

13                   MR. MAXWELL:  Yes, Your Honor.

14                   THE COURT:  And are you convinced that

15   he understands the minimum and maximum sentence

16   involved here?

17                   MR. MAXWELL:  Yes, Your Honor.

18                   THE COURT:  Thank you, sir.

19                   Assistant U.S. Attorney Clark, I

20   understand that there is a written plea agreement.

21   Is that correct?

22                   MS. CLARK:  Yes, there is, Your Honor.

23                   THE COURT:  All right.  And I understand

24   that you provided an opportunity for Mr. Maxwell and

25   his client to review it?
```

```
 1                    MS. CLARK:  I did.

 2                    THE COURT:  All right.  Mr.

 3     Acosta-Banda, have you read the plea agreement

 4     carefully or had it read to you?

 5                    THE DEFENDANT:  Yes.

 6                    THE COURT:  Would you like a recess or

 7     more time to review the plea agreement or talk to

 8     Mr. Maxwell about whether this is really an

 9     agreement you wish to enter into?

10                    THE DEFENDANT:  No, I'm all right.

11                    THE COURT:  All right.  Ms. Clark?

12                    MS. CLARK:  Yes, Your Honor.

13                    THE COURT:  Would you highlight the

14     terms of the plea agreement.

15                    MS. CLARK:  Yes, I will, Your Honor.

16     The plea agreement is a nine-page letter bearing

17     today's date addressed to Attorney Maxwell.  It

18     starts out by setting forth the elements of the

19     offense to which Mr. Acosta-Banda is pleading guilty

20     today, that is, Count One of the superseding

21     indictment charging him with conspiracy to

22     distribute and to possess with intent to distribute

23     heroin and fentanyl, in violation of 21, United

24     States Code, Sections 841(a)(1), 841(b)(1)(C), and

25     846.
```

1          On page 2 of the plea agreement it sets

2     forth the maximum penalties that the Court could

3     impose if Mr. Acosta-Banda were to plead guilty to

4     Count One today.  I have already summarized those

5     for the Court.

6          Page 3 of the plea agreement sets forth

7     how the sentencing guidelines work and how the

8     parties believe they apply to the defendant in this

9     case.  It begins by noting that the Court is

10    required to consider any applicable sentencing

11    guidelines as well as the factors enumerated in 18

12    U.S.C. Section 3553(a) to determine the appropriate

13    sentence in this case.  And, importantly, the plea

14    agreement notes that the Court is not bound by this

15    plea agreement between the parties.

16          The plea agreement -- the defendant also

17    understands he has no right to withdraw his guilty

18    plea if his sentence or the guideline application is

19    other than what is anticipated in this plea

20    agreement.

21          In the middle of page 3 the agreement

22    summarizes the government's agreeing to recommend a

23    two-level reduction based upon his acceptance of

24    personal responsibility for the offense and an

25    additional one-level reduction based upon his prompt

1    notification of his intention to enter a plea of

2    guilty today.

3              This three-point reduction would require

4    the defendant to truthfully admit the conduct

5    comprising the offense of conviction and any

6    relevant conduct and to disclose complete and

7    truthful financials to the U.S. Attorney's Office

8    and the probation office.  And the plea agreement

9    notes that the government reserves the right to seek

10   a denial of the adjustment if Mr. Acosta-Banda has

11   not terminated or withdrawn from criminal conduct.

12             THE INTERPRETER:  I'm sorry, Counselor,

13   I am having trouble.  Could you repeat the very

14   last --

15             MS. CLARK:  I will slow down.

16             THE INTERPRETER:  And just speak

17   directly into the mic.

18             MS. CLARK:  Okay.  Thank you.

19             The plea agreement then summarizes that

20   the government is reserving the right to seek a

21   denial of adjustment for acceptance of

22   responsibility if Mr. Acosta-Banda has not

23   terminated or withdrawn from criminal conduct, if

24   it's determined that he has obstructed or impeded

25   the administration of justice, or if he seeks to

1    withdraw his guilty plea or takes a position at

2    sentencing which in the government's opinion is

3    inconsistent with acceptance of responsibility.

4            On page 4 the plea agreement summarizes

5    a stipulation as to the applicable quantity of

6    heroin and fentanyl which was part of the

7    defendant's relevant and readily foreseeable

8    conduct.  In the agreement Mr. Acosta-Banda is

9    expressly agreeing and stipulating that the quantity

10   of heroin and fentanyl that was reasonably

11   foreseeable to him as a result of his role in the

12   charged conspiracy was at least 3 kilograms, but

13   less than 10 kilograms of heroin, and in the plea

14   agreement he waives any right to a jury trial or a

15   sentencing hearing on the issue of quantity.

16           In the middle of page 4 the parties

17   stipulate as to the applicable guideline range here.

18   They calculate the base offense level for the

19   defendant as 32.  The parties agree that as a minor

20   participant two levels are subtracted.  And based

21   upon his acceptance of responsibility, three

22   additional levels are subtracted, for a total

23   offense level of 27.

24           The parties initially assess Mr.

25   Acosta-Banda to fall within Criminal History

```
 1    Category III.  With an offense level of 27, that
 2    would result in a guidelines range of 87 to
 3    108 months of imprisonment, a fine range of 25,000
 4    to 250,000 dollars, and a supervised release term of
 5    two years to five years.
 6              At the bottom of page 4 the parties are
 7    reserving their rights to seek a departure or a
 8    non-guideline sentence and the right to object to a
 9    departure or a non-guideline sentence.
10              And, again, at the bottom of page 4 the
11    plea agreement reiterates that the defendant
12    understands that the Court is not bound by this
13    agreement on the guideline range and he cannot
14    withdraw his guilty plea if the Court imposes a
15    sentence outside that range.
16              On page 5 through page 7 of the plea
17    agreement it summarizes the various rights that Mr.
18    Acosta-Banda would be waiving if he was to plead
19    guilty today, the first of which relates to his
20    right to proceed in person, which because we're here
21    today is not applicable to this proceeding.
22              It then summarizes a waiver of his
23    various trial rights, which the Court has previously
24    summarized.  That would be his right to a public
25    trial in front of a jury with an attorney, the right
```

1   to cross-examine and confront witnesses, the right

2   to testify and present evidence and to compel the

3   attendance of witnesses.

4            On page 6 it summarizes a waiver as to

5   statute of limitations, which simply means if his

6   conviction is vacated at some point it's not

7   time-barred by a statute of limitations defense.

8            In the middle Mr. Acosta-Banda is

9   waiving his right to challenge the conviction or

10  collaterally attack his conviction.

11           And on the bottom of page 6 he is

12  waiving his right to appeal or collaterally attack

13  the sentence that would be imposed as long as that

14  sentence does not exceed 108 months of imprisonment,

15  a five-year term of supervised release, a $100

16  special assessment, and a $250,000 fine.

17           On page 7 the plea agreement summarizes

18  the potential immigration consequences to his guilty

19  plea.  The defendant is acknowledging that by

20  pleading guilty to a conspiracy charge to distribute

21  narcotics removal could be presumptively mandatory.

22           THE INTERPRETER:  I'm sorry, Counselor,

23  I was having difficulty hearing you.

24           MS. CLARK:  I apologize again.

25           THE INTERPRETER:  It's the

1  circumstances, Counselor.

2          MS. CLARK:  I will slow down a little

3  bit.

4          THE INTERPRETER:  It's just the masks.

5  It's everything.

6          MS. CLARK:  All right.  I will slow down

7  and repeat that.

8          Essentially the plea agreement

9  summarizes that Mr. Acosta-Banda is acknowledging

10  that by pleading guilty to the drug conspiracy

11  charge removal is presumptively mandatory and that

12  he is nevertheless agreeing that he wants to plead

13  guilty regardless of any immigration consequence.

14          On the bottom of page 7 Mr. Acosta-Banda

15  is agreeing that he is entering into this plea

16  agreement freely and voluntarily without any

17  threats, force, intimidation, or coercion.

18          The plea agreement then notes that the

19  agreement is limited to the undersigned parties and

20  cannot bind any other federal authority.

21          And, finally, on page 8 the plea

22  agreement summarizes the collaterally consequences,

23  including immigration previously summarized by the

24  Court.

25          It also notes that entering a guilty

1  plea satisfies his federal criminal liability in the

2  District of Connecticut, and that this plea

3  agreement encompasses all promises made by the

4  government in connection with this plea.

5          It is then signed at the bottom of page

6  8 by myself and there is a space on page 9 for Mr.

7  Acosta-Banda and his attorney, Attorney Maxwell.

8          THE COURT:  Thank you very much, Ms.

9  Clark.

10          What I'm going to do now, sir, is I want

11  to highlight certain provisions of this plea

12  agreement.  I'm going to begin by describing to you

13  how sentencing works.  As to any possible term of

14  imprisonment, supervised release, criminal fine, and

15  other parts of a sentence, there are several things

16  you must know.  First, I cannot impose a sentence

17  above what the statutory maximum sentence is or

18  below any mandatory minimum, but I have discretion

19  to determine where within that minimum and maximum

20  the sentence should be, and the exercise of

21  discretion will be based in large part on the

22  arguments and facts set forth by the government and

23  by you, through your defense counsel, as well as the

24  advice I receive from the United States Probation

25  Office which will prepare a document known as the

1   presentence investigation report.

2            Second, in deciding what sentence to

3   impose, I must consider the factors set forth in the

4   principal federal sentencing statute 18 U.S.C.

5   Section 3553. Those factors include the nature and

6   circumstances of the crime as well as your personal

7   history and character. I have to decide upon a

8   sentence that reflects the seriousness of the crime,

9   that promotes respect for the law, and that provides

10   just punishment.

11            I also must consider what sentence is

12   needed to protect the public and deter others from

13   engaging in crimes, in addition to what sentence may

14   serve rehabilitation goals such as to provide you

15   with educational and/or vocational training and with

16   medical care, if needed.

17            And the statute commands me to consider

18   the need to provide restitution and the need to

19   avoid unwarranted sentence disparities among

20   defendants who have similar backgrounds and who have

21   been convicted of similar criminal conduct.

22            Third, I have to consider what sentence

23   is recommended by the United States sentencing

24   guidelines. I do not have to follow what the

25   sentencing guidelines say, and I may depart or vary

```
1   upward or downward from the sentencing guidelines,

2   but that recommendation must be considered.

3            Based principally on the seriousness of

4   the crime and on a defendant's past criminal

5   behavior, the guidelines provide a presumptive

6   sentencing range, i.e. a maximum and minimum

7   sentence within the statute's permissible range.

8   There may, however, be factors present that would

9   allow for a departure from this presumptive

10  guideline range.  So there might be facts about your

11  case that would cause me to sentence you to a longer

12  or shorter term of imprisonment than the guidelines

13  calculation.  Until you are sentenced, which will be

14  after I receive a presentence report and hear from

15  you and from your lawyer and from the government,

16  you cannot know with certainty what the guidelines

17  recommendation will be, whether there will be

18  grounds to depart from the guidelines, and what the

19  ultimate sentence actually will be.

20           Moreover, in deciding what sentence to

21  impose I will very strongly consider, but I'm not

22  bound by, what you and the government have agreed to

23  regarding sentencing in your plea agreement.

24  Therefore, you won't know your sentence until the

25  day of sentencing.  And if I calculate your sentence
```

1    differently from what the sentencing guidelines

2    suggest or from what you and the government agreed

3    to or from what you hoped for, this will not allow

4    you to have the sentence cancelled, to withdraw your

5    guilty plea, and have the case go to trial.  Do you

6    understand all of that, sir?

7                    THE DEFENDANT:  Yes.

8                    THE COURT:  Do you understand that I can

9    impose a sentence more severe than you may expect?

10                    THE DEFENDANT:  Absolutely.

11                    THE COURT:  All right.  Sir, do you have

12   any questions about what I have explained about how

13   your sentence will be determined?

14                    THE DEFENDANT:  No.

15                    THE COURT:  Sir, I understand you wish

16   to plead guilty to Count One of the superseding

17   indictment.  It is a charge of conspiracy to

18   distribute and to possession with intent to

19   distribute heroin and fentanyl, in violation of

20   Title 21, United States Code, Sections 841(a)(1),

21   841(b)(1)(C), and 846.  I now want to discuss with

22   you the penalties and sentencing scheme that are

23   applicable in your case if you do plead guilty.  I

24   want you to understand that if you plead guilty to

25   this count you may be sentenced as follows:  A

1  maximum of 20 years of imprisonment; a maximum term

2  of supervised release of life, and should you

3  violate any condition of supervised release you may

4  be required to serve a further term of imprisonment

5  of up to two years per violation with no credit for

6  time already spent on supervised release; that you

7  may be assessed a fine of as much as $1 million, and

8  that you also are subject to an alternative fine

9  provision and the maximum fine that may be imposed

10 is the greatest of the following, twice the gross

11 gain from the offense, twice the loss from the

12 offense --

13            THE INTERPRETER:  I'm sorry, Your Honor.

14            THE COURT:  I was too fast?

15            THE INTERPRETER:  I just wasn't able to

16 hear some of that, everything.

17            THE COURT:  That's fine.

18            THE INTERPRETER:  The fine imposed and

19 what you said right after that.

20            THE COURT:  Twice the gross gain to the

21 defendant resulting from the offense, twice the

22 gross loss resulting from the offense, or $250,000,

23 or the amount specified in the section defining the

24 offense, which is $1 million.

25            And should the Court impose a fine or

1   restitution of more than $2,500, interest will be

2   charged on the unpaid balance of the fine not paid

3   within 15 days after the judgment date, and other

4   penalties and fines may be assessed on the unpaid

5   balance.

6           And I also must impose a mandatory

7   special assessment of $100 on each count in this

8   case for a total of $100.

9           Do you understand, sir, that your

10   sentence could be increased for a variety of

11   reasons, for example if it is determined you have a

12   more serious criminal history than we are currently

13   aware?  Do you understand that?

14           THE DEFENDANT:  Yes.

15           THE COURT:  And have you discussed this

16   possibility with Mr. Maxwell?

17           THE DEFENDANT:  Yes.

18           THE COURT:  And you understand that if

19   such matters are brought to my attention and I

20   decide to increase your sentence because of them you

21   may not withdraw your guilty plea?  Do you

22   understand?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Okay.  All right.  Sir, I

25   also understand that there is a section of your plea

1   agreement that concerns your rights to appeal.  Are

2   you aware of that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Ms. Clark, I assume the

5   United States has disclosed any and all provisions

6   concerning waiver of appeal rights in the plea

7   agreement; is that correct?

8            MS. CLARK:  Yes, Your Honor.

9            THE COURT:  Thank you.

10           Mr. Acosta-Banda, have the provisions

11  concerning waiver of your appeal rights been fully

12  explained to you?

13          THE DEFENDANT:  Yes.

14          THE COURT:  And do understand them?

15          THE DEFENDANT:  Yes.

16          THE COURT:  So in your plea agreement,

17  sir, you voluntarily, knowingly, and intelligently

18  waive your right to appeal or to attack your

19  conviction or sentence of imprisonment collaterally

20  if it does not exceed the following:  108 months of

21  imprisonment, a five-year term of supervised

22  release, a $100 special assessment, and a $250,000

23  fine.  And this is even if the Court imposes such a

24  sentence based on an analysis different from that

25  set forth above, and such waivers are generally

```
 1   enforceable.  Do you understand all of that?
 2                   THE DEFENDANT:  Yes.
 3                   THE COURT:  Mr. Maxwell, are there any
 4   sentencing issues that you believe would survive
 5   this waiver of appeal rights?
 6                   MR. MAXWELL:  No, Your Honor.
 7                   THE COURT:  Thank you, sir.
 8                   Sir, if despite the waiver you wish to
 9   appeal some issue that is claimed to survive it, you
10   must file a notice of appeal within 14 days of
11   sentencing.  Do you understand that timeline, sir?
12                   THE DEFENDANT:  Yes.
13                   THE COURT:  And are you willing to waive
14   the appeal rights described in the plea agreement?
15                   THE DEFENDANT:  Yes.
16                   THE COURT:  All right.  Sir, again, the
17   following charge is at issue here, Count One of the
18   superseding indictment, a violation of Title 21 of
19   the United States Code, Sections 841(a)(1),
20   841(b)(1)(C), and 846.  I will now ask Assistant
21   U.S. Attorney Clark to explain the elements of the
22   offense to which you intend to plead guilty.  By
23   elements, sir, I mean those facts that the
24   government would have to prove beyond a reasonable
25   doubt before you could be convicted were you to
```

1   decide not to plead guilty and instead proceeded to

2   trial.  And I want you to bear in mind that the

3   government would have to prove each of those facts

4   by persuading a jury of 12 persons that those facts

5   were true beyond a reasonable doubt.  Do you

6   understand?

7               THE DEFENDANT:  Yes.

8               THE COURT:  Ms. Clark?

9               MS. CLARK:  Your Honor, the elements of

10  the offense to which Mr. Acosta-Banda is pleading

11  guilty to are:  Number one, from approximately

12  February of 2019 through February 10th of 2020,

13  there was an agreement between two or more persons

14  to possess with the intent to distribute and to

15  distribute heroin and fentanyl; and two, during the

16  existence of the conspiracy the defendant knowingly,

17  willfully, and voluntarily became a participant in

18  or member of that agreement, and did so with the

19  intention of furthering an objective of the

20  conspiracy.

21              THE COURT:  Thank you very much.

22              MS. CLARK:  And I will briefly note, I

23  believe the plea agreement references August 2019.

24  If Attorney Maxwell agrees, we can change that in

25  the plea agreement to reflect the superseding

1    indictment dates.

2                THE COURT:  Okay.  What are those dates?

3                MS. CLARK:  February of 2019.

4                MR. MAXWELL:  Your Honor, I agree with

5    that.

6                THE COURT:  So what you might want to do

7    -- why don't you just do it now.  Why don't you make

8    the correction on the plea agreement and you can all

9    initial it.

10               MS. CLARK:  Thank you, Your Honor.

11               Your Honor, Attorney Maxwell made the

12   change, and I signed it.

13               THE COURT:  All right.  Thank you very

14   much.

15               All right.  Mr. Acosta-Banda, do you

16   understand the elements of the offense to which you

17   are here to plead guilty to?

18               THE DEFENDANT:  Yes.

19               THE COURT:  Do you have any questions

20   about the elements of this particular offense?

21               THE DEFENDANT:  No.

22               THE COURT:  Okay.  Sir, what we are

23   going to do now is we're going to turn to the

24   conduct that brings us here today, and I'm going to

25   ask you to tell me in your own words what you did

```
 1   that shows that you are, in fact, guilty of the
 2   charge which you are offering to plead guilty to.
 3   And you can consult with Mr. Maxwell for a moment if
 4   you need to.
 5              (Discussion held off the record.)
 6              THE DEFENDANT:  On the 10th of
 7   February 2020 someone sent me to pick up some money
 8   and I found out that it had to do with drugs at the
 9   moment that I was in the location before my arrest.
10              THE COURT:  All right.  After you found
11   it had to do with drugs, did you willingly
12   participate in trading the money for the drugs or
13   vice-versa?
14              THE DEFENDANT:  Yes.  I was there when
15   the federal agents came to arrest.
16              THE COURT:  No, no.  I'm asking you
17   about did you know -- I guess the question is, did
18   you agree then to be involved with distributing the
19   heroin and fentanyl or the money involved --
20   connected with it?
21              THE DEFENDANT:  Yes.  Yes.
22              THE COURT:  All right.  And you are
23   aware that there was more than just you involved?
24   There were two or more people who were involved with
25   this drug distribution?
```

1          THE DEFENDANT:  Yes.

2          THE COURT:  And so, therefore, you

3   knowingly, willingly, and voluntarily participated

4   in this drug operation?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Okay.  All right.  What I'm

7   going to do now is I'm going to ask Assistant U.S.

8   Attorney Clark to summarize what you did that shows

9   that you are, in fact, guilty of the charge to which

10  you intend to plead guilty to and to summarize the

11  government's evidence as to the charge against you.

12  Please listen carefully because when she is finished

13  I will ask you whether you agree with her summary of

14  what you did.

15          Ms. Clark?

16          MS. CLARK:  Your Honor, if this case

17  were to go to trial the government would prove the

18  following through the testimony of cooperating and

19  law enforcement witnesses, consensual recordings of

20  in-person meetings and phone calls, as well as video

21  surveillance and physical evidence.

22          In 2019 the Drug Enforcement

23  Administration received information from a

24  confidential source, CS, that one of the CS's heroin

25  customers, Wallace Best, along with Best's brother,

**67**

1    Jeffrey Thomas, Thomas's associate Jason Cox, was

2    seeking to exploit Cox's connection to a Mexican

3    drug cartel that was able to procure kilogram

4    quantities of narcotics moving across the border of

5    Mexico into the United States.

6              In a series of recorded conversations,

7    the evidence would show Best, Thomas, and Cox

8    introducing the CS to a Mexican source of supply and

9    discussing how that CS would be transporting

10   purchased narcotics from Cox's source out of

11   California.

12             As a result of those discussions, the CS

13   travelled to California for two purchases of

14   narcotics.  The second of those purchases occurred

15   on February 10, 2020.  The evidence would establish

16   the CS travelled to the Home Depot parking lot

17   located at 5920 Fairmont Avenue in San Diego for the

18   purpose of purchasing 5 kilograms of heroin at the

19   direction of Cox's Mexican source of supply.

20             Images, video, law enforcement, and CS

21   testimony would establish that upon arriving at the

22   Home Depot at the time and date coordinated with the

23   source of supply, a black Lincoln Zephyr being

24   driven by the defendant, Mr. Acosta-Banda, was

25   observed pulling into the Home Depot parking lot.

1   He situated his vehicle near the CS's vehicle.  He

2   was speaking on his phone.  He was observed scanning

3   the parking lot.  He is observed acknowledging by a

4   nod and a hand gesture to the driver of a white

5   pickup truck as that vehicle entered the parking lot

6   and travelled to the opposite side of the lot.

7           As this is happening, the CS would

8   testify that he was alerted by a cell phone call

9   that Cox's Mexican source of supply -- that he

10  should look for a green pickup truck who would be

11  there with the narcotics.

12          At that time Mr. Acosta-Banda, while

13  still on his cell phone, moves his vehicle from the

14  space next to the confidential source, drives to the

15  middle of the Home Depot parking lot and parks next

16  to a green pickup truck.

17          The defendant is observed exiting the

18  vehicle, greeting the driver and passenger of the

19  green pickup truck.  As they're standing there the

20  white pickup truck drives back towards the center of

21  the Home Depot parking lot, parks next to the green

22  pickup, gets out --

23          (Discussion held off the record.)

24          MR. MAXWELL:  Sorry, your Honor.

25          THE COURT:  No, it's fine.

1          MS. CLARK:  The driver exits and greets

2    the defendant and the driver of the green pickup and

3    the passenger of the green pickup.  The evidence

4    would then establish after several minutes the

5    driver of the green pickup is observed walking away

6    from the group to a fourth vehicle, retrieving from

7    the trunk of that vehicle a Modelo beer box, which

8    he then delivers to the CS's vehicle, at which point

9    the DEA agents identify themselves and place the

10   defendant and others under arrest.

11          With respect to the suspected narcotics

12   delivered to the confidential source in the Modelo

13   beer box, the laboratory testing would confirm the

14   box contained approximately 5 kilograms of heroin.

15          The evidence would further establish

16   that at the time of the defendant's arrest he

17   consented to law enforcement searching his cell

18   phone.  During a search of that phone officers

19   located WhatsApp conversations from February 9

20   wherein the defendant is forwarded a voice message

21   from Cox's source of supply, and on the day of the

22   controlled purchase, February 10th, the defendant

23   exchanges messages with that same contact over

24   WhatsApp acknowledging that they want five pieces,

25   is the quote translated from Spanish.  And in that

```
1   same series of exchanges the defendant forwards the

2   contact information for the Home Depot to another

3   contact within that phone.

4            THE COURT:  All right.  I just want to

5   make sure I understand this.

6            MS. CLARK:  Yes, Your Honor.

7            THE COURT:  So there were a number of

8   cars that are at a location that has been previously

9   arranged through these various means to meet up with

10  the confidential source to purchase 5 kilograms of

11  heroin, correct?

12           MS. CLARK:  Yes, Your Honor.

13           THE COURT:  And then what then happened

14  is that the actual heroin was in another car that

15  was delivered, although not the car of the

16  defendant, but once you all arrested everyone, based

17  on the movements and arrangement of the cars as well

18  as the information on Mr. Acosta-Banda's cell phone,

19  it's clear he was connected in the operation to

20  deliver and transport these 5 kilograms of heroin,

21  correct?

22           MS. CLARK:  Yes, Your Honor.

23           THE COURT:  Okay.  Thank you.

24           All right.  Mr. Acosta-Banda, it is a

25  long summary, but the real important question is
```

43

1   whether or not her summary of what you did, do you

2   agree with that?  Not anyone else.  I just want to

3   know, her summary of what you did, your involvement

4   in that transaction, do you agree with her summary?

5          THE DEFENDANT:  Yes.

6          THE COURT:  All right.  Is there

7   anything she said about what you did -- anyone else

8   I don't worry about -- but what you did that you

9   disagree with what she said?

10         THE DEFENDANT:  No.

11         THE COURT:  All right.  Is there

12   anything else you wish to say about her summary?

13         THE DEFENDANT:  No.

14         THE COURT:  Okay.  All right.  Now,

15   turning back to the plea agreement itself, Mr.

16   Acosta-Banda, does the written plea agreement and

17   the other matters we have discussed today as

18   outlined by Assistant U.S. Attorney Clark fully and

19   accurately reflect your understanding of the

20   agreement that you have entered into with the United

21   States government?

22         THE DEFENDANT:  Yes.

23         THE COURT:  And you are aware that your

24   attorney, Mr. Maxwell, and the prosecutor, Assistant

25   U.S. Attorney Clark, and perhaps Assistant U.S.

**72**

```
1   Attorney Peck, have discussed your agreement to

2   plead guilty?

3               THE DEFENDANT:  Yes.

4               THE COURT:  And is your willingness to

5   plead guilty today based on the prior discussions

6   between Mr. Maxwell and Assistant U.S. Attorney

7   Clark and/or Peck that have resulted in this plea

8   agreement that we have here today?

9               THE DEFENDANT:  Yes.

10              THE COURT:  And other than the promises

11  contained in the written agreement, has anyone made

12  any promises that are causing you to plead guilty

13  today, sir?

14              THE DEFENDANT:  No.

15              THE COURT:  And has anyone made any

16  threats against you or is anyone in any way forcing

17  you to plead guilty or otherwise coercing you to

18  plead guilty today, sir?

19              THE DEFENDANT:  No.

20              THE COURT:  And are you pleading guilty

21  today of your own free will and because you are, in

22  fact, guilty?

23              THE DEFENDANT:  Yes.

24              THE COURT:  All right.  If you are

25  ready, go ahead and sign the plea agreement, date
```

1 the plea agreement, and Mr. Maxwell will take

2 custody of it and provide it to Ms. Perez.

3         MR. MAXWELL:  For the record, Your

4 Honor, the defendant has initialed and dated the

5 change on page 1 and signed the plea agreement.

6         THE COURT:  All right.  Thank you.

7         MR. MAXWELL:  May I approach, Your

8 Honor?

9         THE COURT:  Please.

10         All right.  At this time, sir, I will

11 ask the clerk of court to ask you how you wish to

12 plead.  This is your last opportunity to decide

13 whether you wish to go through with this and enter a

14 plea of guilty.  Are you ready to be put to a plea,

15 sir?

16         THE DEFENDANT:  Yes.

17         THE COURT:  All right.  Please stand.  I

18 will have the charge read to you unless you waive a

19 reading of the charge.  Do you waive a reading of

20 the charge?

21         THE DEFENDANT:  Yes.

22         THE COURT:  All right.  Ms. Perez?

23         THE CLERK:  In the case of United States

24 of America v. Constantino Acosta-Banda, Criminal No.

25 3:20CR28(VAB), as to Count One of the superseding

1  indictment charging you with a violation of Title

2  21, United States Code, Sections 841(a)(1),

3  841(b)(1)(C), and 846, what is your plea?

4              THE DEFENDANT:  Guilty.

5              THE CLERK:  Your Honor, the defendant

6  pleads guilty as to Count One of the superseding

7  indictment.

8              THE COURT:  All right.  Thank you very

9  much, Ms. Perez.

10             On the basis of the plea agreement and

11 the other matters discussed today, the answers given

12 by Mr. Acosta-Banda under oath, on the record, and

13 in the presence of his counsel, Mr. Maxwell, to the

14 questions of the Court, the remarks of Mr. Maxwell

15 and the remarks of Assistant U.S. Attorney Clark, it

16 is the finding of the Court in the case of the

17 United States v. Constantino Acosta-Banda, that the

18 defendant is fully competent and capable of entering

19 an informed plea, that the defendant is aware of the

20 nature of the charge and the consequences of the

21 plea, and that the plea of guilty is a knowing and

22 voluntary plea supported by an independent basis in

23 fact containing each of the essential elements of

24 the offense.

25             The Court finds that the defendant knows

1    of his right to plead not guilty and to a trial and

2    related rights, and that he's give up these rights

3    by his plea of guilty; that he knows the maximum

4    possible sentence and any minimum required sentence

5    in terms of imprisonment, supervised release,

6    monetary fine, forfeiture, restitution, and payment

7    of a special assessment; that he knows of the

8    Court's obligation to consider the sentencing

9    statute and the sentencing guidelines; he knows of

10   and accepts the plea agreement provision regarding

11   waiving his right to appeal or attack his sentence

12   collaterally; and, because he is not a United States

13   citizen, he could be deported and removed from the

14   United States, denied citizenship, and denied

15   admission to the United States in the future.

16            The plea to Count One of the superseding

17   indictment, therefore, is accepted, and Mr.

18   Acosta-Banda is now adjudged guilty of that offense.

19   Accordingly, a finding of guilty shall enter and

20   this case is referred to the United States Probation

21   Office for a presentence investigation.

22            Mr. Acosta-Banda, a United States

23   probation officer will prepare a presentence report

24   on you.  This report will be submitted to the Court

25   to assist it in determining the appropriate sentence

1  in your case.  Please bear in mind that the

2  probation officers work for the court, not the

3  United States attorney.  So your cooperation and

4  that of your family and friends with the United

5  States probation officer will benefit you.  It is

6  very important, however, that you discuss carefully

7  with your attorney what you say to the probation

8  office because, again, the presentence report is

9  very important in the process of determining your

10  sentence under the sentencing guidelines.  In

11  addition, anything that you, your family, friends or

12  anyone else tells the probation officer could have

13  an impact on your sentence and other consequences as

14  well.  You also have the right to have your attorney

15  present during your conversation -- discussions with

16  the probation officer.  Do you understand all of

17  that, sir?

18              THE DEFENDANT:  Yes.

19              THE COURT:  So please read and review

20  the presentence report with your attorney.  At

21  sentencing I will ask if you have read the

22  presentence report, understood it, and given any

23  response you have to it to the probation officer or

24  to your attorney.

25              Mr. Maxwell, is there an application for

49

1   release pending sentencing?

2              MR. MAXWELL:  No, Your Honor.  There is

3   an immigration detainer on him.  He is in custody.

4   Although I do have one mechanical request when the

5   Court is ready.

6              THE COURT:  Sure.

7              MR. MAXWELL:  As I understand it, there

8   was a presentence report prepared for him in

9   connection with an immigration-related prosecution

10   in California, which I am sure the United States

11   Probation Office will be getting a copy of.  I would

12   request that they be directed to share that with me

13   as well.  I think it's only fair if they have it

14   that we should have it.

15              THE COURT:  Okay.  Hang on a second.

16              Ms. Clark, does the United States have

17   any objection?

18              MS. CLARK:  Your Honor, I would only

19   note that I'm not sure that the probation office can

20   share the PSR.

21              THE COURT:  Yeah, I'll tell you what, I

22   think we're going to -- let's take this up with the

23   probation office.  Let's find out.  I mean, at the

24   appropriate time maybe you want to sort of file

25   something with them if you are having difficulty

1  getting it and we can then take it up at that time.

2          MR. MAXWELL:  My only request is if

3  they're going to have it, I would want to.

4          THE COURT:  I understand your issue is

5  that to the extent it may have something that

6  impacts on sentencing, not having that information,

7  you know, could certainly prejudice your client, but

8  what I want to do -- what I don't want to do is get

9  ahead of that issue without probation present to

10  sort of address any of the issues that are involved

11  there.

12          MR. MAXWELL:  Well, I didn't want to get

13  behind the issue.

14          THE COURT:  No, I think getting ahead of

15  the issue is the right thing, but I don't want to

16  get ahead of probation as I get ahead of the issue.

17          MR. MAXWELL:  Thank you, Your Honor.

18          THE COURT:  All right.  Under Local Rule

19  32(f) I am deferring entering a scheduling order.

20  If the parties can meet, consult with probation and

21  arrive at mutually agreeable deadlines for

22  disclosure of memorandum and sentencing and submit a

23  schedule by March 19th, that will be greatly

24  appreciated.

25          Does that schedule work for the United

1    States, Ms. Clark?

2              MS. CLARK:  Yes, Your Honor, it does.

3              THE COURT:  Mr. Maxwell?

4              MR. MAXWELL:  Yes, Your Honor.

5              THE COURT:  All right.  Is there

6    anything further we need to do today, Ms. Clark?

7              MS. CLARK:  Not from government.

8              THE COURT:  Mr. Maxwell?

9              MR. MAXWELL:  No, Your Honor.

10             THE COURT:  All right.  Thank you very

11   much.

12             We are adjourned.

13             (Proceeding concluded 11:20 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

52

```
 1

 2

 3            I certify that the foregoing is a correct

 4    transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7                              2/7/22

 8                               Date

 9

10              /S/   Sharon Montini

11                 Official Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**81**

MAR 15 2021 pm3:47
FILED-USDC-CT-NEW HAVEN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Grand Jury N-19-1

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:20CR28 (VAB) |
| v. | VIOLATIONS: |
| WALLACE BEST, a.k.a. "Coop"; JEFFREY THOMAS, a.k.a. "Zig"; JASON COX; OSCAR GARCIA-HERNANDEZ, a.k.a. "Psych"; GUSTAVO GONZALEZ-YANEZ; JESUS MENDEZ; DAVID AZARIAS MORALES-VERDUGO; FRANK JAMONT BEST, a.k.a. "JB," "Cash"; LAMONT D. JEFFERIES, a.k.a. "Lamonte Jefferies"; and TOMASZ TUROWSKI | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), 841(b)(1)(A)(vi) and 846 (Conspiracy to Distribute and to Possess With Intent to Distribute Heroin and Fentanyl)

21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i), 841(b)(1)(C) and 846 (Possession with Intent to Distribute and Distribution of Controlled Substances and Conspiracy to Distribute and to Possess With Intent to Distribute Heroin, Fentanyl and Cocaine Base/Crack Cocaine)

21 U.S.C. §§ 843(b) and 846 (Use of a Communication Facility to Facilitate Narcotics Conspiracy) |

SECOND SUPERSEDING INDICTMENT

The Grand Jury charges:

COUNT ONE
(Conspiracy to Distribute, and to Possess with
Intent to Distribute, Heroin and Fentanyl)

1.     From approximately February 2019 through February 2020, the exact dates

being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the

defendants WALLACE BEST, a.k.a. "Coop"; JEFFREY THOMAS, a.k.a. "Zig"; JASON

COX;  OSCAR  GARCIA-HERNANDEZ,  a.k.a.  "Psych;  GUSTAVO  GONZALEZ-

YANEZ; JESUS MENDEZ; and DAVID AZARIAS MORALES-VERDUGO, with Oscar

**82**

Zavala, a.k.a. "Manuel Garcia Martinez," "Oscar Rangel Zavala," and "Oscar Zavala Rangel" and Constantino Acosta-Banda, charged separately, and with others known and unknown to the Grand Jury, did knowingly and intentionally conspire together and with one another to possess with intent to distribute controlled substances, contrary to the provisions of Title 21, United States Code, Section 841(a)(1).

<u>SUBSTANCES AND QUANTITIES INVOLVED IN THE CONSPIRACY</u>

2.    The object of the conspiracy with respect to the defendants WALLACE BEST, JEFFREY THOMAS, JASON COX, OSCAR GARCIA-HERNANDEZ, GUSTAVO GONZALEZ-YANEZ, JESUS MENDEZ, and DAVID AZARIAS MORALES-VERDUGO was the possession with intent to distribute heroin, a Schedule I controlled substance, and N-phenyl-N-[1-(2-phenyletheyl)-4-piperidinyl] propanamide ("fentanyl"), a Schedule II controlled substance, and these defendants knew and reasonably should have foreseen from their own conduct and that of other members of the narcotics conspiracy charged in Count One that the conspiracy involved one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(i), and 400 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenyletheyl)-4-piperidinyl] propanamide ("fentanyl"), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(vi).

All in violation of Title 21, United States Code, Section 846.

COUNT TWO
(Conspiracy to Distribute, and to Possess with
Intent to Distribute, Heroin, Fentanyl and Cocaine Base/Crack Cocaine)

3.      From approximately February 2019 and continuing until approximately February 2020, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the defendants WALLACE BEST, a.k.a. "Coop"; JEFFREY THOMAS, a.k.a. "Zig"; FRANK JAMONT BEST, a.k.a. "JB," and "Cash"; LAMONT JEFFERIES, and TOMASZ TUROWSKI, and others known and unknown to the Grand Jury, knowingly and intentionally conspired together and with one another to distribute, and to possess with the intent to distribute, controlled substances, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1).

SUBSTANCES AND QUANTITIES INVOLVED IN THE CONSPIRACY

4.      The object of the conspiracy with respect to the defendants WALLACE BEST, JEFFREY THOMAS, and FRANK JAMONT BEST, was the possession with intent to distribute heroin, a Schedule I controlled substance, and N-phenyl-N-[1-(2-phenyletheyl)-4-piperidinyl] propanamide ("fentanyl") and cocaine base/crack cocaine, Schedule II controlled substances, and these defendants knew and reasonably should have foreseen from their own conduct and that of other members of the narcotics conspiracy charged in Count Two that the conspiracy involved 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(i), and N-phenyl-N-[1-(2-phenyletheyl)-4-piperidinyl) propanamide ("fentanyl") and cocaine base/crack cocaine, Schedule II controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

3

5.     The object of the conspiracy with respect to the defendant LAMONT JEFFERIES was the possession with intent to distribute heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

6.     The object of the conspiracy with respect to the defendant TOMASZ TUROWSKI was the possession with intent to distribute heroin, a Schedule I controlled substance, and cocaine base/crack cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

All in violation of Title 21, United States Code, Section 846.

COUNT THREE
(Possession with Intent to Distribute and Distribution of Heroin)

7.     On or about February 26, 2019, in the District of Connecticut, the defendant FRANK JAMONT BEST, a.k.a. "JB" and "Cash," knowingly and intentionally possessed with intent to distribute and did distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COUNT FOUR
(Possession with Intent to Distribute and Distribution of Fentanyl)

8.     On or about March 7, 2019, in the District of Connecticut, the defendant FRANK JAMONT BEST, a.k.a. "JB" and "Cash," knowingly and intentionally possessed with intent to distribute and did distribute a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide ("fentanyl"), a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

4

**85**

<u>COUNT FIVE</u>
(Possession with Intent to Distribute and Distribution of Heroin)

9.     On or about March 14, 2019, in the District of Connecticut, the defendant FRANK JAMONT BEST, a.k.a. "JB" and "Cash," knowingly and intentionally possessed with intent to distribute and did distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).


<u>COUNT SIX</u>
(Possession with Intent to Distribute and Distribution of Heroin)

10.    On or about March 21, 2019, in the District of Connecticut, the defendant FRANK JAMONT BEST, a.k.a. "JB" and "Cash," knowingly and intentionally possessed with intent to distribute and did distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).


<u>COUNT SEVEN</u>
(Possession with Intent to Distribute and Distribution of Heroin and Cocaine
Base/Crack Cocaine)

11.    On or about June 4, 2019, in the District of Connecticut, the defendant FRANK JAMONT BEST, a.k.a. "JB" and "Cash," knowingly and intentionally possessed with intent to distribute and did distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and cocaine base/crack cocaine, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COUNT EIGHT
(Use of a Telephone to Facilitate a Narcotics Conspiracy)

12.     On or about June 5, 2019, in the District of Connecticut, the defendant
TOMASZ TUROWSKI, did knowingly and intentionally use a communication facility, to
wit, a telephone, in facilitating the commission of any act or acts constituting a felony under
Title 21, United States Code, Section 846, that is, the conspiracy to possess with intent to
distribute controlled substances charged in Count Two of this Second Superseding
Indictment.

All in violation of Title 21, United States Code, Section 843(b).

SECTION 851 INFORMATION

13.     Pursuant to Title 21, United States Code, Sections 841(b)(1)(A),
841(b)(1)(B), 841(b)(1)(C), and 851, upon conviction of the offenses charged in Count One
and Count Two of this Second Superseding Indictment, the defendant WALLACE BEST is
subject to enhanced penalties as he has been previously convicted of a serious drug felony,
as defined by Title 21, United States Code, Section 802(57) as set forth more specifically in
paragraph 14 below.

14.     On or about August 22, 2002, the defendant WALLACE BEST was
convicted in the United States District Court for the District of Connecticut, Docket No.
3:01CR179 (SRU), of Conspiracy to Possess with Intent to Distribute 500 Grams or More
of Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B)(ii), which at the
time was punishable by up to 40 years of imprisonment and for which the defendant was
sentenced to a term of 63 months of imprisonment and an eight-year term of supervised
release. On or about February 1, 2007, within 15 years of the commencement of the instant

6

**87**

offense, after having served more than 12 months of that sentence, the defendant WALLACE BEST was released from this term of imprisonment.

15.     Pursuant to Title 21, United States Code, Sections 841(b)(1)(A), (b)(1)(B) and (b)(1)(C), and 851, upon conviction of the offenses charged in Count One and Count Two of this Second Superseding Indictment, the defendant JEFFREY THOMAS is subject to enhanced penalties as he has been previously convicted of a serious drug felony, as defined by Title 21, United States Code, Section 802(57) as set forth more specifically in paragraph 16 below.

16.     On or about May 2, 2002, the defendant JEFFREY THOMAS was convicted in the United States District Court for the District of Connecticut, Docket No. 3:01CR179 (SRU), of Conspiracy to Possess with Intent to Distribute 50 Grams or More of Cocaine Base and 500 Grams or More of Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(iii) and 841(b)(1)(B)(ii), which at the time was punishable by up to a lifetime of imprisonment and for which the defendant was sentenced to a term of 262 months of imprisonment followed by 15 years of supervised release.  On or about January 9, 2019, within 15 years of the commencement of the instant offense, after having served more than 12 months of that sentence, the defendant JEFFREY THOMAS was released from this term of imprisonment.

17.     Pursuant to Title 21, United States Code, Sections 841(b)(1)(A), (b)(1)(B) (b)(1)(C), and 851, upon conviction of the offense charged in Count One of this Second Superseding Indictment, the defendant JASON COX is subject to enhanced penalties as he has been previously convicted of a serious drug felony, as defined by Title 21, United States Code, Section 802(57) as set forth more specifically in paragraph 18 below.

18.     On or about May 18, 2001, the defendant JASON COX was convicted in the United States District Court for the District of Connecticut, Docket No. 3:00CR69 (AWT), of Conspiracy to Possess With Intent to Distribute and Distribution of More than Fifty Grams of Cocaine Base, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 841 (b)(1)(A)(iii), two counts of Possession With Intent to Distribute Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2, five counts of Possession With Intent to Distribute Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and one count of Possession of a Firearm in Connection With Drug Trafficking, in violation of 18 U.S.C. § 924(c)(1), each of which at that time had a maximum sentence that exceeded 10 years, and was sentenced to a term of 420 months of imprisonment.  On August 8, 2013, the Court vacated JASON COX's conviction on Count 14 which charged him with Possession of a Firearm in Connection with Drug Trafficking, in violation of 18 U.S.C. § 924(c)(1) and dismissed that count.  On or about August 8, 2014, within 15 years of the commencement of the instant offense, JASON COX was re-sentenced to time served, after having served more than 12 months of his sentences.

All in accordance with Title 21, United States Code, Sections 802(57), 841(b)(1)(A), (b)(1)(B), (b)(1)(C) and 851.

<u>FORFEITURE ALLEGATION</u>
(Controlled Substance Offenses)

19.     Upon conviction of the controlled substance offenses alleged in Counts One through Seven of this Second Superseding Indictment, the defendants WALLACE BEST, a.k.a. "Coop"; JEFFREY THOMAS, a.k.a. "Zig"; JASON COX; OSCAR GARCIA-HERNANDEZ, a.k.a. "Psych"; GUSTAVO GONZALEZ-YANEZ; JESUS MENDEZ; DAVID AZARIAS MORALES-VERDUGO, FRANK JAMONT BEST, a.k.a. "JB" and

8

"Cash," LAMONT JEFFRIES, and TOMASZ TUROWSKI shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, all right, title, and interest in any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the violations of Title 21, United States Code, Section 846, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said violation[s], and a sum of money equal to the total amount of proceeds obtained as a result of the offenses.

20.     If any of the above described forfeitable property, as a result of any act or omission of the defendant(s), cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant(s) up to the value of the forfeitable property described above.

All in accordance with Title 21, United States Code, Section 853, and Rule 32.2(a),

Federal Rules of Criminal Procedure.

A TRUE BILL

FOREPERSON

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

KAREN L. PECK
ASSISTANT UNITED STATES ATTORNEY

LAUREN C. CLARK
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO.: 3:20cr00028 (VAB) |
| | : | |
| v. | : | |
| | : | |
| CONSTANTINO ACOSTA-BANDA | : | OCTOBER 19, 2021 |

**MEMORANDUM IN AID OF SENTENCING**

## I.     **INTRODUCTION**

On March 4, 2021, the defendant appeared before this Court and entered a guilty plea to Count I of and eight count superseding Indictment charging him with conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c) and 846.  The plea was entered pursuant to a written plea agreement wherein the defendant's base offense level was calculated to be 32 pursuant to USSG § 2D1.1(c)(3).  Two levels were then subtracted pursuant to USSG § 3B1.2 based on the fact that the defendant was a minor participate in the offense conduct and three levels were then subtracted for his acceptance of responsibility and prompt notification of his intention to plead guilty resulting in a total offense level of 27.  The defendant's criminal history places him in category III and with a total offense level of 27, the resulting advisory guideline sentencing range is 87 to 108 months with a supervised release term of two to five years.

1

**92**

As set forth in the PSR, there are nine co-defendants involved in this matter which stems from an investigation which commenced in January of 2019 as described in paragraph six through 15 of the PreSentence Report. This defendant was arrested and taken into custody in connection with a sale of drugs to the confidential informant on February 10, 2020 in The Home Depot parking lot in San Diego, California involving approximately five kilograms of heroin. Prior to that date, this defendant had absolutely no connection to anyone charged in the conspiracy or events occurring before February 10, 2020. As set forth in paragraph 20 of the PSR he was involved only in this one transaction and being held responsible for the narcotics involved in that February 10, 2020 purchase.

For the reasons set forth in this memorandum, the defendant submits that a sentence of maybe 48 months is sufficient but not greater than necessary to satisfy the requirements of 18 U.S.C. § 3553a.

II.   **LEGAL STANDARD**

A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In reaching its sentencing decision, the Court must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. See *United States v. Booker*, 543 U.S. 220, 245-46 (2005); *Gall v. United States*, 552 U.S. 38, 59 (2007). The Court should begin by calculating the applicable Sentencing Guidelines range.

2

**93**

However, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

Rather than relying on the Guidelines, a sentencing court must make an individualized assessment as to the appropriate sentence based on the facts presented and in light of each of the factors set forth in 18 U.S.C. § 3553(a). The Court may impose a below-Guidelines sentence based entirely on policy considerations, including disagreements with the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Seval*, 293 F. App'x 824, 836-37 (2nd Cir. 2008) (unpublished summary order) ("the Supreme Court has made is clear that sentencing judges may consider the general appropriateness of a Guideline range"). This is particularly true when considering Guidelines that are not based on the Sentencing Commission's traditional empirical and experiential study. See *Kimbrough*, 552 U.S. at 109.

Section 3553(a)(2) states that the purposes of sentencing include:

(A)     to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

To determine a sentence that best comports with these goals, the Court shoulder consider: (1) the nature and circumstances of the offense and the history and characteristics of the

3

**94**

offender; (2) the kinds of sentences available; (3) the kinds of sentences and the sentencing range

established in the Sentencing Guidelines; (4) policy statements issued by the Sentencing

Commission; (6) the need to avoid unwarranted sentence disparities amount similarly situated

defendants; and (7) the need to provide restitution to any victims of the offense.  See 18 U.S.C. §

3553(a)(1), (a)(3)-(7).  Most importantly, the Court should order a sentence that is "sufficient,

but not greater than necessary, to comply with the purposes" of sentencing.

III.    **FACTS**

      The defendant does not dispute the facts as set forth in the PSR.  This was the defendant's

only involvement in any aspect of this conspiracy and for that matter his only involvement in the

distribution of narcotics during his lifetime.  Unwittingly, his involvement likely began when he

decided to return to the United States to reunite with his family following his deportation or

removal from the United States in December of 2018.  At that time, he was working and living in

Tiajuana and driving a pickup truck with California plates on it.  He was approached by a man he

did not know who asked if he was from California and he replied his family was there, but he

had been deported.  The man very pleasantly suggested he go back to California and the

defendant said it was very expensive to go and he did not have any money.  The man said he

knew someone who could help him with that like a layaway or pay later plan and all the

defendant had to do was provide two addresses, one in Mexico and one in California in case they

needed to locate him to get their money back.  The defendant believed that with the earnings

4

from his granite business he could repay this debt.  The defendant provided the addresses and was smuggled into the United States and after arriving here, he was contacted by a second man known to him only as Gordo who told him that he would be in charge of getting the money that the defendant owed.  The total price was $8,500.00, but if he paid it over time the price was $10,000.00.  There was no written contract, agreement or time deadline other than the second man telling the defendant not to take too long to pay because he could always be sent back to Mexico.  The defendant spoke to this man regularly as he would call to find out how things were going.  He had paid before his arrest $1,300.00 and the man sent someone to Chula Vista, where the defendant was living with his family to retrieve those funds.

On February 9, 2020, the man called Gordo called the defendant and asked what he was doing the next day.  Rain was expected so the defendant replied he would not be working.  On February 10, 2020, he called the defendant again and told him that he had to pick up some money for him that day.  Initially, he thought he would be picking up money for smuggling people across the border and agreed to do it because he still owed several thousand dollars for his crossing, but his view of the transaction soon changed.  Gordo then sent him a message with the address of The Home Depot and directed him to send the message with the address of The Home Depot a Mr. Palma-Javalera also known as Pariente.  The defendant had met Mr. Palma-Havalera approximately three months before this incident and they had become quite friendly.  He is actually a distant cousin of the defendant's mother.  After several communications with

5

**96**

Gordo, an unknown male and Mr. Palma-Javalera, he realized he was, in fact, picking up money for drugs and assisting in making the arrangements at the direction of others.

The defendant arrived at The Home Depot looking for two people in a green pickup truck as he was told by Gordo that they would give him the money he was to retrieve. When he did not see the green pickup truck, he called Gordo again and was simply told to just wait for them to call you. Thereafter, another individual called the defendant from a number that he did not recognize and was not registered in his phone informing him that the green pickup truck had just arrived and stating further that it was important that Mr. Palma-Javalera should not speak with the person from whom he was going to get the money. At one point, he sent Mr. Palma-Javalera a communication about five pieces after previously exchanging other messages with him.

The green pickup truck arrived and the defendant drove over and parked next to it and met the two individuals who he did not know and who he had never met in the past. Mr. Palma-Javalera arrived subsequently in a white F-150 pickup truck. Thereafter, a black sedan vehicle parked next to the green pickup truck and the person in the black vehicle opened the truck and retrieved a Modelo beer box. The defendant did not know the driver of the black vehicle and had never seen him before. The Modelo beer box was handed to one of the individuals from the green pickup truck who then walked over towards the car with the money at which point the defendant and others were arrested. The defendant had no idea how much money he was supposed to pick up that day.

6

As previously indicated, the events of February 10, 2020 at The Home Depot were the defendant's only involvement in the charged conspiracy and for that matter the only time the defendant has ever been involved in the unlawful distribution of narcotics. He had absolutely no proprietary interest in the transaction and clearly was not a manager or director of the same, but merely an individual who was sent to the location in order to retrieve the proceeds from the transaction. He did not even know how much money he was supposed to receive. His expected compensation for these activities was a partial reduction in the remaining $8,700.00 debt he owed to those individuals who assisted him in getting back into the United States in late 2018, but he had no idea how much of a reduction. As an individual who has always made his living and supporting his family as best he could through honest labors in the granite countertop business, he is completely and totally ashamed for his misconduct and embarrassed and humiliated for himself and his family for the situation he has put himself in. He knows full well he never should have returned to this country after his removal in 2018 and is now paying a severe penalty for his actions. In light of what happened to his four brothers, he should have known better from the outset, but was lonely and missed his family terribly and was desperate to return.

IV.   **DISCUSSION**

    A.   **The defendant's background and work history.**

The defendant was born in 1978 in Chihuahua, Mexico, a rural farming area with large tracks of land and had eight siblings. His parents had a common law relationship for 27 years and his father is now deceased while his mother is 63 years of age and living in the Sierra Mountain area. His first job was being paid to tend goats while living with his parents and at the age of 12 he moved in with his grandparents who owned a plot of land and grew tomatoes, onions and other produce and while living there he operated a small popsicle stand at a bus depot. His grandparents lived a 12 to 13 hour car ride from his parents so he saw little of them, but at age 13 he moved to Tiajuana, Mexico to live on his own. He explained to the probation officer that his mother had too many children who were bringing so much stress to her life, she did not seem to mind that he moved out on his own. At times, he felt rejected by his family as he was the only child with a darker complexion and was often referred to as "charcoal boy." When he moved to Tiajuana he secured a job working as a watchman which he did for several months and then began working for a man who operated a fruit business cart and at that age learned how to run and manage a fruit business. In Tiajuana he was living in a rundown building with people he met on the street barely getting by with his meager earnings and often times going hungry. Fortunately, he met a woman by the name of Leonida Lopez who provided him with a home and often cooked for him and he continued to maintain his own employment in the fruit business and also doing odd jobs wherever he could find them including driving children to school. When he was 18 years of age, the parents of children he transported to and from school offered him a

8

**99**

room in their home which was a large ranch.  He remained there for about a year and a half, but moved out when he got married to Leticia Alvarez, presently age 39, in 1998.

The defendant first came to the United States in the year 2000 when he traveled from Tiajuana to San Francisco and worked for his wife's uncle for a period of time doing granite countertop installations and learned this occupation.  He then returned to Mexico and ultimately returned to the United States in 2002 with his wife and then eldest child who was born in Tiajuana and is presently 21 years of age.  Prior to that, while living in Mexico, he would easily walk across the border into the United States and when he returned to the United States in 2002 he was self-employed installing granite countertops and remained working in that avocation up until the time of his arrest for this offense.  He would frequently be hired by customers at Home Depot to install granite counters purchased at the store and at times worked for Granite Depot.  At the time of his arrest, his eldest son was helping him in the business and learning the same.

As reported in paragraph 68 of the PSR, he has three other children, all boys, ages 17, 14 and 10.  The oldest resides with his girlfriend and works with his older brother in the construction and granite countertop business.  The 14-year-old resides with his mother along with the 10-year-old.  According to the defendant, the 14-year-old has autism and often times exhibits poor and out of control behavior and needs, in the defendant's words "a little extra care and cannot be treated like the other children."

9

The defendant's formative years in the rural farming area of Mexico were quite different from those that one might experience here in the United States due to the early separation from his parents and grandparents.  At the age of 12, he moved away from his mother and father and lived with his maternal grandparents and at the age of 13 moved on his own to Tiajuana, Mexico, far away from his parents and grandparents.  According to the defendant's self-report to the probation officer, he was diligent in his efforts to support himself and later his family starting at an early age and continued to do so over the years.   After moving initially to the United States to the San Francisco area, he learned the granite countertop business and continued to work in that business both in Tiajuana and for the many years that he was in the United States prior to his arrest in order to support his family as previously described.

Educationally, he completed only the second grade; however, he has developed moderate fluency in the English language and for the most part is able to read and write in English and do math all of which he learned on his own over the years.

A very dark side of his background is the fate of his four brothers as described in paragraphs 55 and 56 of the PSR.  Apparently one brother, Juan Carlos at age 32, was shot by a watchman who mistook him and his friend as thieves when they were sitting around drinking at a construction site.  Another brother, Natiridad, was the victim of a kidnapping and was shot and killed by his captors in 2010 at the age of 32.  This death, according to the defendant, created "bad blood" between the cartel and the Acosta-Banda family that resulted in the kidnappings of

10

**101**

his two additional brothers, Alberto and Ismael.  One was kidnapped in 2010 at the age of 31 and has not been seen since and the other brother was kidnapped on his way to a doctor's appointment, and he too has not been seen since and was 30 years of age when he disappeared. The defendant was told after the disappearance of his brother, Alberto, that "anyone seen in the Banda family will be killed."  For these reasons, the defendant has never since returned and never plans to return to the geographical area in Mexico where he was born and his family resided.

### B.    The defendant's criminal and immigration history.

The defendant's criminal history is a level III and should be considered in light of his apparent longstanding problem with alcohol abuse which was a contributing factor in seemingly all of his arrests.  Indeed, the offenses for which the defendant has been convicted all involve alcohol to some degree or another including an initial arrest in 2006 for operating under the influence for which he received no points as well as another arrest in 2007 for domestic violence for which he received no points.  The defendant was intoxicated when that incident with his spouse occurred.  In 2011, he was convicted twice for operating under suspension for a DWI and also at that time refused a blood alcohol test.  His most significant arrest was in 2017 when he was charged with a hit and run automobile accident involving alcohol resulting in serious physical injuries to a child.  The defendant was very much under the influence on that evening as described in paragraph 43 of the PSR.  He had gone to a restaurant in San Diego to watch a

11

boxing match with his co-worker, Jorge Adame.  His wife was present and after having words with her at this establishment, he apparently got into an argument with another individual resulting in a fight and he was punched and kicked in the face by this other individual.  The defendant then left the premises riding as a passenger in his truck with Mr. Adame driving.  The defendant did not recall the specific details of the collision, but indicated that Mr. Adame was driving the car at the time of the accident.  Mr. Adame claimed the defendant was driving.  Both were intoxicated.  His only recollection was being involved in a physical altercation at the bar and then being awakened by authorities and moving the vehicle after the accident to the side of the road.  According to the Sentencing Memorandum filed by his federal defender in the matter described in paragraph 44, the defendant was tried twice in State Court in the DWI hit and run while causing injury charges and both trials ended in hung juries and mistrials.  This count was dismissed by the trial court in March of 2018.  Ultimately, he entered a guilty plea to battery and destruction of property and was sentenced to the time served which was 321 days.

The motor vehicle accident case drew the attention of the Immigration and Customs Enforcement and resulted in his prosecution, conviction and removal or deportation described in paragraph 44 of the PSR.  In addition, in January of 2017, he was arrested for a domestic violence offense involving his wife, but the charges were dropped or not prosecuted.  The defendant's alcohol abuse dates back to when he was 17 years old when he first tried alcohol, but at the time he did not think he had a problem with his consumption.  As time when on and after

12

he married, he realized, as he told the probation officer, he began to make poor decisions when it came to drinking. He often drank to excess at social gatherings and on weekends and as his consumption increased, he began drinking at home before he would go out for the evening. He was not able to provide the probation officer with an estimate as to how much or how often he was drinking, but gave an example as described in paragraph 73 of the PSR indicating that he and his cousin between December 3, 2016 and January 4, 2017 together consumed 64 liters of tequila in addition to beer. Not surprisingly, his cousin eventually died due to alcoholism and the defendant fully recognizes that alcohol has led him to make poor decisions indicating that the majority of times he has been arrested in the past he has been drunk which he knows does not justify or excuse his criminal behaviors especially those which impact others. In fact, on the morning of his arrest in this matter, he had consumed at least two beers and perhaps more prior to his arrival at The Home Depot parking lot. Even since his arrest, he was cited twice by Wyatt officials for possessing a bag of what appeared to be homemade alcohol. The defendant understands that he must remain sober after his release from prison and to that end is hopeful to be able to participate in an intensive alcohol treatment program while serving his sentence and continue with groups such as Alcoholics Anonymous in Mexico after his release. He hopes that by maintaining sobriety he will never find himself in a criminal court again and will set an example for his children and provide a lesson to them not to repeat the mistakes of alcohol abuse he has made.

13

As stated in paragraph 66 of the PSR, the defendant has never had legal status in the United States and has been expeditiously removed to Mexico on at least five occasions between November of 2002 and April of 2007 and thereafter removed via a reinstatement of a prior removal on seven occasions between July of 2004 and 2017 and voluntarily returned to Mexico on five occasions between 2009 and 2011.   He was removed or deported following his conviction described in paragraph 44 of the PSR and now has an immigration detainer lodged against him.   On the one hand, these several instances of removal and return show a complete disrespect of American Immigration law, but on the other hand in the defendant's own words, the reason he kept returning to this country was because of his family, namely his wife and four children who live here, one a special needs child with autism.   In 2003, when he moved his wife and first-born son to the United States, he had to pay someone to assist in their entering the country; however, it was not until his most recent reentry in 2019 that he had any financial arrangement for his return.   He clearly loves his children and understands how they are dependent on him for his parental and financial support.   Prior to his last illegal entry, he had served a nine-month federal sentence preceded by 321 days in state custody and felt lonely and isolated in Mexico.   He advised the probation officer he is proud that he has been able to learn how to read, write and do math on his own and been able to use the gifts that have been given to him by God to earn a living and care for his family.   He is also very proud of his children even though he often times has not provided them with the best example, but they are successfully

14

making their way in life. While his numerous, unlawful reentries into this country do on one level demonstrate a disregard for our immigration laws, on another level it demonstrates a devotion to his children and now estranged wife over the many years past. He will never again try to enter the United States illegally and upon his release plans to settle and work in Tiajuana in order that his children can more easily visit with him there.

### C.   The appropriate sentence.

The defendant's advisory sentencing guideline range of 87 to 108 months is far greater than is reasonably necessary to accomplish the goals of sentencing as set forth in 18 U.S.C. § 3553. In determining the appropriate sentence in this case, the defendant urges the Court to consider several of the observations by Judge Gleason in the matter of *United States of America v. Ysidro Diaz,* **No11-CR-00821-2JG2013 WL322243 (ED.U.V. Jan. 28, 2013)**. In that matter, Mr. Diaz was charged with an offense involving one kilogram of heroin and was therefore facing a 10-year mandatory minimum prison sentence. Mr. Diaz was eligible for the safety valve; however, as Judge Gleason wrote "he got out of the mandatory minimum frying pan, but all that got him was into the guidelines fire." In this matter, the defendant did not plead to a count requiring a 10-year mandatory minimum prison sentence; however, even with the two-level reduction for his minor role in the offense, the high end of his advisory guideline range is just 11 months short of the 10-year mark. Among the several observations by Judge Gleason about the drug guidelines two are very relevant to this case. First, in Judge Gleason's view, the guideline

15

**106**

ranges are excessively severe because they subject all drug trafficking defendants to the harsh weight-driven regime that should be intended only for managers and leaders of drug organizations. Second, drug trafficking offense guidelines should be more sensitive to factors directly relevant to culpability, including the defendant's role in the offense and less sensitive to drug type and quantity. While Judge Gleason did not believe quantity was irrelevant in assessing a defendant's culpability, he felt the guidelines were flawed to the extent that drug quantity is the predominant factor to determine a defendant's culpability. By way of example, the Judge observed that a dealer who sells 50 kilograms of heroin inflicts far more harm on society and deserves greater punishment than one who sells only a kilogram. He noted numerous factors that distinguish one drug offender's culpability from another including the defendant's role, the defendant's compensation, whether he had a proprietary interest in the drugs, how long he was involved in drug trafficking, why defendant got involved to begin with and whether he stopped because he was arrested or for some other reason. He further observed drug quantity rarely has the dominant affect the Commission has ascribed to it especially when it comes to determining the culpability of couriers and other low-level offenders.

Applying these principals to the instant matter makes a sentence within the advisory guidelines applicable to this defendant seems unduly harsh and greater than is necessary for this defendant. While he does have a criminal history category of III, there is nothing to indicate in his criminal record that he was ever involved in the drug trafficking business and clearly the

16

transaction to have taken place on the date he was arrested was his only involvement in the entire conspiracy charged in the indictment.  With no prior involvement in drug trafficking and the debt he owed and not knowing any of the other participants except Mr. Palma-Javalera, he was the perfect individual to undertake the ministerial task of picking up the money for the leaders and organizers.  As for payment, he was never told what his compensation would be, but assumed it would be at least partial reduction in the debt he owed to Gordo and others for his trip across the border.  Except for Mr. Palma-Javalera, he did not know any of the other individuals with whom he was arrested and because of the debt he owed, he felt he had no choice to comply with Gordo's request especially in light of the possible consequences he may have suffered if he refused, perhaps the least of which was being sent back.

The defendant does not view himself as and evil or vile person.  Like many defendants, he did not think of the very serious harm drugs such as heroin cause individuals and society. Like many when asked how he would feel if one of his children became addicted to heroin or worse, the response was of course terrible; and, his view in regard will act as a significant deterrent for him in the future.  As reported by the probation officer, to his credit he came across during the interview as forthcoming, engaged and extremely appreciative of the officer's efforts.

A sentence of maybe 48 months is certainly punitive to this defendant and a deterrent to him specifically and to the public at large.  It would not minimize the seriousness of his misconduct, but does reflect his actual culpability in a more realistic way than a sentence within

17

**108**

the advisory guideline range.  A four-year separation from his children will, in fact, be extremely severe for this defendant and will deter him from ever being involved in this type of conduct again.   Following his release from his sentence, he will be deported and removed from the country which he will not oppose in any way and he will never return.  It is a lesson he will never forget and an experience he will never risk repeating.  It will also provide adequate opportunity for him to receive needed substance abuse treatment for his longstanding alcohol abuse.  It is a sentence that is sufficient, but not greater than necessary to satisfy the requirements and goals of 18 U.S.C. § 3553a.

THE DEFENDANT
Constantino Acosta-Banda


By _____
John D. Maxwell, Esquire
Brown Paindiris & Scott, LLP
2252 Main Street
Glastonbury, CT 06033
Fed. Bar No. ct00051
Tel. No. (860) 659-0700
Fax No. (860) 652-4382
Email:  jmaxwell@bpslawyers.com

18

**109**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO.:  3:20cr00028 (VAB) |
| | : | |
| v. | : | |
| | : | |
| CONSTANTINO ACOSTA-BANDA | : | OCTOBER 19, 2021 |

        This is to certify that on October 19, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                                    THE DEFENDANT
                                    Constantino Acosta-Banda


                                    By _____
                                    John D. Maxwell, Esquire
                                    Brown Paindiris & Scott, LLP
                                    2252 Main Street
                                    Glastonbury, CT 06033
                                    Fed. Bar No. ct00051
                                    Tel. No. (860) 659-0700
                                    Fax No. (860) 652-4382
                                    Email:  jmaxwell@bpslawyers.com

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: 3:20 CR 28 (VAB) |
| | : | |
| v. | : | |
| | : | |
| CONSTANTINO ACOSTA-BANDA | : | October 26, 2021 |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The Government respectfully submits this memorandum in aid of sentencing and in response to the defendant's sentencing memorandum that was filed on October 19, 2021 (Doc. No. 645). The defendant, Constantino Acosta-Banda, was arrested in San Diego, California as he coordinated the delivery of five kilograms of heroin to a DEA confidential source on behalf of cartel connections in Mexico. Unsurprisingly, this was not the defendant's first brush with the law, having been deported seventeen times before the instant offense. Despite those numerous deportations, the defendant continued to re-enter the United States illegally, where he committed numerous offenses including a domestic assault on the mother of his children, a DUI hit-and-run that left one little boy fighting for his life, and the instant offense. For these reasons, as set forth in greater detail below, a sentence within the Guidelines range of between 87 to 108 months of imprisonment is the appropriate sentence to reflect the statutory factors applicable in a criminal sentencing.

I.      **THE OFFENSE AND RELEVANT CONDUCT/FACTUAL BACKGROUND**

The facts underlying Acosta-Banda's conviction are set out accurately in the U.S. Probation Officer's Presentence Report ("PSR") but summarized herein with additional relevant detail.

The DEA's investigation began in approximately January 2019 when agents received information from an informant that an individual was selling "raw" or "loose" heroin in the North End of Bridgeport, Connecticut. *See* PSR ¶ 7. After making a series of controlled purchases of heroin from that individual in February and March 2019, the DEA was able to confirm the individual's identity as Frank Best. *Id.* In the following months, from May 2019 through August 2019, the DEA conducted electronic surveillance, *i.e.*, a court-authorized wiretap, on wire and electronic communications over a series of four targeted telephones belonging to Frank Best and Jeffery Thomas, both of whom have prior federal narcotics convictions. *Id.* The intercepted communications revealed that Frank Best distributed heroin (at times combined with fentanyl) and crack-cocaine, and that he was being supplied by Thomas and Wallace Best. *See* PSR ¶ 8.

As interceptions continued in Connecticut, the DEA received information that law enforcement authorities in Suffolk County, New York, were conducting a state wiretap and had intercepted Wallace Best speaking with his heroin supplier.  *See* PSR ¶ 9.  One of the intercepted conversations included talk about Jeffrey Thomas' connection to Mexican drug cartel traffickers who could provide high-quality heroin at a good price.  Wallace Best explained that Thomas had made these connections in prison and that Wallace Best and Thomas were looking for a way to exploit those connections to transport narcotics to Connecticut. *Id.*

After being arrested by authorities in New York, Wallace Best's heroin source agreed to cooperate with the DEA's ongoing investigation in Connecticut. *See* PSR ¶ 10. Thereafter, from approximately August 2019 through October 2019, the source (hereinafter "CS-1") had a series of consensually recorded conversations over the phone and in person in which Wallace Best and Thomas introduced CS-1 to Jason Cox, a long-time Jeffrey Thomas associate who, at the time, was living in Georgia and who worked with Mexican drug trafficker Oscar Garcia-Hernandez,

a/k/a "Psych." Wallace Best and Jeffrey Thomas were eager to establish an operation in Connecticut that would receive a steady supply of narcotics from the West Coast. *Id.* CS-1 offered to provide transport for the cartel-sourced narcotics from California to Connecticut, which Cox confirmed would include "dope" and "coke" in amounts up to five kilograms at a time. Cox introduced CS-1 to Psych, and they began communicating about potential transactions.

The first transaction was arranged by Cox and Psych for a kilogram of heroin and was described as a trial run to see if CS-1 could provide transport from coast to coast as he claimed. *See* PSR ¶ 11. The transaction entailed a trip to San Diego, California, and the purchase of 1.1 kilograms of fentanyl that was transferred to CS-1 by conspirators Jesus Mendez and Oscar Zavala in exchange for $27,000 of DEA funds. *See* PSR ¶¶ 12-14.

Thereafter, the Connecticut-based conspirators and CS-1 continued their discussions after the first transaction which was considered to be a success, showing CS-1's ability to transport narcotics back to Connecticut. So, a second, larger transaction—this one for five kilograms of heroin—was arranged to occur on February 10, 2020 in the same Home Depot parking lot in San Diego. *See* PSR ¶ 15.

Shortly after CS-1 arrived at the Home Depot parking lot as directed by co-defendant Garcia-Hernandez, law enforcement observed defendant Acosta-Banda, in a black Lincoln Zephyr, pull into the lot and pull his vehicle into a spot a few spots down from CS-1's vehicle. *See* PSR ¶ 17. Acosta-Banda appeared to be constantly scanning the parking lot and talking on his cell phone. *See* PSR ¶16. Shortly after CS-1 was told by Garcia-Hernandez to look for a green pickup truck in the parking lot, agents observed Acosta-Banda move his vehicle within the parking lot so that it was situated next to a green pickup truck being driven by Gustavo Gonzalez-Yanez. Gonzalez-Yanez's passenger was Jesus Mendez, who was also present at the first narcotics transaction. *See*

**113**

PSR ¶ 17.  Acosta-Banda exited his vehicle and began conversing with Mendez and Gonzalez-Yanez.  *Id.*  As this happened, conspirator David Morales-Verdugo arrived and removed a large Modelo beer box from his trunk and handed the box to Gonzalez-Yanez, who walked the box over to CS-1's vehicle under the close watch of Mendez, Acosta-Banda, and others.  *Id.*  Once the delivery occurred, law enforcement seized the beer box and took Acosta-Banda, Mendez, Morales-Verdugo, and Gonzalez-Yanez into custody.  The contents of the beer box was sent to the DEA lab where it was found to contain approximately 4.9 kilograms of heroin.  *Id.*

A search of Acosta-Banda's phone revealed a series of communications with another individual that appear to be related to the February 10, 2020 drug transaction.  Specifically, shortly after CS-1 arrived in San Diego for the anticipated controlled purchase, Acosta-Banda texted this contact in Spanish that "the guy just got here" and confirmed that "they want 5 . . . pieces," in reference to the five kilograms of heroin that had been ordered by Cox from Garcia-Hernandez to be delivered during this second deal.  *See* PSR ¶ 18.  Acosta-Banda also told this individual that the potential meeting was happening "around 3," which was consistent with information being provided by Garcia-Hernandez to CS-1.  Acosta-Banda also sent this contact the address for the "Home Depot" at "5920 Fairmount," which is the location ultimately used for the controlled purchase. *See id.*

The evidence therefore shows that Acosta-Banda was acting as a coordinator for this multi-kilogram deal and appeared to have prior associations with others involved in the transaction, including Garcia-Hernandez, Cox's connection to the Mexican cartel.

## II.      SENTENCING GUIDELINES

As set forth in the PSR and the parties' plea agreement dated March 4, 2021, the defendant's base offense level is 32 under U.S.S.G. §2D1.1(c)(4) since the offense involved at

least 3 kilograms but less than 10 kilograms of heroin. *See* PSR ¶ 26. The parties agree that the three-level reduction for acceptance of responsibility applies and that the defendant should receive a two-level reduction based on a minor role in the criminal activity pursuant to § 3E.1.1(a) and (b), and U.S.S.G. §3B1.2(b). *See* PSR ¶ 29. Finally, both the Government and PSR calculate the defendant to fall within Criminal History Category III. A total offense level of 27 and a CHC of III results in Guidelines range of 87 to 108 months of imprisonment. *See* PSR ¶ 87. The Guidelines term of supervised release is three years. *See* PSR ¶ 90.

### III.   LEGAL STANDARD

As the Court is undoubtedly aware, after the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005), rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir.), cert. denied, 549 U.S. 882 (2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant;" (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing

Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

**IV.   DISCUSSION**

**A.   Seriousness of the Offense**

On February 10, 2020, Acosta-Banda and three co-conspirators delivered five kilograms of heroin to a DEA confidential source, in the middle of the day, in a crowded parking lot, in the hopes of walking away with thousands of dollars in profit.  One of the co-conspirators, David Azarias Morales-Verdugo, brought a loaded gun.  Acosta-Banda's offense in serious in that he coordinated the delivery of bulk quantities of heroin, on behalf of a drug cartel, across the border from Mexico into the United States.  While he purports to be only involved in a single narcotics transaction and did not otherwise know or associate with his co-conspirators, this claim defies credibility. First, by the defendant's own admission, he was present at the Home Depot to pick up drug proceeds for a five-kilogram purchase of heroin.  *See* Def.'s Mem. at 5-6.  Because the heroin in this deal was to be sold to the DEA source for $25,000 for each of the first four kilograms, this means that someone within the cartel trusted the defendant enough to let him take custody of at least $100,000 of drug proceeds and transport the money back to cartel sources.  Second, although the defendant attempts to distance himself from the individuals who coordinated the deal, his phone records tell a different story.  In the text messages from his phone, the defendant appears to be alerting the cartel to the DEA source's arrival in California ("the guy just got here").  The defendant also places the order for the narcotics ("they want 5 . . . pieces") to be delivered at the Home Depot and appears to do this at least a day prior to the scheduled deal.  *See also* Def.'s Mem. at 5 (admitting to coordinating with someone named "Gordo" the day before the drug delivery). He also appears to convey an understanding of when the deal is supposed to occur ("around 3")

**116**

and conveys the location of the deal ("5920 Fairmount Home Depot") to others.  This is not evidence of the defendant being an unwitting drug mule, but rather a more integral participant in the narcotics delivery team, and in fact someone involved in coordinating others. His supervision of people and events happening when the five kilograms was being delivered strongly supports that inference.

The defendant's critiques of the Guidelines relying too heavily on drug type and quantity, and less on role, is belied by the truth of how trafficked narcotics make their way into the community.  *See* Def.'s Mem. at 15-16.  Drug users usually acquire their narcotics from individuals often referred to as street-level dealers.  Street level dealers are typically found carrying several grams of user-sized, pre-packaged heroin and/or fentanyl.  Above them in the distribution chain are usually a series of redistributors who deal in bulk quantities of pre-packaged heroin and/or fentanyl.  The quantities attributable to redistributors vary anywhere from tens to hundreds of grams at a time, depending on the product and the price.  Above redistributors, at least in Connecticut and within the region, are the operators of heroin mills and stash houses.  These individuals can work with quantities of several hundred grams to kilogram quantities at a time.  In many cases, these heroin mills are used to prepare and package bulk quantities of raw product into the pre-packaged heroin that is ultimately distributed on the streets.  In this case, the five kilograms of heroin smuggled over the border into the United States from Mexico, is where the entire distribution process begins.  The product was packaged as bulk heroin—it was not yet prepared for street-level distribution—and the quantity was such that it would be changing hands many times, before making it to the end user.  In that respect, the defendant's conduct—had the narcotics actually made their way to Connecticut as intended by Cox, Best and Thomas—would have impacted significantly more people in our community than any street dealer or redistributor.  This

**117**

makes the Guidelines range eminently reasonable.

**B.  History and Characteristics of the Defendant**

Acosta-Banda's history and characteristics also merit a substantial sentence.   The

defendant's criminal history, up until now, appears to be limited to a series of traffic infractions

and domestic abuse arrests, which he claims were fueled exclusively by alcohol addiction.  While

in terms of a CHC calculation, this may be true, the reality is much more insidious than it appears.

After the defendant's arrest in 2017 for a DUI crash and hit-and-run that left a six-year-old boy

fighting for his life, federal records revealed that the defendant had been previously deported at

least seventeen times since 2002.  *See* Def's Mem. at 14 (describing the seventeen removals from

the United States prior to the instant offense).  After each of those deportations, the defendant came

back.  He claims that it was simply to be with his children, but the reality is that he also brought

violence and danger.

The defendant was arrested numerous times for driving under the influence, driving

without a license, and driving on a suspended license.  His 2017 arrest for hitting and almost killing

a child is proof that even a misdemeanor criminal offense can be dangerous and even deadly.  *See*

David Hernandez et al, "DUI Suspect in Hit-Run Crash That Left Boy, 6, Badly Hurt Was

Deported 15 Times," San Diego Union Tribune (May 9, 2017) *available at*

https://www.sandiegouniontribune.com/news/public-safety/sd-me-dui-deportee-20170509-

story.html; CBS Los Angeles, "Suspected DUI Driver That Hospitalized Child Has Been Deported

15 Times," *available at*  https://www.youtube.com/watch?v=ktY_eYmhq1w (posted May 11,

2017).  His domestic abuse charges are equally troubling and rife with evidence that the defendant

is not only a danger to the community at large but will also engage in physical violence with the

people closest to him.  Finally, the defendant's criminal history category fails to account for the

fact that each time the defendant re-entered the United States unlawfully, he committed a federal criminal offense.  In this respect, the fact that the defendant's CHC represents only one federal reentry conviction is under-representative of his actual criminal history.  In this regard, a sentence within the calculated Guidelines range is reasonable.

### C.   Deterrence, Protection of the Public, Promote Respect for the Law

A significant term of imprisonment also serves the goals of providing adequate deterrence, protecting the public and promoting respect for the law.  As stated in the PSR, prior arrests and convictions for illegal reentry, DUI and domestic assault have failed to deter the defendant from committing additional offenses or continuing to hurt other people.  Indeed, his offense conduct upon each illegal reentry has escalated to the point where he is now trafficking kilogram quantities of narcotics over the border for members of a Mexican drug cartel, drugs that go all over the country as this case shows.  The sentence imposed needs to send a clear and unequivocal message that anything other than compliance with the law will not be tolerated and that protection of the public from the offenses committed by the defendant is paramount.

### V.   CONCLUSION

For the reasons stated herein and on the full record of this case and an assessment of the factors outlined in 18 U.S.C. § 3553(a), the Government respectfully submits that in light of the seriousness of the offense, the defendant's history and characteristics, and the need of the sentence to provide just punishment, respect for the law and to deter the defendant and others from engaging in criminal activity, the sentence which is sufficient but not greater than necessary to accomplish

those various sentencing goals is a term of imprisonment within the Guidelines range of 87 to 108 months of imprisonment.

Respectfully submitted,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

/s/*Lauren C. Clark*
LAUREN C. CLARK
Federal Bar No. phv09365

KAREN L. PECK
ASSISTANT UNITED STATES ATTORNEYS
1000 Lafayette Boulevard, 10th Floor
Bridgeport, CT 06604
Tel: (203) 696-3000

**120**

<u>CERTIFICATION</u>

I hereby certify that on October 26, 2021, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/*Lauren C. Clark*
LAUREN C. CLARK
ASSISTANT UNITED STATES ATTORNEY

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
District of Connecticut

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| | ) | Case Number:  3:20cr28 (VAB)-06 |
| | ) | USM Number:  68307-298 |
| Constantino Acosta-Banda | ) | |
| | ) | John D. Maxwell |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)   1 of the Superseding Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 | Conspiracy to Distribute and to Possess with Intent to Distribute Heroin and Fentanyl | 2/11/2020 | 1s |

   The defendant is sentenced as provided in pages 2 through ___6___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)   1   ☑ is   ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

11/2/2021
Date of Imposition of Judgment

Victor Bolden
Digitally signed by Victor Bolden
Date: 2021.11.16 15:36:53
-05'00'

Signature of Judge

Victor A. Bolden, USDJ
Name and Title of Judge

11/16/2021
Date

**122**

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page  2  of  6

DEFENDANT:   Constantino Acosta-Banda
CASE NUMBER:   3:20cr28 (VAB)-06

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
70 months.

☑ The court makes the following recommendations to the Bureau of Prisons:
   The defendant shall be placed in a facility in California that can allow family visitation.
   FCI Mendota
   FCI Victorville
   FCI Terminal Island (low)

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m.   ☐ p.m.   on _____ .

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**123**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3 — Supervised Release
_____
                                                    Judgment—Page __3__ of __6__

DEFENDANT:     Constantino Acosta-Banda
CASE NUMBER:   3:20cr28 (VAB)-06

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

 3 years.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from
     imprisonment and at least two periodic drug tests thereafter, as determined by the court.
             ☐ The above drug testing condition is suspended, based on the court's determination that you
               pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of
       restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as
       directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
       reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached
page.

**124**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | |
|---|---|---|---|
| | Judgment—Page | 4 | of | 6 |

DEFENDANT:   Constantino Acosta-Banda
CASE NUMBER:   3:20cr28 (VAB)-06

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature   _____   Date _____

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page ___5___ of ___6___

DEFENDANT:   Constantino Acosta-Banda
CASE NUMBER:  3:20cr28 (VAB)-06

## SPECIAL CONDITIONS OF SUPERVISION

1. If you are ordered deported from the United States, you must remain outside the United States unless legally authorized to re-enter. If you re-enter the United States, you must report to the nearest Probation Office within 72 hours after you return.

2. You must participate in a program recommended by the Probation Office and approved by the Court for inpatient or outpatient substance abuse treatment and testing. You must follow the rules and regulations of that program. The probation officer will supervise your participation in the program. You must pay all or a portion of costs associated with treatment based on your ability to pay as recommended by the probation officer and approved by the Court.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page   6   of   6

DEFENDANT:  Constantino Acosta-Banda
CASE NUMBER: 3:20cr28 (VAB)-06

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

11/5/21

TO: United States District Court of Connecticut
     Office of the Court Clerk
     915 Lafayette Blvd.
     Bridgeport, CT. 06604

NOV 17 2021 PM 1:21
FILED - USDC - BPT - CT

Re: U.S. vs. Constantino Acosta-Banda
     Docket No. 3:20 CR 00028 (VAB)

Notice of Appeal:

   Movant was arrested on 2-11-20 for
violating 21 U.S.C. 841(a)(1), 841(B)(1)(C),
and 846. He plead guilty on 3-04-21
and was sentenced on 11-2-21.
   Movant wishes to appeal both his conviction,
and sentence for the following reasons.

   I: Ineffective assistance of Counsel:
          Movant was lied to repeatedly by his
defense counsel in regard to his culpability
regarding the allegations against Him. Mr.
Banda was adamant in his denial of any
prior knowledge regarding any drug conspiracy,
and maintained that he was only present at
the scene of the alleged transaction, to pick
up money that was owed to the person who
smuggled him into the Country. He owed this
person approximately $8700.00 and was
told that if he picked up this money, the
smuggler would make a substantial deduction
to his debt. None of this seemed to matter

**128**

to his defense counsel. He was still informed by said counsel that he was fully culpabile of everything in the indightment. To the extent that he was told to Lie to the Court and say he was a willing participant in the alleged conspiracy. He was intimidated into pleading guilty to all charges when his defense counsel told him that if he did not plead guilty, he would be convicted anyway, and face a substantial amount of time.

II: Movant's Guilty Plea cannot be valid because it was not made knowingly, willingly, and voluntarily:

Due to his defese Counsil's intimidation, as well as being miss informed, Movant's plea of guilty should be recinded. (Baykin v. Alabama)

Movant respectfully requests this Court to set aside both his guilty plea and his subsequint sentence, and assign him new counsel as he can no longer afford to pay legal fees.

Respectfully Submitted,

Banda Acosta constantixo

Sworn to and subscribed
before me this
5 day of november, 2021

129

Constantino Acosta-Danda #68507-298
Donald W. Wyatt detention Facility.
950 High St.
Central Falls RI. 02863

U.S. District Court of Connecticut
Office of the Court Clerk
915 Lafayette Blvd.
Bridge Port CT. 06604

0660434768 C025

**130**

```
 1              UNITED STATE DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3  - - - - - - - - - - - - -  x
                                : Case No.
 4  UNITED STATES OF AMERICA,    : 20CR28(VAB)
                                :
 5            Government,        :
          vs.                   :
 6                              : 915 Lafayette Blvd
    CONSTANTINO ACOSTA-BANDA,    : Bridgeport, CT
 7                              : November 22, 2021
            Defendant.          :
 8  - - - - - - - - - - - - -  X

 9

10          TRANSCRIPT OF SENTENCING HEARING

11  BEFORE:  THE HONORABLE VICTOR A. BOLDEN, U.S.D.J.

12  APPEARANCES:
    FOR THE GOVERNMENT:      LAUREN C CLARK, ESQ.
13                           DOJ-USAO
                             1000 Lafayette Boulevard
14                           Ste 10th Floor
                             Bridgeport, CT 06604
15

16
    FOR THE DEFENDANT:       JOHN D. MAXWELL, ESQ.
17                           Brown, Paindiris & Scott
                             2252 Main St.
18                           Glastonbury, CT 06033

19

20

21

22              Sharon Montini, RMR, FCRR
                 Official Court Reporter
23                 915 Lafayette Blvd
                  Bridgeport, CT 06604
24

25
```

1            (Proceeding commenced 9:55 a.m.)

2            THE COURT:  All right.  Please be

3  seated.  We are here in the United States v.

4  Constantino Acosta-Banda.  Will counsel please state

5  their appearances for the record.

6            MS. CLARK:  Good morning, Your Honor.

7  Lauren Clark on behalf of the United States.

8            THE COURT:  Good morning, Ms. Clark.

9            MR. MAXWELL:  Good morning, Your Honor.

10  John Maxwell on behalf of the defendant, Mr.

11  Acosta-Banda, who is sitting to my left.

12            THE COURT:  All right.  Good morning,

13  Mr. Maxwell.  Good morning, Mr. Acosta-Banda.

14            I will also note for the record that

15  United States Probation Officer Lauren Axcia Harte

16  is also present, and then we also have an

17  interpreter present.

18            Ms. Perez, would you swear the

19  interpreter in.

20            (Oath administered)

21            THE COURT:  All right.  Would you please

22  state your name, address, and qualifications for the

23  record.

24            THE INTERPRETER:  Yes.  Good morning,

25  Your Honor.  Carlos Camacho, federally certified

1    Spanish interpreter with over 20 years of federal

2    court work, living in Ulster County, New York.

3              THE COURT:  Thank you, Mr. Camacho.  And

4    have you had an opportunity to speak with Mr.

5    Acosta-Banda?

6              THE INTERPRETER:  Yes, I have without

7    any difficulty at all, Your Honor.

8              THE COURT:  All right.  Great.  Is there

9    any reason why you would not be able to justly,

10   truly, fairly, and impartially act as an

11   interpreter?

12             THE INTERPRETER:  No, Your Honor.

13             THE COURT:  Thank you so much.  And I

14   appreciate you being here as always, Mr. Camacho.

15             On March the 4th of this year Mr.

16   Acosta-Banda appeared before me and entered a guilty

17   plea to Count One, which charged him with conspiracy

18   to distribute and to possess with intent to

19   distribute heroin and fentanyl, in violation of 21

20   U.S.C. Sections 841(a)(1), 841(b)(1)(C), and 846.

21             The United States Probation Office then

22   prepared a presentence report.  The final report was

23   dated October the 13th of this year.  I have

24   reviewed that and the first addendum, also dated

25   October 13th of this year, and consulted with its

4

1   principal author United States Probation Officer

2   Harte.  I have also reviewed the various submissions

3   by both sides regarding this case.

4            Mr. Maxwell, have you and Mr.

5   Acosta-Banda read and discussed the presentence

6   report and any addenda to it?

7            MR. MAXWELL:  Yes, Your Honor.  We did

8   read the first presentence report, the first

9   disclosure, with the aid of an interpreter via Zoom.

10   The second disclosure I just discussed what the new

11   -- the small parts of it that were new without the

12   aid of an interpreter.  But Mr. Acosta-Banda

13   understands English a lot, can read English a lot.

14   I prefer to have an interpreter present for court

15   proceedings so he doesn't miss anything.

16            THE COURT:  All right.  And were there

17   any objections to any of the factual statements in

18   these documents?

19            MR. MAXWELL:  No, Your Honor.

20            THE COURT:  All right.  Thank you very

21   much.

22            Assistant U.S. Attorney Clark, does the

23   United States have any objections to any of the

24   factual statements in the presentence report or its

25   addenda?

**134**

1          MS. CLARK:  No, Your Honor.

2          THE COURT:  All right.  With there being

3    no objections to the factual statements contained in

4    the presentence report, the Court adopts them as its

5    findings of fact in this case.

6          And, Ms. Clark, I should have asked this

7    at the outset, but there are no issues with the

8    Crimes Victims' Rights Act; is that correct?

9          MS. CLARK:  That is correct.

10         THE COURT:  Thank you very much.

11         I also accept the plea agreement from

12   March the 4th of 2021.  I am satisfied that the

13   agreement adequately reflects the seriousness of the

14   actual offense behavior and that accepting it will

15   not undermine the purposes of sentencing.

16         Mr. Acosta-Banda faces the following

17   maximum and minimum penalties as a matter of

18   statute.  Under 21 U.S.C. Sections 841(a)(1),

19   841(b)(1)(C), and 846, he faces a maximum term of

20   imprisonment of up to 20 years.  Under 18 U.S.C.

21   Section 3571, he faces a maximum fine of $1 million.

22   He faces a minimum term of supervised release of at

23   least three years and maximum term of life, and if

24   he were to violate any condition of supervised

25   release, he could then be sentenced to additional

6

1    time in prison of as much as the statutory maximum

2    of two years.  He is eligible for probation for not

3    less than one, no more than five years.  And the

4    Court also must impose a mandatory special

5    assessment under 18 U.S.C. Section 3013 of $100 on

6    each count of conviction, in this case a total of

7    $100.

8              Do either counsel have any objection or

9    correction to that statement of the minimum and

10   maximum penalties in this case?  Ms. Clark?

11             MS. CLARK:  No, Your Honor.

12             THE COURT:  Mr. Maxwell?

13             MR. MAXWELL:  No, Your Honor.

14             THE COURT:  And I think the government

15   filed a motion for providing the third point of

16   acceptance of responsibility.  That motion is hereby

17   granted.

18             It looks like we have got a base offense

19   level of 32.  Subtracting the three points for

20   acceptance of responsibility brings us to a total

21   offense level of 29.  Mr. Acosta-Banda is in

22   Criminal History Category III.  The resulting

23   sentencing guideline range is 87 to 108 months.

24   Term of supervised release, two to five years.  He's

25   not eligible for probation under the guidelines.

7

1　The fine range is 25,000 to 250,000 dollars, and

2　there is the mandatory special assessment of $100 on

3　each count for a total of $100.

4　　　　　　Ms. Harte is standing.  What did I mess

5　up?

6　　　　　　PROBATION OFFICER HARTE:  Your Honor,

7　perhaps I misheard you, but I believe you said a

8　total offense level of 29.  I believe it is 27.

9　　　　　　THE COURT:  It is 27.  You are right,

10　27.

11　　　　　　THE INTERPRETER:  Your Honor, I

12　apologize.  The interpreter wasn't able to hear --

13　　　　　　THE COURT:  Ms. Harte, yes.  Ms. Harte

14　raised the issue that the Court had incorrectly

15　stated the total offense level.  It should be 27,

16　not 29.

17　　　　　　THE INTERPRETER:  Thank you, Your Honor.

18　　　　　　THE COURT:  And other than that

19　correction, is there any -- does counsel have any

20　objection to that calculation of the sentencing

21　guidelines or the resulting sentencing guideline

22　range?  Ms. Clark?

23　　　　　　MS. CLARK:  No, Your Honor.

24　　　　　　THE COURT:  Mr. Maxwell?

25　　　　　　MR. MAXWELL:  No, Your Honor.

1          THE COURT:  All right.  Mr. Maxwell,

2    before I proceed to sentence Mr. Acosta-Banda, I

3    would like to give you an opportunity to make any

4    statements you wish to make on his behalf, including

5    any argument in support of a downward departure or a

6    non-guideline sentence.

7          Mr. Acosta-Banda, you have the right to

8    make a statement today, sir.  You're not required to

9    say anything, but I would be interested in anything

10   you might wish to say.  When you and Mr. Maxwell are

11   finished, I will hear from Assistant U.S. Attorney

12   Clark.

13          Mr. Maxwell?

14          MR. MAXWELL:  Thank you, Your Honor.

15   Your Honor, as you know, I filed a sentencing memo,

16   so some of my remarks may be duplicative of

17   something I said in there.  For that I apologize,

18   but -- and also Mr. Acosta-Banda will make a brief

19   statement at the close of the proceedings.

20          Before I forget, however, I want to

21   point out to the Court that this man is -- his

22   family is in Southern California, and often -- the

23   reason I'm saying this now, oftentimes I overlook

24   this factor at the close of my sentencing remarks.

25   I know the Court cannot control where he serves his

 1   sentence; however, any recommendations that he serve

 2   his sentence somewhere in the District of California

 3   would be greatly appreciated by this defendant.

 4              He's been in custody at the Wyatt

 5   Detention Center since shortly after his arrest last

 6   year.  Needless to say, none of his family have been

 7   able to come out here to visit him.  He realizes

 8   that he is going to be sentenced to a period of

 9   incarceration following today's proceeding, and it

10   would be most I think beneficial to him if he could

11   be as close as possible to his wife who -- maybe his

12   ex-wife, but maybe not, they're going to reunite

13   perhaps after he finishes his sentence, and his four

14   children.

15              I have also taken the liberty of doing

16   research.  There are three facilities out there that

17   might fit the bill.  FCI Mendato in Mendato,

18   California, which is a medium-security facility; FCI

19   Victorville, in Victorville, California, which is a

20   medium facility; and FCI Terminal Island in San

21   Pedro, which is a low-security facility.  All of

22   these facilities appear to have the RDAP and other

23   substance abuse programs.  I do believe this

24   defendant will benefit from a very intensive

25   substance abuse program when incarcerated as well as

1  vocational programs.

2          With that said, Your Honor, and now that

3  I won't forget it at the end, I will start my

4  remarks.  First of all, I want to talk a little bit

5  about the offense conduct.  In the PSR the defendant

6  was described as forthcoming, engaged, and

7  appreciative of the PO's efforts.  I'm not seeing

8  that language often in PSRs, but having sat through

9  the very lengthy interview -- and it was lengthier

10  than normal because we had an interpreter present in

11  the room with us out at Wyatt -- I can honestly

12  believe I couldn't agree more.  In the many months I

13  have known this gentleman and the many interactions

14  I have had with him, he comes across as being just

15  that.

16          In the sentencing memo I have laid out

17  the defendant's version.  He agrees with the facts

18  as set forth in the PSI.  And I also disclosed

19  additional information that fills in more or less

20  his part of the story.  He certainly assisted with

21  his presence and with his text message

22  communications in the facilitation of this

23  transaction.  He was taking instructions from a

24  person he knew only as Gordo.  He's never met this

25  person -- this individual in person, wouldn't

1  recognize him if he saw him.  Another person who he

2  didn't know, quote, whose number was not in his

3  phone, and a third person referred to as Pariente,

4  who I identified in my sentencing memo.  Those were

5  the people that he was corresponding with.

6          He actually went to the facility at the

7  Home Depot at Gordo's instructions.  He had called

8  him the day before, said, "What are you doing

9  tomorrow?"

10          "It's supposed to be raining, I'm not

11  working."

12          "I want you to go pick up some money for

13  me."  And Mr. Acosta-Banda when he started out that

14  morning actually initially thought he was going to

15  be picking up money for unlawfully smuggled people,

16  which is obviously still criminal, but just a

17  different type of criminal behavior.

18          However, as I indicated in the memo, he

19  soon realized, no, this was a heroin deal and a drug

20  deal, but he nevertheless proceeded to go through

21  with it for reasons I will get into shortly.

22          Significantly, he didn't know any of the

23  individuals involved that day except for Mr.

24  Pariente, who apparently was some kind of distant

25  cousin to his wife.  He didn't know any of the

1   co-defendants here in this case, Mr. Mendez,

2   Zavala, Verdugo, or Gonzalez-Yanez.  In fact, while

3   in custody there was a rumor going around Wyatt

4   maybe he was a confidential informant because nobody

5   knew him, which of course he has dispelled because

6   he is not a confidential informant.

7         He had nothing to do with information

8   about a garage leased by some of these other

9   defendants.  He doesn't know Garcia-Hernandez.  He

10   didn't know how much money he was supposed to pick

11   up.  And as I explained in my memo, he came back to

12   the United States unlawfully, in about June or July

13   of 2019, following his removal -- he believes it was

14   a deportation.  I think it was more of a removal --

15   after he finished his federal sentence in June or

16   July of 2019, on some type of credit arrangement

17   with a fellow he met in Mexico.  And he didn't know

18   how much of that debt he still owed -- $8,700, he

19   had paid 1,300 -- would be reduced.

20         He had nothing to do with an earlier

21   test deal, apparently that occurred on January 29th

22   at the same Home Depot, but this time I think it was

23   a kilogram of fentanyl.  He had no role in setting

24   up that deal or this deal other than coordinating

25   and being there to get the money.  He had no

1  proprietary interest in the deal.  And he went

2  because he felt that he didn't want to get sent back

3  to Mexico.  He didn't really fear any physical harm.

4  I said, Did you actually think they might hurt you

5  if you didn't do it?  And he said, No, I was afraid

6  of being sent back to Mexico.

7           In his own mind he rationalized, well,

8  he was just picking up the money, he wasn't really

9  touching the drugs, and I think that helped him

10  rationalize his misconduct without ever thinking

11  that, Jesus, gee whiz, any sale of goods requires

12  two things, money and the goods, you pay the money,

13  you get the goods.  So that clearly picking up the

14  money he understands is just as bad as delivering

15  the drugs, just as significant as delivering the

16  drugs.

17           He never gave any thought, I don't

18  think, like many people, to the actual impact this

19  type of material has in this country, and in any

20  country where it's present on the streets.  And I

21  actually asked him.  I said, well, how would you

22  like it if your kids got addicted, or how would you

23  like it if you came home one day and one of your

24  kids -- your boys overdosed and was in the emergency

25  room fighting for his life.  And the reaction was,

**143**

1   naturally, he would be horrified at such a thing.

2           Now, I have suggested and indicated in

3   my sentencing memo, and the probation officer agrees

4   I think on one point, that that one day, February

5   10th, was his only involvement in the charged

6   conspiracy.  And I have also indicated in the

7   sentencing memo that this is his only time involved

8   with any type of illegal drug dealing.

9           Attorney Clark has suggested in her memo

10  that this claim does not seem credible, and I can

11  only respond to that with a few points.  There is no

12  evidence that he ever was involved in any other

13  activity that I'm aware of that the government has.

14  He has no drug-related criminal history.  The fact

15  that he had no prior involvement I think may have

16  been an attractive point for the people that said,

17  oh, listen, we'll get you back to the United States.

18  We'll take you on credit.  Well, you can go on

19  credit and you just pay us back.

20          Those individuals, who I assume were

21  part of the cartel and part of the organization that

22  was selling this stuff -- or transporting the stuff

23  from Mexico or the U.S., wanted somebody, no doubt,

24  without any involvement, because if you've never

25  been involved with drugs before the odds are you are

1  not going to be a confidential informant.  And if

2  you have never been involved with drugs before the

3  odds are you are not going to be involved with a

4  rival cartel that might double cross the people that

5  he was there to serve that day.

6           So another fact mitigating against it

7  was the time involved.  As I explained in detail how

8  this arrangement came about in my sentencing memo,

9  he's driving a truck somewhere in, I think, Tijuana

10 with California plates.  He gets approached, You are

11 from the United States?  He said, Well, I've been

12 deported, I can't go back.  He said, I don't have

13 the money.  One thing led to another and he makes

14 this arrangement to came back on credit.  That

15 happened in June or July -- I think July of 2019.

16 That doesn't give him very much time to get steeped

17 up in the drug trade.  He came back to the United

18 States.  He reunited with his family.  He started

19 working again as a granite repair person, and

20 continued on up until the date of his arrest.

21           And I'm not suggesting, Judge, that he's

22 innocent by any means.  He's guilty.  He admits and

23 accepts responsibility.  I'm just saying I believe

24 this is his first time involved in the drug business

25 as he has indicated to me that it, in fact, was.  He

**145**

1   did it because he didn't want to go back to Mexico.

2   He didn't really feel -- never gave it a thought

3   that he thought he would be in danger if he didn't

4   do it.  He participated as a means of paying off his

5   debt that he owed to get here.

6            And obviously his involvement

7   unwittingly began when he was recruited for this

8   return trip.  And I think his decision was based on

9   several factors.  In fact, the latest -- I asked him

10  yesterday, flat out yesterday, I said, Here you are,

11  you've served 320 days in a state jail and then

12  another nine-month federal sentence for being in the

13  country illegally, why did you come back?  I

14  suggested in the sentencing memo that he missed his

15  family and kids, and certainly he did.  And

16  yesterday he told me another thing.  I asked him

17  again, I said, Why did you come back?  He said, I've

18  lived in the United States for 20 years.  My whole

19  life is in the United States.

20           He's not lived here lawfully, but in his

21  mind that's why he felt the need and the necessity

22  of coming back.  Is it right?  No.  Is it lawful?

23  No.  But it's somewhat understandable from his

24  perspective.

25           He also -- you know, other factors, he

1   failed to consider who he might be dealing with.

2   You know, he knew something about the cartel given

3   what happened to his brothers.  Maybe in his mind --

4   maybe there was a degree of either reckless or

5   willful or even negligent blindness, but the biggest

6   mistake he made, in my opinion, and I'm a believer

7   in old sayings, and I believe one worthy old saying

8   is anything that's too good to be true usually is.

9   In this case I think this proposal looked, was, and

10  by every appearance was, too good to be true for

11  him.  Hey, boy, I get to go back over the border on

12  credit.  Anything that easy or that good doesn't

13  come without strings attached, and this came with

14  strings attached.

15          His role that day was to pick up the

16  money.  His role was to coordinate, pass messages,

17  relay messages at the direction of others.  And his

18  biggest role, Judge, was to act as a shield for the

19  decision-makers and movers and shakers of this

20  operation so that in the event there was a sting

21  operation and law enforcement sprung upon this

22  transaction and busted the transaction, people like

23  him would get arrest and taken into custody, like

24  his other fellow defendants that were at the parking

25  lot that day would get taken into custody, and not

1    the people that were organizing, shipping, selling

2    and making profit off of this.

3                His criminal history, Judge, is

4    problematical.  It's only a category III, but it

5    does show misconduct that is, I have suggested in my

6    memo, oftentimes caused by a rather significant

7    alcohol abuse problem that's been apparently growing

8    since the time he started drinking when he was 17.

9    Two offenses.  And, again, alcohol -- I'm not

10   suggesting that alcohol is in any way an excuse for

11   criminal misconduct.  It isn't.  In fact, in many

12   cases alcohol is an essential element of certain

13   types of criminal misconduct.  But alcohol almost

14   always goes with spousal abuse.  Okay?  Alcohol

15   never mixes with driving.  When you are convicted of

16   drunk driving you lose your license.

17               And looking at Mr. Acosta-Banda's rap

18   sheet, he had a domestic violence abuse for which he

19   got no points.  He had a DWI, for which he got no

20   points.  He had two operating under suspensions for

21   which he got, I think, one point each.  And those

22   suspensions were for operating under the influence.

23   He had the arrest for DWI and causing injury to a

24   minor.

25               I did the follow-up research with his

1    federal defender in California and learned that

2    there were actually two trials out there, both

3    ending in mistrials.  So eventually that charge --

4    there were apparently two defendants.  He was tried

5    twice and a mistrial both, which doesn't mean

6    acquittal, but eventually he pled guilty to

7    something other than that offense and got two points

8    for that, an assault, I believe, and a harassment

9    charge.  And, again, he suffered and incurred

10   another spousal abuse charge at some point that was

11   dropped and not prosecuted by the prosecutor.

12          So in speaking to him about his record,

13   yes, every time he's been arrested it's had

14   something to do with alcohol.  He started drinking,

15   he said, when he was 17, and I guess over the years

16   it got worse and worse.  It's clear and apparent to

17   me that when he drinks he turns into something he is

18   not.  When the probation officer asked how much do

19   you drink, well, it's hard to say, but I will give

20   you an example, and it's spelled out in the PSR and

21   my sentencing memo, apparently he and his cousin

22   drank about 64 liters of Tequila in a 30-day period,

23   plus beer.  Now, the cousin since died, likely from

24   liver failure.  But when he gets drunk he must turn

25   into something he isn't.

1        Look, this has been a long time with

2   COVID.  We got delayed because of my hip surgery.

3   I've had many conferences and conversations with

4   him, and if you meet him and talk to him, he comes

5   across as very polite, respectful, very

6   appreciative, very forthright.  If you talked to him

7   and didn't know his situation, you would think, hey,

8   he's a pretty decent guy.  But obviously alcohol

9   does something to him and makes him make really bad,

10  bad decisions.  And I'm not trying to rationalize

11  his arrest history and his conviction history or

12  justify it based on alcohol, I'm just saying that it

13  clearly was a significant factor.  And if he doesn't

14  get a handle on his alcohol abuse, it will be a

15  factor going forward.  Even in Wyatt he apparently

16  had some kind of fake alcohol or bootleg alcohol in

17  a small container in his cell.

18        But sitting here -- you know, if you

19  talk to him about it, he knows he has made bad

20  decisions.  Many of his bad decisions have been

21  while under the influence; many fights with his

22  wife, many arguments, many disagreements which his

23  children have seen.  And he hopes that his children

24  learn from his misconduct.

25        He also understands that after his

1    release from this sentence he's going to simply have

2    to eliminate alcohol from his life for two reasons.

3    One, to keep the respect of his children, because

4    right now they're sticking by him, but children only

5    have so much patience with someone that keeps going

6    back and making the same mistake over and over like

7    he has done in the past with alcohol, but also to

8    prevent himself from ending up like his cousin.

9    And, thirdly, he's going to be back in Mexico, and

10   I'm sure Mexico has plenty of laws related to

11   alcohol, such as drunk driving, spousal abuse, and

12   other activity.  So it's not going to be an excuse

13   for criminal conduct down there either.

14            So going forward he knows that it simply

15   cannot be in his life in any way, shape or form.

16   He's going to have to, I think, participate in a

17   significant and substantial program while in the

18   Bureau of Prisons custody to help him, because I

19   don't think he's ever been in such a program for

20   alcohol.  He's taken a DWI class following a DWI

21   conviction, but I don't think it took.

22            His history before -- his life history,

23   it's a little bit unusual, but I think it shows --

24   or demonstrates someone that his whole life he's

25   worked very hard to get by, survive, and support his

1 family, starting, you know, when he was 12 tending

2 goats at his mother's house, mother's farm, a very

3 rural area.  And I cannot pronounce the name of the

4 area, but it's a very rural area.  In fact, I tried

5 to pronounce it.  I was practicing before I stood

6 up, but I couldn't do it, Chihuahua, Mexico.  He

7 spent time living with his grandparents.  His mother

8 had a lot of children.

9            Ultimately, and I think this is

10 different than we see things around here, at the age

11 of 13 he moves by himself to Tijuana and he -- I was

12 talking to him yesterday about this.  He said that

13 was really the hardest time of his whole life, when

14 he first got to Tijuana.  He was living with others

15 in an abandoned building, doing whatever he could to

16 get by, earn money to eat.  And then, as described

17 in the PSR, he did other jobs.  He learned how to

18 run a fruit market.  He was taken in by this very

19 nice lady that provided a home for him so he could

20 work.  He then took up housing with a family that he

21 was driving their kids to school.

22            But, anyway, ultimately he meets his

23 wife, gets married, and then for two years goes to

24 San Francisco and works as a granite mason, learns

25 that trade, and comes back.  By this time he's

1    married.  He has his first son, and he and his wife

2    move and settle in Southern California.  There he is

3    for the next 20 years -- not 20, but 18 years until

4    now, working and raising his family.

5            In between there are apparently a lot of

6    removals and re-entries and removals and re-entries.

7    Whatever it is, he kept coming back, which clearly,

8    as I have suggested in the memo, on the one hand

9    certainly demonstrates a lack of respect for our

10   immigration laws, and there is no doubt that that

11   demonstrates a lack of respect, but it also -- his

12   side of the story is, well, my family was there and

13   this country is where I've lived for the last

14   20 years and worked, and it's almost like, what am I

15   supposed to do?  But you are not supposed to come

16   back, and that's the law.

17           And now following this conviction he's

18   going to go clearly -- he's not going to be removed,

19   he's going to be deported.  I don't know, I'm no

20   expert on immigration law, but I'm pretty sure this

21   is a deportable offense.  He's certainly not going

22   to contest his deportation.  So he's never going to

23   be able to come back.

24           His plan is to reside in Tijuana when

25   he's released.  His plan is to try and establish his

**153**

1  granite business in Tijuana.  But he believes also

2  by his living in Tijuana his children will be able

3  to travel easily to Tijuana to visit him and see

4  him.  It's like a 20-minute ride.  And he's hopeful

5  perhaps he can reunite with his wife.

6           I have suggested in my memo a sentence

7  significantly below the low end of the guideline

8  range of 44 months.  And, you know, sentencing is

9  certainly not an exact science.  It's hard to say.

10  I mean, obviously for someone like this gentleman we

11  have to consider the very seriousness of the

12  offense, and 5 kilograms of heroin is serious.  You

13  have to figure the deterrent effect and you have to

14  consider his prior record.

15           For this gentleman, his role in the

16  offense was -- well, it's not that of the lowliest

17  mule, but he certainly had no proprietary role.  He

18  was there to get the money, that's it.  He was there

19  to get the money -- or directed or told to go get

20  the money in exchange for his passage to the United

21  States.  How much he would have owed after this for

22  this passage had he not been arrested he has no

23  idea.  So what was in it for him was, in his mind,

24  only his ability to continue to stay here, which he

25  apparently seemed rather intent or even desperate to

1    do.

2              As I indicated earlier, the main reason

3    he was sent is so that the people running this

4    operation wouldn't end up like him and the others

5    who were arrested that day in the Home Depot parking

6    lot.  Was he the lowliest mule?  No, but he was not

7    -- certainly far, far, far from an organizer or

8    leader, and I think a tick below the minor role two

9    point adjustment that's reflected in the PSR.

10             I think a sentence of 44 months is --

11   48 months.  I said 44.  48 months.  It's a four-year

12   time away.  It's the longest sentence he's ever

13   served.  He is intimidated by what has occurred.  He

14   is fearful of the future and how long the Court may

15   sentence him today.  He is hopeful, obviously, for

16   the best, prepared for the worst, but I think in

17   fashioning a sentence for him his lower end role in

18   this conspiracy should be considered.

19             I think he has made enough -- he's made

20   certainly his share of mistakes in his life, but I

21   think on balance he's demonstrated that he's a

22   pretty hard worker, pretty devoted to his family,

23   and has strived his entire life to support and take

24   care of his family, and I would ask the Court to

25   give him credit for that as well.

1          With that said, I have completed my

2   remarks.

3          THE COURT:  Mr. Acosta-Banda, you said

4   he wished to speak.

5          MR. MAXWELL:  Yes, Your Honor.

6          THE COURT:  Go ahead.

7          THE DEFENDANT:  Before anything else I

8   want to say good morning.  The truth is, I am very

9   ashamed because of the situation I'm going through

10  now.  And I never thought that drugs could be so

11  harmful to society, to the community, especially

12  heroin.  And I believe that, since I have children,

13  I have four kids, I would feel terrible, I would

14  feel devastated if one of them -- or if they became

15  addicted.  And I've heard stories from many people,

16  people who become addicted and become overdosed,

17  it's terrible for them.

18          And I -- all my life I have always been

19  a person that has accepted my responsibilities.  I

20  mentioned that to my attorney.  And so here I am

21  ready and willing to accept full responsibility for

22  my actions and for whatever sentence is imposed.

23  And so at this point I just want to focus on the

24  future and provide a good education for my children.

25          That's all.

```
1              THE COURT:  All right.  Thank you very

2    much.

3              Ms. Clark?

4              MS. CLARK:  Thank you, Your Honor.  The

5    Court is familiar with the offense conduct here, so

6    I'm not going to rehash that.  I will note that

7    hopefully the Court can appreciate 5 kilograms of

8    heroin is a significant amount of narcotics, not

9    just for San Diego, but even more so here for

10   Connecticut where we just don't see those quantities

11   prepared to be trafficked into the state.

12             I can appreciate Mr. Acosta-Banda maybe

13   not realizing the impact that it has in our

14   community here in Connecticut, but I find it very

15   hard to believe that someone in his position, to

16   coordinate the delivery of 5 kilograms on behalf of

17   a drug cartel in a parking lot from Mexico, didn't

18   know that there was some value to what he was

19   delivering or that it wasn't going to have an impact

20   or was somehow not illegal to provide any mitigating

21   circumstances here in this particular case.

22             And here's how I look at the offense

23   conduct and this claim that Mr. Acosta-Banda -- that

24   this is his first and only time doing this.  He says

25   that he was in communication with three people, even
```

1  though he didn't know who any of them were, what

2  they did.  The text messages are very clear.  He is

3  the one indicating to another person that they're

4  waiting for five pieces.  This is right before the 5

5  kilos are delivered to the parking lot.

6             And I also have a very hard time with

7  this idea that Mr. Acosta-Banda is there to pick up

8  money.  What that tells me is that somebody in the

9  cartel trusted him enough to pick up $100,000, which

10 I think roughly is what 5 kilos would have cost in

11 San Diego.  100,000 at that point in time, trusted

12 him enough not to run with it, not to take a cut, to

13 deliver it subserviently to whoever at the cartel

14 was entitled to that $100,000 of drug proceeds.

15 That's significant, to ask the Court to find that he

16 really didn't know what he was doing when he was

17 given the trust of members of the cartel who were

18 ordering up these kilos for delivery to the CS.

19             That strikes me as evidence that he knew

20 a little bit more than he's even letting on now.

21 That's a significant amount of money to put into

22 somebody 's hands.  He is communicating in the text

23 messages to another person where to go, the Home

24 Depot parking lot.  And these communications begin

25 the night before.  So there is planning.  There's a

1   process.

2           Sure, maybe he thinks at the time

3   initially it was humans that he was smuggling into

4   the United States, which is just as unlawful, but I

5   think the use of the five pieces, it's coded

6   language, like what we see with other drug

7   traffickers who are not willing to talk openly about

8   what they are doing.  They know what is going on.

9   And so I have concerns about the extent to which Mr.

10  Acosta-Banda really was involved in this.

11          And that's separate and apart from this

12  agreement that two points should be reduced for his

13  role in this particular conspiracy.  Yes, he did not

14  actually touch the drugs, but he was in that parking

15  lot with a watchful eye making sure that every piece

16  went as planned.  He was on his cell phone the

17  entire time in the parking lot, according to the DEA

18  agents.  There were communications on the phone.  He

19  knew the key players.  It's very hard to find that

20  this is -- really, he's just another runner or

21  someone.  He has a management role in that he's

22  watching this happen, making sure it happens.  And

23  he's there to pick up $100,000 of drug proceeds.

24          I also think it's relevant the -- again,

25  very quickly, this idea of him as a recidivist of

1    deportation offenses and coming back into the United

2    States, my concern, my primary concern is there

3    appears to be an escalation.  It would be one thing

4    -- and, again, I'm not excusing it.  It would be one

5    thing if you come into the United States over and

6    over again because you want to see your family.

7    That's not what is happening here.  It would be

8    another if you are coming into the United States and

9    you are seeing your family and you are also

10   committing minor offenses, which is kind of how it

11   started out here for him.  There are DUIs.  There is

12   domestic abuse.  There is a DUI that almost kills a

13   child.  And after every single deportation Mr.

14   Acosta-Banda is coming back here.

15           The escalation is the current offense.

16   He's gone from driving under the influence to

17   domestic assault to then delivering 5 kilos of

18   heroin to a parking lot.  That just seems like such

19   an extreme escalation of conduct on deportation that

20   goes, again, to whether or not this really is just

21   the first time he's doing this.  And it also goes to

22   this concept of the conduct is escalating and there

23   has been no adequate deterrence up until now.

24           And I also want to briefly talk about

25   this idea that Mr. Acosta-Banda is claiming that

1    now, once he is released, he's going to stay put in

2    Mexico.  He is going to live in Tijuana.  His

3    children are going to come to him.  I find that very

4    hard to believe, given his history, that he's going

5    to lawfully remain a couple of miles from the U.S.

6    border, and now, after 17 deportations and all of

7    these offenses, agree to stay put.

8              Just because he's deported doesn't mean

9    he couldn't try to get back in.  He obviously knows

10   people who are able to make that happen.  He has

11   obviously taken advantage of that 16 or 17 times

12   before.  And even though he's been prosecuted here,

13   including federally, and including in offenses where

14   people's lives have almost ended, I'm talking about

15   that little boy who was hit in the DUI, despite all

16   of that, nothing has deterred Mr. Acosta-Banda from

17   coming back here and committing more offenses.

18             I look at the guideline range as

19   appropriate here.  I don't see a basis for any

20   downward departure.  He's already getting the two

21   point reduction for being a minor participant in

22   this conspiracy.  And the quantity, the 5 kilograms,

23   the guideline range I think is based off of 1

24   kilogram.  This is five times that amount.  I don't

25   see an additional basis for a downward departure in

1  that regard, and that's why the government is taking

2  the position that a guideline sentence here is

3  appropriate.

4          THE COURT:  Thank you, Ms. Clark.

5          Mr. Maxwell, anything further?

6          MR. MAXWELL:  No, Your Honor, but I did

7  want to clarify.  He only briefly that morning of

8  the 10th thought he was --

9          THE COURT:  Understood.

10          MR. MAXWELL:  -- picking -- I didn't

11  want you to think that he showed up at the parking

12  lot thinking "I thought I was getting people."  No,

13  that was not the case.  That wasn't what I intended

14  to convey.

15          THE COURT:  All right.  Thank you very

16  much.  All right.  I am ready now to turn to the

17  imposition of a sentence.

18          Mr. Acosta-Banda, I'm required to

19  consider a number of factors before deciding on a

20  sentence in your case.  They're set forth in a

21  statute 18 U.S.C. Section 3553, and they include:

22  Your background and characteristics; the nature and

23  circumstances of the crime; the various purposes of

24  a criminal sentence, punishment, deterrence,

25  rehabilitation and incapacitation; the sentencing

1     guidelines and the advice they give me about how to

2     sentence you; the need to avoid unwarranted sentence

3     disparities among defendants with similar records

4     who have been found guilty of similar conduct; the

5     need to provide restitution to any victims of the

6     offense, and so forth.

7              In short, I have to consider, sir,

8     everything I've had an opportunity to learn about

9     you, both positive and negative, and weigh that

10    information and determine a sentence that is fair,

11    just, and reasonable in your individual case, and

12    that is sufficient but not greater than necessary to

13    serve the purposes of sentencing.

14             So while I've taken into account all of

15    these factors, I would like to explain more

16    specifically how I have reached a decision as to the

17    appropriate sentence in your case.  And I recognize

18    I have the discretion to depart from the range

19    provided for by the sentencing guidelines on the

20    basis of circumstances not already factored into the

21    guidelines or to impose a sentence outside of the

22    guideline scheme, and I will come back to that

23    later.

24             But as for the various factors that I

25    have evaluated, I start with the nature and

```
 1   circumstances of the crime.  I think, as you
 2   yourself have recognized, and I think the government
 3   has certainly effectively pointed out, the nature of
 4   this crime is very serious.  Very serious quantities
 5   of drugs were involved here, and it's clear that you
 6   had some role in that.  Based on the communications
 7   you had a significant enough relationship and enough
 8   of a trust for you to play a role with moving
 9   significant amounts of drugs.  So that is certainly
10   very, very disconcerting.
11              I also, though, have to look not just at
12   the circumstances of the crime, but also at you and
13   your background and so forth.  And I have sort of
14   looked at the various things with respect to you,
15   but I also have to look at the issue about what is
16   effective punishment.  What is the appropriate
17   sentence that deters you from engaging in this
18   conduct again as well as sends a message to others
19   that this isn't conduct worth engaging in.
20              You know, in this particular case there
21   are particular challenges both -- less relating to
22   the underlying offense here in terms of the drugs,
23   but more in terms of serious questions about your
24   willingness to sort of understand, respect, and
25   comply with the law.  As Ms. Clark has pointed out,
```

**164**

```
 1    there have been numerous occasions, perhaps as many
 2    as 17, when you have been -- having left the
 3    country, but come back.  So there is some question
 4    about whether or not there is that respect for the
 5    law.
 6              Yes, I understand that there is family.
 7    Yes, I understand that there are circumstances that
 8    create issues.  But, as I think Ms. Clark
 9    appropriately pointed out, we're actually not here
10    simply because you came back into the country.
11    We're here because you came back into the country
12    and engaged in criminal acts that appear to be,
13    based on your criminal history, sort of escalating
14    in terms of the seriousness of them.
15              And although the particular incidents in
16    terms of the driving while intoxicated, which is
17    related to an issue that Mr. Maxwell did talk about,
18    about your long and rather tortured history of
19    alcohol abuse and how that then becomes a
20    precipitating event for you engaging in some of the
21    criminal acts, such as driving while intoxicated or
22    perhaps even the domestic violence incidents, that
23    inability to get oneself under control with respect
24    to that issue of alcohol -- and I don't know to what
25    extent that played a role in this event, although
```

1  it's clear having relationships or contacts with

2  people who have the means to be engaged in this kind

3  of criminal activity certainly played a much larger

4  role than alcohol could have played in the

5  underlying drug crimes with which you are facing

6  charges here.  So I've got to grapple with that

7  piece.

8            I also have got to look at the

9  sentencing guidelines.  The sentencing guidelines

10  talk about a range of 87 to 108.  I have decided --

11  well, it is a very significant sentence, and perhaps

12  warranted given the quantities of drugs involved

13  here and your involvement.  So the Court has to

14  really think about and struggle about that.

15            But the Court also has to look at this

16  question about the need to -- I'm sorry?  Is he

17  having trouble?  He can't hear?

18            MR. MAXWELL:  Apparently not, Your

19  Honor.

20            THE CLERK:  Carlos, one second.

21            THE COURT:  It's working now?  Okay.

22  All right.

23            One of the things I also have to look at

24  is this question of avoiding unwarranted sentence

25  disparities.  I know that there was another

1   defendant who was in the midst of this particular

2   conspiracy, Mr. Zavala, who I have also sentenced,

3   and his sentence was 45 months.

4            So I've had to sort of factor all of

5   that into how I should think about this particular

6   sentence and your particular role as well as your

7   particular criminal history.  I'm not suggesting

8   that the two of you are equivalent because I don't

9   think they are.  His criminal history was certainly

10  lesser than yours.  The nature of your involvement I

11  think certainly suggests more.  And then I think not

12  only just the criminal history itself, but some of

13  the other aspects that have been described here, and

14  certainly detailed by Ms. Clark, both in her

15  memorandum and in her remarks today, also reflect

16  differences between the two of you.  But that also

17  is something that factors into how I'm looking at

18  the question about a sentence here.

19           So I do want to say this, Mr.

20  Acosta-Banda, that I talk about with defendants all

21  of the time.  It's important for you to realize

22  whatever sentence I give, it really is preceded by

23  another sentence, the one you have given yourself in

24  your mind and perhaps in your soul.  There are no

25  bars visible in that prison, but it is a prison

1   nonetheless.  In that prison, one of the mind, for

2   whatever reason you did not believe that you could

3   have a better life, or at the very least you did not

4   believe it enough for you not to make wrong and

5   illegal choices.

6           And then once the mind does not believe

7   that a better life is possible, your soul too often

8   follows, that part of you that even when your mind

9   cannot conceive of a better life your soul says to

10  you your life would surely be worse if you violate

11  the law.

12          That seems to be the place that you are

13  in.  Perhaps it's affected by alcohol.  Perhaps it's

14  affected by love of family.  I'm not sure of all the

15  motivations, but for whatever reason your mind is in

16  a place where you are not appreciating enough the

17  consequences of your actions and not really seeing

18  that if you engage in illegal activities, even if

19  you are in Mexico and you want to see your family,

20  that's going to affect your ability to see your

21  family, if you engage in illegal acts that are going

22  to require you to be incarcerated for extended

23  periods of time.  It's not worth it.

24          I don't know, and there is not enough in

25  this record to know how deeply you are engaged with

```
 1   folks who are engaged in serious drug activities in
 2   Mexico.  There is enough of an indication to suggest
 3   that there is some relationship or sufficient
 4   relationship for you to be trusted in particular
 5   ways.  But you've got to think about those
 6   relationships.  However hard they may be to sever,
 7   they put you in jeopardy of losing time with your
 8   family.  They put you in jeopardy of being free.
 9           It's clear that you perhaps have some
10   trade and there are things you are able to do, but
11   you won't be able to do those if you continue to
12   have the relationships and continue to think a way
13   to have a better life can only come through
14   violating the law.
15           So there is a real question that you
16   have to grapple with.  Yes, I have to give a
17   sentence here, but the real question is what
18   sentence will you give yourself.  When will you free
19   your mind and your soul from the prison that you
20   have been in that places you before me now waiting
21   to find out how long you will have to spend in
22   federal custody.
23           You will have to take responsibility for
24   your own actions.  I can't do that.  I can't free
25   your mind and soul.
```

```
1                    Are you having trouble listening again?
2               MR. MAXWELL:  Oh, it's not working?
3               THE COURT:  Hang on.  Hang on.
4               MR. MAXWELL:  That's okay.
5               THE INTERPRETER:  Your Honor, the
6    interpreter asked the defendant if he couldn't hear
7    me to raise his hand, which he did.
8               THE COURT:  Okay.  Great.  Thank you,
9    Mr. Camacho.
10              All right.  So you have to sort of
11   wrestle with that.  And that really is the challenge
12   for you, and I would urge you to really think about
13   that.  And I'm not saying it's easy, but you've got
14   to think about it.  As long as you allow your mind
15   to be locked in a place where you cannot respect the
16   law or begin to recognize not respecting the law
17   puts all of your relationships in jeopardy, in
18   addition to your freedom -- because that's really
19   the real question you've got to decide.  You know,
20   any relationship is not going to last as long as you
21   are engaged in relationships that put you on the
22   pathway of criminal behavior.
23              So I am ready to pronounce your
24   sentence, sir.  I would ask you to stand.
25              For the reasons I've explained, and what
```

1   has not been explained directly is implied in all of

2   the various factors I have considered, I have

3   decided -- going back to this question about the

4   sentencing guidelines.  I have really struggled with

5   this particular question about whether the

6   sentencing guidelines are appropriate, but for a lot

7   of the things I have already talked about and

8   considered, I have decided to do a non-guideline

9   sentence, and I will issue a sentence of 70 months

10  term of imprisonment.

11          Your counsel has asked to refer you --

12  to recommend that the Bureau of Prisons assign you

13  to either one of three facilities in California.  I

14  think it was FCI Mendato, FCI Victorville, FCI

15  Terminal Island.  I will confirm the spelling of the

16  first one.

17          MR. MAXWELL:  Thank you, Your Honor.

18          THE COURT:  But I will make those

19  recommendations.

20          After your term of imprisonment, you

21  shall be placed on supervised release for a period

22  of three years.  As conditions of supervised

23  release, the mandatory conditions, I order the

24  following:  One, you shall not commit another

25  federal, state, or local offense;

1          Two, you shall not unlawfully possess a

2    controlled substance;

3          Condition No. 4, you shall refrain from

4    any unlawful use of a controlled substance and

5    submit to one drug test within 15 days of release on

6    supervised release and at least two periodic drug

7    tests thereafter;

8          No. 6, you shall pay the assessment

9    under 18 U.S.C. Section 3013;

10          And No. 8, you shall cooperate in the

11   collection of a DNA sample if authorized under the

12   DNA Analysis Backlog Elimination Act.

13          The standard conditions of supervised

14   release set forth in the policy statement at

15   Guideline 5D1.3(c) also shall apply.

16          And as further conditions of release:

17   If you are ordered deported from the United States,

18   you must remain outside the United States unless

19   legally authorized to re-enter.  If you re-enter the

20   United States, you must report to the nearest

21   probation office within 72 hours after your return;

22          Conditions -- and then you also -- No.

23   2, you must participate in a program recommended by

24   the probation office and approved by the Court --

25   well, if you don't end up being deported,

1    participate in a program for inpatient or outpatient

2    substance abuse treatment and testing.  You must

3    follow the rules and regulations of that program.

4    You will be supervised by probation.  You must pay

5    all or a portion of the costs associated with that

6    treatment.

7                  If you violate any these conditions

8    during your period of supervised release, meaning if

9    you are deported from this country and you come

10   back, you will be subject to sentencing for

11   additional time in prison of as much as two years.

12   So, in effect, you have a sentence of two years

13   hanging over your head during the period you are on

14   supervised release.  The consequences of a failure

15   to behave properly during supervised release are

16   extremely serious.  The Court would not hesitate to

17   sentence you to additional time in prison if you

18   violated the terms of supervised release.  Do you

19   understand that?

20                  THE DEFENDANT:  Yes.

21                  THE COURT:  All right.  And I want to

22   remind you possession of a firearm or ammunition by

23   a convicted felon is a felony offense.

24                  As for a fine, I'm not ordering you to

25   pay a fine or the cost of imprisonment because your

1  financial status is such you are unable to pay and

2  it's not likely you will be able to pay them.

3            And then I must order you to pay the

4  mandatory special assessment of $100.

5            Do either counsel know of any reason the

6  sentence I have described cannot legally be imposed

7  as the sentence of the Court?  Ms. Clark?

8            MS. CLARK:  No, Your Honor.

9            THE COURT:  Mr. Maxwell?

10           MR. MAXWELL:  No, Your Honor.

11           THE COURT:  Mr. Acosta-Banda, the

12  sentence I have set forth is hereby imposed as the

13  sentence in your case.  The judgment of the Court

14  will be prepared form my signature by the clerk's

15  office in consultation with the United States

16  Probation Office.  You have a right to appeal the

17  sentence I have just imposed.  If you wish to

18  appeal, you must file a written notice of appeal

19  within 14 days of the entry of this judgment.  Do

20  you understand that time limit, 14 days?

21           THE DEFENDANT:  Yes.

22           THE COURT:  All right.  I do want to

23  remind you that in your written plea agreement you

24  agreed to waive your right to appeal or to attack

25  your conviction and sentence if certain conditions

1   were satisfied.  Those conditions appear to have

2   been met, so it appears you have validly waived your

3   right to appeal or to attack your conviction and

4   sentence collaterally.

5           I'm advising you of your right to appeal

6   in the event you believe there is some fundamental

7   defect in these proceedings that has not been waived

8   by your plea agreement.  Do you understand that as

9   well?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And if you wish to appeal

12  but cannot afford to do so, you may apply for leave

13  to appeal in forma pauperis.  If that motion is

14  granted, the Court will waive the filing fee for

15  your appeal and appoint a lawyer to represent you at

16  no cost to you.  Do you understand that as well?

17          THE DEFENDANT:  Yes.

18          THE COURT:  All right.  Thank you.

19          All right.  Ms. Clark, I think -- were

20  there counts to be dismissed in the indictment?

21          MS. CLARK:  No specific counts, Your

22  Honor, but Mr. Acosta-Banda pled to the superseding

23  indictment.  So we would move to dismiss the

24  underlying indictment as to him.

25          THE COURT:  All right.  That motion is

46

1    granted.

2              MR. MAXWELL:  Thank you, Your Honor.

3              THE COURT:  All right.  Ms. Clark,

4    anything further from the United States?

5              MS. CLARK:  No, Your Honor.  Thank you.

6              THE COURT:  Mr. Maxwell, anything

7    further?

8              MR. MAXWELL:  No, Your Honor.

9              THE COURT:  All right.  Thank you all

10   very much.  We are adjourned.

11             And thank you, Mr. Camacho.

12             THE INTERPRETER:  You are welcome, Your

13   Honor.

14             (Proceeding concluded 11:16 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2          I certify that the foregoing is a correct

3   transcript from the record of proceedings in the

4   above-entitled matter.

5

6                              2/7/22

7                               Date

8

9                    /S/   Sharon Montini

10                     Official Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25